

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

WMP:JMK:DCP/JN　　　　　　　*271 Cadman Plaza East*
F.#2016R01428　　　　　　　　*Brooklyn, New York 11201*

February 3, 2017

By ECF

The Honorable Joan M. Azrack
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

　　　　　　Re:　　United States v. Tibor Klein, et al.
　　　　　　　　　　Criminal Docket No. 16-442 (JMA)

Dear Judge Azrack:

　　　　　Following oral argument before the Court on January 26, 2017, the government respectfully submits the following pretrial motion to provide notice that it may introduce certain of the defendant Robert Schulman's statements made under oath to the U.S. Securities and Exchange Commission ("SEC") (hereinafter "SEC Statements"), as well as certain statements made during a meeting with the U.S. Attorney's Office ("EDNY") (hereinafter "EDNY Statements").[1]　As discussed below, the defendant's prior SEC Statements and EDNY Statements are admissible as non-hearsay statements of a party opponent.　Trial in the above-captioned case is currently scheduled to begin on March 6, 2017.

---

　　　　　[1] The government also reserves the right to introduce additional statements as trial develops, including, but not limited to, as impeachment material in the event the defendant chooses to testify.

I.    Background[2]

        As part of the SEC's investigation into trading of King Pharmaceuticals, Inc. ("King") securities in connection with King's merger with Pfizer Inc. ("Pfizer"), the SEC deposed the defendant under oath on August 27, 2012.  See Robert Schulman SEC testimony, August 27, 2012 ("SEC Tr."), attached hereto as Exhibit A.  Nearly three years later, pursuant to its own investigation into the same conduct, the EDNY interviewed the defendant.  See Robert Schulman, Memorandum of Interview, May 19, 2015 ("Sch. MOI"), attached hereto as Exhibit B.[3]  The defendant did not request proffer protection with respect to this meeting.

II.   The Defendant's Prior SEC and EDNY Statements Are Admissible at Trial

        The government respectfully requests that it be permitted to introduce the below statements made by the defendant in its direct case at trial.   The below statements are relevant and probative with respect to the charged conduct.  The statements are therefore admissible as non-hearsay statements of a party opponent.

    A.    Applicable Law

        Pursuant to Rule 801(d)(2)(A) of the Federal Rules of Evidence ("Rule 801(d)(2)(A)"), a defendant's out-of-court statement is not hearsay when offered by the government.  Fed. R. Evid. 801(d)(2)(A) ("A statement is not hearsay if . . . [it] is offered against a party and is [] the party's own statement."); see also, e.g., United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) (Under Rule 801(d)(2)(A), a defendant's statements offered by the government are not hearsay because they are statements of the opposing party).

        A defendant, however, does not have a parallel ability to offer his or her own statements into evidence in an "attempt to get [his] side of the…story in front of the jury without himself testifying and opening himself to cross-examination."   United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004).   "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."  Id.; see also United States v. Yousef, 327 F.3d 56, 153 (2d Cir. 2003) (the defendant "could have testified to everything asserted in his statement, [but] he could not offer the document itself for the truth of the matter asserted").

        Furthermore, the government's presentation of only a portion of the defendant's prior statements does not make the defendant's other statements admissible.  As the Second Circuit made clear in United States v. Jackson, a defendant may not introduce other parts of the

_____

        [2] Given the extensive briefing in this case, the government assumes the Court's familiarity with the salient facts, and therefore, only provides background for purposes of the instant motion.

        [3] While the government does not attach the notes from the interview here, the notes were previously provided to the defendant in discovery.

same statement offered in part by the government unless the defendant makes a proper showing that the statements he seeks to introduce have a separate basis for admission. 180 F.3d 55, 73 (2d Cir. 1999) (rejecting claim under the completeness doctrine that part of a statement made by the defendant could be admitted because the statement followed an inculpatory admission and noting that "the portions of the tape proffered by [the defendant] consisted largely of [his] own self-serving statements, which, as offered by him, are inadmissible hearsay"); see also United States v. Mahaffy, No. 05-CR-613 (S-3) (ILG), 2007 WL 1094153, at *3-5 (E.D.N.Y. Apr. 10, 2007) (refusing to permit introduction of excerpts of defendant's prior statements because they were "otherwise inadmissible hearsay statements" that were "self-serving" and "exculpatory").

Federal Rule of Evidence 106 ("Rule 106") provides, in relevant part, that when a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it. The Second Circuit has found this rule applicable to oral statements as well. See United States v. Johnson, 507 F.3d 793, 796 n.2 (2d Cir. 2007). However, "Rule 106 does not render admissible evidence that is otherwise inadmissible." United States v. Terry, 702 F.2d 299, 314 (2d Cir. 1983). Rather, the statement specified by the adverse party is only required to be read or heard if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding of the admitted portion. Marin, 669 F.2d at 82-83. The burden rests with the defendant to demonstrate that the portions of the statement he seeks to offer are necessary to clarify or explain the portions the government intends to offer. United States v. Glover, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent.").

B.    SEC Statements

The defendant's prior testimony to the SEC, given under oath, is relevant non-hearsay and is admissible by the government at trial as statements of a party-opponent pursuant to Rule 801(d)(2)(A). Therefore, the government may introduce the below excerpts of the defendant's testimony into evidence at trial in its direct case.[4]  The government also seeks to preclude the defendant from introducing any of his self-serving statements at trial without being required to testify. The statements made by the defendant to the SEC regarding the same conduct at issue in this trial are relevant to show the defendant's knowledge regarding the King/Pfizer merger, the defendant's intent to commit the crimes charged, his knowledge regarding his investments and his relationship with Tibor Klein (his investment adviser and friend).

---

[4] The government is merely providing notice to the defendant with this motion that it may introduce the statements excerpted below. The government reserves the right not to introduce certain of the statements below at trial.

**Q: Other than that, you did not make specific investment choices over the life of the account at Klein?**

A: No. I mean, the only specific stock I can remember discussing with him was Enzo Biochem because that was a client that he sort of learned about because I worked for them, and he told me, at one point, that he had bought Enzo and I remember being a little upset at him because I think that the CEO is a certifiable lunatic, and when he bought that, I remember being a little upset, but I don't remember what happened with that. I think he sold it at some point after that.

**Q: How did he know that you were working for Enzo?**

A: He and I actually had a relationship where not just a strict broker, but I mean, he went to my daughter's wedding a couple weeks ago. He and his wife go out with me and my wife.

And the reason he would have probably known about Enzo is because Mr. Klein's offices are up in New York and Enzo is up in New York, so most likely, I was up there visiting Enzo and I had dinner with him that night. Oh, what are you doing in New York? Oh, I met Enzo today.

**Q: Did you tell him anything more about what you were doing for Enzo?**

A: At some point, I probably told him the CEO was certifiable. I'm sure I did. I mean, I was working on litigations for Enzo. I was doing a lot of the patent work, patent interferences for them, and they were just general conversations about oh, what's going on with them, what are you doing with them now?

**Q: And so did he indicate to you when he bought it or why he bought it?**

A: There was one, and I can't recall when, but there was one time when he did one of his visits with us where he told me he bought some, and that's when I said, you know, I'm not sure if that was such a good idea. And I never had a discussion with him after that.

**Q: Did he tell you or did you learn at any time why he bought it?**

A:  I asked him why he bought it and he basically just said he thought the price had gone down and it looked good, if my recollection is correct.  But that's the only individual stock I ever remember discussing with Mr. Klein.

(SEC Tr. at 26-28).

***

**Q:  So you've had a professional relationship with him for how many years now?**

A:  '99 to '12, so 12, 13 years.

**Q:  And the relationship is also personal now as well; is that correct?**

A: That's correct.

**Q:  And how did that come to be?**

A:  It just evolved over the years. I mean, he has a style where like he would – as I said, his offices are up in New York, but he would come down to Washington and come to our house, and it got to the point where he would stay overnight.  You know, my wife and he took walks.  You know, my daughter was married two weeks ago. He was at the wedding.  So I would just say it evolved.  It was probably not one day when it happened.

Plus, I was going up to New York a lot on business and he would always say oh, if you're coming up to New York, let's have dinner, things like that.

**Q:  And so how often do you speak with him now?**

A:  Now, I would say probably once a quarter.

**Q:  And how often do you see him face to face?**

A:  I know this year I've probably seen him twice because at the wedding two weeks ago and then before that he came down to our house, I think, sometimes during the spring just to go over the portfolio.

5

**Q:  What other sort of things do you do together socially besides going out to dinner when he's in your city or you're in his?**

A:  We've gone to baseball games together. So he's bought tickets for me to see like Met games up in New York.  So I've gone with him to baseball games.   But so that's pretty much been the context, is family events and like baseball games and dinners.

**Q:  Have you introduced him to any professional contacts of yours?**

A:  Do you mean professional contacts, do you mean like people in my firm or –

**Q:  Or anyone to help develop his business.**

A:  Yeah, we have friends that I've introduced him to and he's gotten some new accounts because of referrals that I've given.

**Q:  What about vice versa, has he introduced you to anyone for professional reasons?**

A:  He once had some friend who might have had some patent issues he put me in touch with, but nothing ever came of it.

(SEC Tr. at 30-32).

***

**Q:  Go ahead.**

A:  …I certainly had discussions with Mr. Klein about King. Remember when I told you with Enzo, he knew about that?

**Q:  Uh-huh**

A:  Well, with respect to King, a lot of the case took place in New York because King is located in northern New Jersey and I was up in New York quite a bit for depositions, so I have no doubt that Mr. Klein knew that I was working on the King litigation, that King was a client I was working for.

…I certainly did discuss King with Mr. Klein and that I was working for them.

(SEC Tr. at 48).

***

**Q:   And so what sort of work were you doing for King Pharmaceuticals?**

A:   I was working on the litigation against Purdue Pharma.

(SEC Tr. at 53-54).

***

**Q:   At some point, did you become aware of a potential acquisition or merger of King Pharma with Pfizer?**

A:   Yes.

**Q:   How did you learn of the potential merger?**

A:   There is an associate at my firm named David Kelly and he attended a meeting with a partner in my firm named Tom Slater and they went up to New York and I think – I think Mr. Klein, Chris Klein, was there also where King met with people from Pfizer who were never identified to me to talk about a possible deal….

**Q:   When did you – sorry.**

A:   I'm sorry.   And I knew that a deal was possible.

**Q:   And when did you learn of a possible deal between King Pharma and Pfizer?**

A:   … I don't remember.   I can only tell you it would be something very easy to verify because David Kelly went up to New York for that meeting and it was within a couple of days of that meeting that I would have had the phone conversation with him.   I think I spoke to him right after he got back from New York.

(SEC Tr. at 54-55).

***

7

**Q:   According to King, you knew about the deal on or about August 4, 2010.   Does that square with your recollection or help refresh your recollection?**

A:   Not really in the sense that my memory was that I heard about it fairly soon after David went to the meeting, after David Kelly went to the meeting.   So I would have actually thought I would have known about it a little bit before August 4.

I mean, I'm not saying that's not possible and you know how memories can be, but for some reason, I have it in my head that it was sooner than almost three-and-a-half weeks after David Kelly went to that meeting that I heard from him that there was such a meeting.

**Q:   And you believe that that meeting that Mr. Kelly went to was on or about July 12, 2010; is that –**

A:   Well, I guess I'm just deriving that from the fact that that's the date David puts down and that Mr. Slater puts down and they were the two people who went to the meeting.   So I'm taking it as a truth that the two of them put down the date – that that date, 7-12-2000 must be the date that they went to the meeting.   And I just had recollection in my head that I would have learned about it within days, not weeks, of David going to the meeting.

**Q:   When King Pharma put this chart together, did they ask you what specific date you knew of the potential merger or acquisition?**

A:   You know, they may have. I don't recall.

(SEC Tr. at 56-57).

***

**Q:   Did you tell anyone about any knowledge you had regarding a potential merger or acquisition of King Pharma?**

A:   No, I never told anybody.   The best I can think of that I did, and I've been trying to think about this, is there was one evening when Mr. Klein was at my house where I did mention…boy, it would be nice to be king for a day…

(SEC Tr. at 60).

***

**Q:   So then after August of 2010 or about August of 2010? I'm sorry, you're thinking that the meeting happened in July of 2010.**

A:   Yeah, it probably – I mean, let's assume the earliest I found out would have been the 12 if David told me the day he went to the meeting.   Let's say the latest is August 4….

**Q:   And why was he at your house?**

A:   Because he came typically every three or four months just to update us on our portfolio.

**Q:   So do you have any sort of record of when it was that he was at your house for that particular evening.**

A:   The best I can think of is when I was putting the documents together for you, I did see one e-mail that my wife sent him saying it was good to see you and it was some – I don't remember the specific date, but it was some point in the first half of August of 2010.

(SEC Tr. at 61).

***

**Q:   Could you describe your understanding of passing on non-public information, specifically regarding your clients?**

A:   Oh, I mean, as an attorney, I'm very well aware of the fact that, you know, I cannot pass on non-public information about my clients.

Being that I'm a patent attorney, in particular, it is routine for me to be told about new inventions and to file patent applications on them and it's extremely sensitive and so I'm quite aware of the fact that I have to be very careful with the confidences of my clients.

**Q:   What understanding, and now sort of a step further, do you have of making trades in the market based on non-public information?**

A: My understanding is that you can't make trades based on non-public information.

(SEC Tr. at 68).

***

**Q: Now, do you recognize also the phone number (516) 457-7522?**

A: Well, the 516 probably tells me that's probably Tibor's number because that's Long Island. I don't specifically remember the 457 number.

**Q: I think you testified earlier that his cell number was 457-7522.**

A: Okay, that sounds right.

**Q: And if you look at this call log, it appears that you placed a call on or about August 11, 2010 –**

A: I see that.

**Q: -- to Mr. Klein's cell. Do you know why you were calling on that date, on or about August 11?**

A: I have no specific recollection, but I do recall that Mr. Klein came down to visit us the following weekend, I think the weekend of the 13 and 14 period, so I suspect I was simply working out logistics of his coming down to visit. But I'm kind of guessing. I don't know.

**Q: Do you have any specific recollection of anything you said?**

A: I have no specific recollection.

(SEC Tr. at 84).

***

**Q: Now, based on your work and long experience as an attorney, you knew that if you gave information about a possible king merger with Pfizer, prior to the public announcement that would be an improper disclosure, true?**

10

A:   Absolutely.

(SEC Tr. at 89).

***

**Q:   So when David Kelly came back from this meeting that you've described –**

A: Yeah.

**Q:   -- can you talk about his communication with you following the meeting that he had?**

A:    Sure.   First of all, he actually works out of the Atlanta office, whereas, I work out of the Washington, D.C. office.   So he didn't actually come back.   He just called me.   And he just said oh, I was just up in New York.

(SEC Tr. at 91).

***

**Q:   Sorry. Okay, so Mr. Kelly is a litigator in Atlanta and you were describing to me that he called you up on the telephone because –**

A:   Correct.

**Q:   -- you're a litigator in Washington, D.C.?**

A:   Well, I'm more a prep and pros and counseling guy.   I'm more the patent nerd that helps the litigators.

**Q:   So he calls you, Mr. Kelly?**

A:   Yes.

**Q:   And about when was that?**

A:   It would have been, as I told you earlier, it would have been a day or two at most, after he was up in New York at that meeting between Pfizer and King.

**Q: Did you know who the meeting was taking place between? I mean, do you know who was involved in the meeting?**

A: Yes, I did know it was Pfizer and King.

**Q: Was there anyone else involved besides Pfizer and King?**

A: Not to my knowledge.

(SEC Tr. at 91-92).

In addition to the above statements, the government may also introduce the defendant's statements during his SEC testimony regarding the phone numbers he identified for himself and Klein. See e.g., SEC Tr. at 15-18. The government also seeks to introduce the background questionnaire that the defendant filled out and testified about in front of the SEC.[5] See Schulman Background Questionnaire, SEC Exhibit 26, attached hereto as Exhibit C. Because the questionnaire includes statements of the defendant, it is similarly admissible under Rule 801(d)(2)(A) as a statement of a party opponent.

C.    EDNY Statements

The defendant's prior statements to the EDNY are similarly relevant non-hearsay and are admissible at trial pursuant to Rule 801(d)(2)(A). The government hereby provides notice that it may introduce the defendant's statements, summarized below, at trial in its direct case.

- Schulman was asked to discuss the point at which he learned about the potential merger of Pfizer and King. Schulman stated that he first learned of this when he received a telephone call from Dave Kelly, but is not sure when the call took place. Schulman explained that Kelly and Tom Slater had traveled to NYC to attend a meeting at which patent attorneys for Pfizer and King were present. Sometime shortly after this meeting—Schulman estimated within a few weeks of the meeting—Kelly called him to say that the meeting had taken place. (Sch. MOI at 3.)

- With regard to Schulman's knowledge that Pfizer and King were discussing either a full merger or partial sale, he admitted that he possessed this information before he met with Tibor Klein at his residence in August 2010. (Sch. MOI at 4.)

---

[5] The government will endeavor to reach a stipulated agreement with defense counsel in advance of trial regarding the admissibility of certain telephone records and the account holders for those telephone records.

- Schulman was asked whether he followed up on the status of the Pfizer/King negotiations after speaking with Kelly about it in 2010. Schulman said that he did not but recalled that Kelly did tell him to keep this information confidential. Schulman affirmed that this directive gave him reason to believe that a merger was possible. (Sch. MOI at 4.)

- When asked why Kelly called him to report this meeting, Schulman said that the two of them were close and that Kelly called him "as a friend" to report what had happened. (Sch. MOI at 4.)

- With regard to his relationship with Kelly, Schulman said that he hired Kelly in 2003 to work in Hunton and William's ("H&W") office in Washington D.C. and that the two of them became friends. Kelly transferred to H&W's Atlanta office in or about 2007-2008. In 2010, Schulman said that he and Kelly were still friends who occasionally had personal conversations. (Sch. MOI at 4.)

- Schulman was asked to describe his historical relationship with Tibor Klein. Schulman stated that in or around 2000-2001, Klein replaced Michael Montefusco as his financial advisor when he assumed responsibility for Schulman's entire portfolio. Although Schulman never met with Montefusco in person, his relationship with Klein developed rather quickly into a friendship which involved numerous face-to-face meetings in New York and Virginia. (Sch. MOI at 4.)

- In fact, Schulman stated that Klein typically stayed overnight at his home whenever Klein was in town to discuss his portfolio. Schulman described Klein as a close friend during those years. (Sch. MOI at 5.)

- When asked to assess the performance of his portfolio, managed by Klein, Schulman said that he and his wife were generally pleased with the results although they were disappointed because Klein was "too bearish" in the years following the 2008 market collapse (2009-2010). (Sch. MOI at 5.)

- Document Shown – Bates: Schulman 72 – After reviewing the document, SCHULMAN stated that he and his wife share the email account in question. SCHULMAN further stated that he does not recall this particular email but agreed that it is likely that Klein visited his home during the weekend beginning on August 13, 2010. (Sch. MOI at 5.)

- Schulman was asked to identify the owner of the "carrot4jam" email address. He said that it is used by Drew and Jane Mullen. Schulman described the Mullens as personal friends to whom they introduced Klein. Schulman said that the Mullens invested through Klein for a short period. (Sch. MOI at 5.)

- Schulman said that he recalls sitting at his kitchen table with his wife and Klein when he uttered a phrase…"Hey, I'd like to be King for a day." (Sch. MOI at 6.)

- When asked to describe the conversation that preceded Schulman making this statement, he said that he does not remember the context of the conversation. When asked whether Klein knew, at that time, that Schulman had been doing legal work for King, Schulman replied, "Yes." (Sch. MOI at 6.)

- When asked whether his use of the word, "King," was a direct reference to King Pharmaceutical, Schulman again said, "Yes." (Sch. MOI at 6.)

- Schulman was then asked about his prior purchase of Enzo stock. Schulman stated that Klein did cause him to purchase shares of Enzo, a client of H&W at the time. Schulman said that as soon as he learned of this purchase, he reprimanded Klein because he felt that it was improper for him to own said shares given his involvement with Enzo. (Sch. MOI at 7-8.)

III.  Conclusion

For the foregoing reasons, the government respectfully requests that the Court grant the government's motion.


                                        Respectfully submitted,

                                        ROBERT L. CAPERS
                                        United States Attorney

                            By:      ___/s/_____
                                        Julia Nestor
                                        David C. Pitluck
                                        Assistant U.S. Attorneys
                                        718-254-6297/6108


Enclosures (by email and hand delivery)

cc:  All Defense Counsel (by ECF)