LONDON & MEAD
ATTORNEYS AT LAW

1225 19TH STREET, N.W.                              TELEPHONE (202) 331-3334 Ex. 202
SUITE 320                                           TELEFAX (202) 785-4280
WASHINGTON, DC 20036                                CMEAD@LONDONANDMEAD.COM

February 9, 2017

By ECF

The Honorable Joan M. Azrack
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

           Re:     *United States v. Tibor Klein, et al.*, Criminal Docket No. 16-442 (JMA)

Dear Judge Azrack:

      We submit this response to the government's letter of February 3 designating testimony and statements made by our client, Robert Schulman, that the government may introduce in its case-in-chief. ("Govt Motion" Dkt. 61). We agree that, if relevant and not presented in a misleading or prejudicial manner, the government may introduce Schulman's testimony before the SEC and his interview with the EDNY as statements made by a party opponent.

## I.    APPLICABLE LAW—THE "RULE OF COMPLETENESS"

      FRE 106 embodies the "rule of completeness." It provides:

> If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time.

      As the Second Circuit has explained:

> even though a statement may be hearsay, an "omitted portion of [the] statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion."

*United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (alteration in original) (quoting *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987)).

      The government provides parenthetical citations to two cases, *United States v. Jackson*, 180 F.3d 55 (2d Cir. 199), and *United States v. Mahaffy*, No. 05-CR-613, 2007 WL 1094153

(E.D.N.Y. Apr. 10, 2007), to suggest that exculpatory statements are not admissible under the rule of completeness. Govt Motion 3. The government then "seeks to preclude [Mr. Schulman] from introducing *any* of his self-serving statements at trial without being required to testify." Govt. Motion 3 (emphasis added).

But that is simply not the law. In *Jackson*, the statements proffered by the defendant had "little probative value" in relation to the statements offered by the government. 180 F.3d at 73. Likewise, in *Mahaffy*, the statements proffered by the defendant were "not necessary to rebut inferences offered by the Government," or "to avoid jury confusion," or "to complete the story" being told, and they also raised *Bruton* problems. In each case, the statements offered by the defendants were *merely* self-serving, and that is why the rule of completeness did not apply.

Whether Schulman's exculpatory statements were true or "self-serving" is an issue for the jury, not the government, to decide. Contrary to the government's request for a blanket exclusion of Schulman's supposedly "self-serving" statements, Govt Motion at 3, the "doctrine of completeness *applies to a defendant's exculpatory statements* where their exclusion would unfairly distort the meaning of the declarant's non-hearsay statements that are in evidence." *United States v. Walia*, No. 14-CR-213, 2014 WL 3734522, at *8 (E.D.N.Y. July 25, 2014) (emphasis added). Under *Mahaffy*, which the government relies on, "[w]hen the government seeks to introduce inculpatory admissions by a defendant, it must also admit any exculpatory remarks that are 'part and parcel' of the same statement." 2007 WL 1094153, at *2. Moreover, the rule of completeness is violated when "admission of the statement in redacted form distorts its meaning or *excludes information substantially exculpatory of the declarant*." *United States v. James*, No. 02-CR-0778, 2007 WL 1579977, at *1 (E.D.N.Y. May 31, 2007) (emphasis added). For example, in *Walia*, a drug trafficking case, the court held that "to the extent the government is seeking to introduce statements made by Defendant to law enforcement admitting his involvement in, or knowledge of, drug trafficking, Defendant's statements to law enforcement during the same interview denying any knowledge and involvement in drug trafficking are admissible." *Id.* at *8.

The Court should reject the government's request to unfairly cherry-pick from Schulman's SEC testimony or his interview with the EDNY.

## II. DEFENDANT'S ADDITIONAL DESIGNATIONS UNDER FRE 106.

Rob Schulman told the SEC and the EDNY the same thing—that over dinner and wine with Tibor Klein, he said something stupid to the effect of "I'd like to be King for a day." When Schulman testified before the SEC and interviewed with the EDNY, he put those statements in context, explaining that he did not intend that Klein trade, and that he did not learn until months later that Klein had done so. Schulman added further context by explaining that did not work on the merger between Pfizer and King, knew no details about the negotiations leading to the merger, and knew only that the two companies were talking in July or August 2010.

Because Pfizer actually went forward with the acquisition of King two months after Schulman made his blurt, the government's selective references to Schulman's knowledge of a potential merger creates a misleading impression that Schulman knew more than he did. Likewise, the government's isolated reference to Schulman's blurt gives a misleading impression as to his intent. In the most telling example of the government's attempt to prevent the jury from understanding the full context of Schulman's statements, the government proposes an *ellipsis in the middle of a Schulman answer* to a question, in which he explains the "King for a day" blurt. Govt Motion, Dkt. 61 at 8, excerpting SEC Tr. At 60. An answer that goes to the heart of this case cannot be misleadingly truncated.

Based on the government's designations, Schulman is entitled to introduce additional statements because they are "necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Johnson, supra,* 507 F.3d at 796.

Defendant designates the following statements as necessary under FRE 106 and the rule of completeness by subject matter.

**TOPIC A:    THE FULL CONTEXT OF THE "KING FOR A DAY" BLURT.**

The government's designations truncate Schulman's description of his "King for a day" blurt to its words only—removing all relevant context. And both times the government references the blurt, it deletes portions of Schulman's answers with ellipses. Govt Motion, Dkt. 61, at 8, excerpting SEC Tr. at 60; Govt Motion, Dkt. 61, at 14, excerpting Sch. MOI at 6.

**SCHULMAN COUNTER-DESIGNATION 1:**

Schulman requests that the government's designation beginning on page 60 of his SEC transcript be read in its entirety. The full text appears below. The portions that that the government designated are in bold:

> **Q: Did you tell anyone about any knowledge you had regarding a potential merger or acquisition of King Pharma?**
>
> **A: No, I never told anybody. The best I can think of that I did, and I've been trying to think about this, is there was one evening when Mr. Klein was at my house where I did mention**, and I kind of made a joke with him, **boy, it would be nice to be king for a day**, and I made some joke with him about that.
>
> And I'll be honest with you, I think I'd been drinking quite a bit of wine that night and I made some kind of oblique reference to that and that would really be the sum total of everything I could have told anybody.

3

> And, at that point, I would have never told him anything about their meeting, there's a potential merger, it would have been much more of in the nature of hey, wouldn't it be great to be a king for a day, ha, ha, ha, kind of like telling him – like acting like I'm a big shot and I know this thing, but that's the extent of what I would have communicated to him.

SEC Tr. page 60:1-23. That entire portion is also necessary to complete the context of Schulman's interview with the EDNY, because in that interview, the government asked Schulman to confirm that testimony on page 60 of the SEC transcript was true, which he did. Gov't Motion, Ex. B at 6.

**SCHULMAN COUNTER-DESIGNATION 2:**

Two pages later in his SEC testimony, Schulman provided more context about his "King for a day blurt." Schulman requests that his continued testimony be admitted to complete his answers and provide full context:

> Q. And when you said what you did—
>
> A. Uh-huh.
>
> Q. –what did you mean by that?
>
> A. I don't think I really meant anything other than ha, ha, ha, I'm a big shot and I know this, you know, boy, wouldn't it be good to be king for a day as if I had some information.
>
> Q: Information about what?
>
> A: Oh, that I knew something about King. But I never went beyond that.
>
> Q: You know, I'm just trying to understand this as well, Mr. Schulman.
>
> A: Yeah, no, I understand.
>
> Q: And so where did this joke, where did that come from? I mean, were you talking about your litigation or, you know, how did it come about that you uttered – you may have uttered this line? And again, I understand it was under the influence of alcohol.
>
> A: It was, yeah. I do not remember what we were talking about or how it came up. I just remember it came up towards the end of the night and I made that joke.

>Q: And did anyone respond?
>
>A: No.
>
>Q: Did they laugh?
>
>A: I think he kind of smiled. And my wife, my wife was there, too, and she had no recollection of even that joke.
>
>Q: And how is it that you remembered it?
>
>A: Because it was one of those stupid things you say when you're drink that you – you're just like why did I say that because like why was I trying to act like such a big shot.
>
>Q: But did you say anything more about it?
>
>A: No.

SEC TR. page 62:4-63:14.

**SCHULMAN COUNTER-DESIGNATION 3:**

The government also truncates the statements Schulmade during his government interview about the "King for a day" blurt. Schulman asks that the relevant portion of the interview mem be read in its entirety. The full text appears below. The portions that the government designated are in bold:

>SCHULMAN was asked to discuss his recollections of the weekend beginning 8/13/10. SCHULMAN stated that Klein's visit was not long after his father-in-law passed away and that some of the business they conducted that weekend related to his father-in-law's estate. With regard to his consumption of alcohol that weekend, SCHULMAN said that he drank some wine but did not exceed his limit of ½ bottle.
>
>**SCHULMAN said he recalls sitting at his kitchen table with his wife and Klein when he uttered a phrase** that he described as "the statement that changed my life." When asked to repeat the statement, SCHULMAN said, **"Hey, I'd like to be King for a day."**
>
>SCHULMAN said that he made this statement to Klein after having consumed some wine. SCHULMAN described his condition at the time as "light-headed."

When asked to describe Klein's response to this statement, SCHULMAN said that he had none.

**When asked to describe the conversation that preceded SCHULMAN making this statement, he said that he does not remember the context of the conversation. When asked whether Klein knew, at that time, that SCHULMAN had been doing legal work for King, SCHULMAN replied, "Yes."**

**When asked whether his use of the word, "King" was a direct reference to King Pharmaceutical, SCHULMAN again said, "Yes."**

Portions of Page 60 of SCHULMAN'S SEC deposition transcript were read aloud and he affirmed that the statements attributed to him are accurate.
SCHULMAN was asked to explain why the government should not construe his actions as providing inside information – in the form of a tip to Klein; also as being improper. SCHULMAN's attorney interceded and made a statement on his behalf at this point.

SCHULMAN was then asked to describe his actions, if any, as soon as he felt that he was sober following the meeting with Klein at his residence on or about 8/13/10. SCHULMAN stated that he did not say anything to Klein, nor did he take any actions, because he didn't believe that what he told Klein was "actionable."

SCHULMAN stated that at no time did he ever tell Klein that a Pfizer/King merger was possible nor did he ever say that a meeting had taken place between the two companies. In fact, SCHULMAN added, he never mentioned Pfizer to Klein at all.

With regard to SCHULMAN'S subsequent ownership and sale of King stock. SCHULMAN said that he never knew that Klein had executed the transactions until the SEC inquiry began. Additionally, SCHULMAN stated that he never knew that Klein had caused some of his other clients to purchase King stock as well.

Schulman MOI at 6.

### **SCHULMAN ADDITIONAL COUNTER-DESIGNATIONS RELATED TO THE BLURT.**

Schulman also requests that the following statements be admitted to complete his testimony about the "King for a day" blurt" and to put it in context.

**SCHULMAN COUNTER-DESIGNATION 4:**

The interview memo noted that toward the end of the interview, Schulman's counsel "asked SCHULMAN to respond to several of his questions and SCHULMAN made the following remark. SCHULMAN stated that he had no idea that Klein acted on the statement he made in August 2010 while drunk." Sch. MOI at 7. Schulman designates that portion of the interview memo and intends to elicit on cross of Postal Agent Richard Cinnano several statements in response to defense counsel's questions that Agent Cinnano did not record in his memo: 1) that Schulman did not intend that Klein trade in King stock based on the blurt about "King for a day;" 2) that because of his financial good fortune, Schulman had no motive to risk his career to provide MNPI to Klein; and 3) that Schulman frequently received MNPI related to the financial affairs of corporate clients, and did not trade on that information.

**TOPIC B:** **WHAT SCHULMAN ACTUALLY KNEW ABOUT THE KING/PFIZER NEGOTATIONS THAT LED TO THE MERGER ANNOUNCEMENT ON 10/12/10.**

The government has designated substantial portions of Schulman's SEC testimony and government interview related to his knowledge about the King/Pfizer "merger." There was no "merger" agreed between King and Pfizer when Schulman made his blurt to Klein during the weekend of August 13-14, 2010. Pfizer eventually announced the merger two months later, on October 12, 2010. The government's designations repeatedly refer to questions about knowledge of a "merger" to create a misleading impression about what Schulman actually knew. Govt Motion, Dkt. 61, at 7, excerpting SEC Tr. at 54-5; Govt Motion at 8, excerpting SEC Tr. at 56-7; Govt Motion at 8, excerpting SEC Tr. at 60; Govt Motion at 10-11, excerpting SEC Tr. at 89; Govt Motion at 12, excerpting Sch. MOI at 3; Govt Motion at 12, excerpting Sch. MOI at 4; Govt Motion at 13, excerpting Sch. MOI at 3.

Schulman repeatedly told the SEC and the EDNY *the limits* of what he knew about any potential merger between Pfizer and King. Those additional statements are necessary to complete Schulman's statements and avoid creating the misleading impression that Schulman knew more than he actually did.

**SCHULMAN COUNTER-DESIGNATION 5:**

The government designates a portion from pages 54-5 of Schulman's SEC testimony. The government's designation contains two ellipses. Schulman requests that the entire excerpt of his SEC testimony be admitted through the beginning of page 56 of the transcript. The portions that the government designated appear in bold.

> **Q: At some point, did you become aware of a potential acquisition or merger of King Pharma with Pfizer.**

**A: Yes.**

**Q: How did you learn of the potential merger?**

**A: There is an associate at my firm named David Kelly and he attended a meeting with a partner in my firm name Tom Slater and they went up to New York and I think – I think Mr. Klein, Chris Klein, was there also where King met with people from Pfizer who were never identified to me to talk about a possible deal.** That's pretty much the extent I know.

I did not know the deal was imminent, I did not know was if it a deal simply to take over this particular case, this particular technology or was it a much larger deal than that. I really did not have a sense of that. I knew they were talking to each other.

**Q: When did you – sorry.**

**A: I'm sorry. And I knew that a deal was possible.**

**Q. And when did you learn of a possible deal between King Pharma and Pfizer?**

A. Oh, Lord. And I knew you were going to ask that. **I don't remember. I can only tell you it would be something very easy to verify because David Kelly went up to New York for that meeting and it was within a couple of days of that meeting that I would have had the phone conversation with him. I think I spoke to him right after he got back from New York.**

Q. Did you work on any aspect of that deal?

A. No, I did not.

Q. None of the due diligence, none of the—

A. No.

**SCHULMAN COUNTER-DESIGNATION 6:**

Schulman requests admission of the following excerpt from his SEC testimony necessary to complete his statements about what he knew of the King/Pfizer negotiations and to put his statements in context:

Q: And what specifically did you learn about the merger or acquisition?

> A: I think I've pretty much told you everything. What did I know? I knew they met. I knew a merger or acquisition was possible. But what I didn't know was was this the first get acquainted meeting, was this we're going to have a signing ceremony tomorrow meeting, and what I didn't know was was it merger and acquisition or was it just obtaining this particular technology because having worked in intellectual property for 30 years, I've seen every permutation and variation where sometimes they're just interested in one particular division, sometimes they're just interested in one particular patent or technology, other times they want the whole enchilada.
>
> And so what I did not have a sense of is whether they were just looking at acquiring this particular King technology, in which case, it made sense that our people were up in New York because, normally, when you're doing something like that, they want to talk to the patent attorneys because Pfizer would have wanted to know hey, what do you think of case, you know, if we're going to acquire this technology, we want to know what the litigators think about the chances of the case.
>
> So I knew they met. I knew there was a realm of possibility, there was sort of a spectrum from just discussing this one technology. If I was to go to two extremes, I would have said, in my own mind, just discussing this particular technology and at a very early phase on one extreme to the whole enchilada, taking over the whole company and we're going to have a signing ceremony tomorrow.
>
> And I had no idea at the time in that entire continuum because, frankly, I worked in this field and seen more than my fair share of these deals fall through, including one I did for GE about four weeks ago fall through. I know that until the dotted line is signed on these things, no one really knows what's going to happen.
>
> Q: At some point, did you know that it was something more than a preliminary discussion?
>
> A: I never heard any more information from anybody at my firm. I don't think I knew it until it was a fait accompli.

SEC Tr. page 57:25-59:18.

**SCHULMAN COUNTER-DESIGNATION 7:**

The government's designation at 91-2 of the SEC transcript stopped before a portion of testimony where Schulman provided the full context of what he understood from a call with his Hunton colleague David Kelly about a meeting between Pfizer and King. Govt Motion at 11-12.

Schulman designates his continuing testimony on pages 92-3 providing that context. The government's designation appears in bold:

> **Q: Sorry. Okay, so Mr. Kelly is a litigator in Atlanta and you were describing to me that he called you up on the telephone because –**
>
> **A: Correct.**
>
> **Q: -- you're a litigator in Washington, D.C.?**
>
> **A: Well, I'm more a prep and pros and counseling guy. I'm more the patent nerd that helps the litigators.**
>
> **Q: So he calls you, Mr. Kelly?**
> **A: Yes.**
>
> **Q: And about when was that?**
>
> **A: It would have been, as I told you earlier, it would have been a day or two at most, after he was up in New York at that meeting between Pfizer and King.**
>
> **Q: Did you know who the meeting was taking place between? I mean, do you know who was involved in the meeting?**
>
> **A: Yes, I did know it was Pfizer and King.**
>
> **Q: Was there anyone else involved besides Pfizer and King?**
>
> **A: Not to my knowledge.**
>
> Q: And what did you understand the purpose of the meeting to be?
>
> A: To discuss, as I said earlier, I knew – the one fact I knew is they were interested in the technology that was subject of the litigation, and I knew that because that's why David had to be up there to answer questions about the litigation. So I knew for certain that they were interested in that particular technology of King's.
>
> Beyond that, I did not – did I know that an acquisition was in that spectrum of possibilities? I definitely knew that. But again, I did not know if it was just that technology versus the whole enchilada and I didn't know were they at the early

stages, were they at the later stages. Because I've seen patent diligences where the patent come in in the beginning and I've seen – some people people's philosophy is the patents can kill it, so let's do it at the beginning and some people's philosophy is the patents can kill it, so let's do it at the end.

Q: So what was Hunton & Williams' role at that meeting?

A: Well, I wasn't at the meeting and David didn't go into any detail beyond just a couple of those statements, so I'm not really sure, but I'm assuming it was because Pfizer wanted to hear from King's counsel what Hunton & Williams' assessment was of the merits of the case.

SEC Tr. pages 91:20-93:21.

**SCHULMAN COUNTER-DESIGNATION 8:**

By designating just the portions of the SEC transcript that describe lawyers from Schulman's firm, Hunton & Williams, meeting with Pfizer attorneys several months before the King/Pfizer merger, the government's designations create the inaccurate impression that Hunton & Williams was working on the merger itself., and thereby had far more information about the merger than it actually did. Govt Motion at 8, 11-12. Schulman designates the following portion of the SEC transcript to provide the accurate context that Hunton & Williams was not deal counsel for King—Covington & Burling was:

Q: Do you know if Hunton & Williams was involved in any capacity in the actual merger/acquisition that took place in October of that year?

A: To my knowledge, they were completely not involved in it. I think it was Covington & Burling because I remember getting some communications from Erika Rodriquez in response to in inquiries from Covington & Burling. But I'm not 100 percent sure about that.

Q: Do you know if any of your corporate partners were working on this?

A: To my knowledge, no, it was Covington & Burling.

SEC Tr. page 94:12-25.

**SCHULMAN COUNTER-DESIGNATION 9:**

The government has designated several paragraphs from the interview memo where Shulman stated that his Hunton colleague, David Kelly, had told Schulman about a meeting where Pfizer counsel were asking King's patent litigation counsel questions about recent

litigation. Again, those portions contain references to leading questions about Schulman's knowledge of a "merger" that create a misleading impression. Govt Motion at 12-13. The government's designations give an incomplete picture of what Schulman said he actually knew. To complete his statements and correct that misleading impression, Schulman designates the following paragraphs from the interview memo related to his actual knowledge of the King/Pfizer meeting. The portions from the interview memo designated by the government appear in bold:

> **Schulman was asked to discuss the point at which he learned about the potential merger of Pfizer and King. Schulman stated that he first learned of this when he received a telephone call from Dave Kelly, but is not sure when the call took place. Schulman explained that Kelly and Tom Slater had traveled to NYC to attend a meeting at which patent attorneys for Pfizer and King were present. Sometime shortly after this meeting—Schulman estimated within a few weeks of the meeting—Kelly called him to say that the meeting had taken place.**
>
> . . .
>
> With regard to the meeting between Pfizer and King that Kelly described to him in 2010, SCHULMAN stated he was not completely sure that it meant a merger was going to ensue. SCHULMAN described the King settlement discussions and a potential merger involving King as "each in their own universe."
>
> AUSA Paes asked SCHULMAN to explain why Pfizer, an unrelated party to the King litigation, would have its patent attorneys meeting with King. SCHULMAN said that he is not sure but surmised that Pfizer may've been interested in a produced or branch of King. SCHULMAN admitted, however, that he knew Pfizer was interested in the outcome of King's pending litigation.
>
> SCHULMAN further admitted that he recognized, at the time, that a merger between Pfizer and King was not out of the realm of possibility. SCHULMAN added, however, that during his career he has seen a lot of potential mergers fail so he was not certain about one between Pfizer and King.
>
> When asked whether he knew at the time that the Pfizer/King talks were about either a full merger or a partial sale (product/segment), SCHULMAN said, yes.
>
> SCHULMAN was asked about the number of viable product lines owned by King. SCHULMAN stated that Alpharma owned at least two significant products while King owned a few as well. He said that he is not sure exactly how many product lines King owned after it acquired Alpharma.
>
> **With regard to Schulman's knowledge that Pfizer and King were discussing**

LONDON & MEAD
ATTORNEYS AT LAW
The Honorable Joan M. Azrack
February 9, 2017
Page 13

> **either a full merger or partial sale, he admitted that he possessed this information before he met with Tibor Klein at his residence in August 2010.**
>
> **Schulman was asked whether he followed up on the status of the Pfizer/King negotiations after speaking with Kelly about it in 2010. Schulman said that he did not but recalled that Kelly did tell him to keep this information confidential. Schulman affirmed that this directive gave him reason to believe that a merger was possible.**
>
> **When asked why Kelly called him to report this meeting, Schulman said that the two of them were close and that Kelly called him "as a friend" to report what had happened.**
>
> . . .
>
> **With regard to his relationship with Kelly, Schulman said that he hired Kelly in2003 to work in Hunton and William's ("H&W") office in Washington D.C. and that the two of them became friends. Kelly transferred to H&W's Atlanta office in or about 2007-2008. In 2010, Schulman said that he and Kelly were still friends who occasionally had personal conversations.**

Schulman MOI at 3-4.

**SCHULMAN'S OBJECTION TO HEARSAY IN QUESTIONS PUT TO HIM RELATED TO WHEN HE KNEW ABOUT A "MERGER":**

The government designates questions by SEC counsel related to a chart from King Pharmaceutical stating that Schulman "knew about the deal," or "knew of the potential merger or acquisition" by August 4. Govt Motion at 8, quoting SEC Tr. at 56-7. The government's entire designation reads:

> Q. According to King, you knew about the deal on or about August 4, 2010. Does that square with your recollection or help refresh your recollection?
>
> A: Not really in the sense that my memory was that I heard about it fairly soon after David went to the meeting, after David Kelly went to the meeting. So I would have actually thought I would have known about it a little bit before August 4.
>
> I mean, I'm not saying that's not possible and you know how memories can be, but for some reason, I have it in my head that it was sooner than almost three-and-a-half weeks after David Kelly

> went to that meeting that I heard from him that there was such a meeting.
>
> Q: And you believe that that meeting that Mr. Kelly went to was on or about July 12, 2010; is that –
>
> A: Well, I guess I'm just deriving that from the fact that that's the date David puts down and that Mr. Slater puts down and they were the two people who went to the meeting. So I'm taking it as a truth that the two of them put down the date – that that date, 7-12-2000 must be the date that they went to the meeting. And I just had recollection in my head that I would have learned about it within days, not weeks, of David going to the meeting.
>
> Q: When King Pharma put this chart together, did they ask you what specific date you knew of the potential merger or acquisition?
>
> A: You know, they may have. I don't recall.

Th first question incorporates a hearsay statement by King and creates a misleading impression that Schulman knew more than he did. The question did not refresh Schulman's recollection. The question can be rephrased to read, "Do you recall knowing about the deal during the first week in August?" Schulman's answer could then be read in its entirety without any loss of meaning.

The third question reads: "When King Pharma put this chart together, did they ask you what specific date you knew of the potential merger or acquisition?" Again, that question incorporates a chart by King that is hearsay, and creates a misleading impression that King might have talked to Schulman before preparing that chart. Schulman had no substantive memory. That question and answer add nothing; they should not be admitted.

**TOPIC C:   SCHULMAN'S KNOWLEDGE OF WHAT STOCKS KLEIN BOUGHT FOR HIM—PURCHASING ENZO STOCK AS AN EXAMPLE**

In its first motion in limine, the government said that it would introduce Schulman's knowledge that Klein had bought stock for Schulman in Enzo, a pharmaceutical client of Schulman's. The government's motion in limine said that Schulman's knowledge about Klein buying Enzo stock for him:

> demonstrates that Schulman was acutely aware of the stocks in his portfolio around the time of the King securities trades at issue and had prior knowledge that Klein traded securities of a company that Schulman represented, and that

> Schulman did nothing to sever his relationship with Klein after learning of this trading. It also demonstrate that Klein and Schulman discussed the stock in Schulman's portfolio. And finally, it provides evidence that Schulman knew that Klein had traded in securities of companies that Schulman had represented before, and that Schulman was aware of the problematic nature of those trades.

Dkt. 36 at 7.

Consistent with that mistaken theory, the government designated excerpts from Schulman's SEC testimony and his EDNY interview related to Schulman's knowledge that Klein had bought stock in Enzo for him. Govt Motion, Dkt. 61 at 4-5, excerpting SEC Tr. at 26-8; Dkt. 61 at 6, excerpting SEC Tr. at 48; Govt Motion, Dkt. 61 at 14, excerpting Sch. MOI at 7-8.

When placed in context, Schulman's full statements directly contradict the government's theory. The government omitted the crucial paragraph from the interview memo giving the full context that Klein had full discretion to trade in Schulman's account with and Schulman did not discuss individual stocks with him. The government designated Shulman's SEC testimony related to Klein's purchase of Enzo stock, but did not designate the preceding two pages of testimony where Schulman provided the full context of Klein's discretionary trading in the Schulman accounts.

In order to complete his statements about Klein's trading in Enzo stock and rebut the government's theory that the Enzo trading somehow proves that Schulman "was acutely aware of the stocks in his portfolio," Schulman designates the following excerpts from his SEC testimony and interview memo. The excerpts below provide necessary context that Schulman learned about Klein's trading in Enzo solely from an oral conversation with Klein, and that Schulman did not review or discuss the individual stocks that Klein bought for him.

**SCHULMAN COUNTER-DESIGNATION 10:**

Schulman designates the following two critical paragraphs from his interview memo to complete his statements about his knowledge of Klein's trading in Enzo, King, and other stocks:

> SCHULMAN stated that over time his wife assumed the lead role in handling their personal finances. He said that he and his wife met with Klein approximately two or three times per year to discuss their accounts.
>
> SCHULMAN stated that he recalls no discussions with Klein about the purchase or sale of individual stocks. Rather, he recalls general conversations during which Klein would suggest particular investment strategies. SCHULMAN said that Klein had discretion to trade the SCHULMAN accounts but did not handle their day-to-day business affairs—Klein did not write checks for them nor pay their bills.

15

Sch. MOI at 5.

**SCHULMAN COUNTER-DESIGNATION 11:**

Schulman asks that his full testimony about Klein's discretion to trade his account be admitted to complete the government's designated testimony about trading in Enzo stock. The full context shows that Schulman's description of his knowledge of Klein's trading in Enzo stock was virtually the only time he could recall discussing a specific investment with Klein, and that Schulman volunteered the Enzo transaction to the SEC questioner. The entire portion that Schulman asks to be included appears below. The portion designated by the government appears in bold:

> Q. So now with regard to the Klein Financial Services account, did or do you make determinations as to how to invest your funds in the accounts held at Klein Financial Services?
>
> A. Not on any specific level with a specific fund. The most involvement I would is that when Mr. Klein would meet with my wife and myself, he would talk very general like oh, I think the market's going to go down, so I'm buying gold now or I think energy is going to be really good, so I'm buying a lot of energy now.
>
> His latest thing is South Dakota, which I'm actually a little nervous about, but he told me South Dakota—or it North Dakota with all the oil drilling.
>
> Apparently, North Dakota is all the rage now, so apparently, he's got me buying stuff in North Dakota.
>
> Q. Now, when I asked that question, you said you didn't make specific choices.
>
> A. Correct.
>
> Q. Have you ever over the life of those accounts at Klein Financial Services, which by the way I'll refer also to as Klein during the course of this testimony, did you ever over the life of those accounts make specific determinations as to how to invest your funds?
>
> A. The only thing I remember specifically, I remember he had me into some kind of long-term life insurance plan and they were taking out like over $2,000 a month for some life insurance plan and my wife and I talked to him specifically about stopping doing that.

THE WITNESS; Could you repeat the question? I want to make sure I'm answering correctly.

(Record read.)

A. That's the only one I can think of where I told him, you know we want to stop this.

**Q: Other than that, you did not make specific investment choices over the life of the account at Klein?**

**A: No. I mean, the only specific stock I can remember discussing with him was Enzo Biochem because that was a client that he sort of learned about because I worked for them, and he told me, at one point, that he had bought Enzo and I remember being a little upset at him because I think that the CEO is a certifiable lunatic, and when he bought that, I remember being a little upset, but I don't remember what happened with that. I think he sold it at some point after that.**

**Q: How did he know that you were working for Enzo?**

**A: He and I actually had a relationship where not just a strict broker, but I mean, he went to my daughter's wedding a couple weeks ago. He and his wife go out with me and my wife. And the reason he would have probably known about Enzo is because Mr. Klein's offices are up in New York and Enzo is up in New York, so most likely, I was up there visiting Enzo and I had dinner with him that night. Oh, what are you doing in New York? Oh, I met Enzo today.**

**Q: Did you tell him anything more about what you were doing for Enzo?**

**A: At some point, I probably told him the CEO was certifiable. I'm sure I did. I mean, I was working on litigations for Enzo. I was doing a lot of the patent work, patent interferences for them, and they were just general conversations about oh, what's going on with them, what are you doing with them now?**

**Q: And so did he indicate to you when he bought it or why he bought it?**

**A: There was one, and I can't recall when, but there was one time**

> when he did one of his visits with us where he told me he bought some, and that's when I said, you know, I'm not sure if that was such a good idea. And I never had a discussion with him after that.
>
> **Q: Did he tell you or did you learn at any time why he bought it?**
>
> **A: I asked him why he bought it and he basically just said he thought the price had gone down and it looked good, if my recollection is correct. But that's the only individual stock I ever remember discussing with Mr. Klein.**

SEC Tr. pages 24:21-28:9.

**DESIGNATIONS ABOUT THROWING AWAY TRADE CONFIRMATIONS AND NOT REVIEWING FINANCIAL ACCOUNT STATEMENTS IN DETAIL.**

To complete his answers about not knowing that Klein had purchased King stock for him, Schulman designates the following portions of his SEC testimony related to his practice of not reviewing financial account statements or trade confirmations from Pershing Advisor Solutions (Klein used Pershing to make trades for his clients)

**SCHULMAN COUNTER-DESIGNATION 12:**

> Q: Mr. Schulman, what is Pershing Advisor Solutions, which I may also refer to as Pershing during the court of this testimony.
>
> A: I'm not really sure. I just know I get a ton of envelopes from them, which I normally just throw out.
>
> Q: Is that a clearing firm?
>
> A: It might be. I don't know. I have no reason to believe that it's not.

SEC Tr. page 32:16-24.

**SCHULMAN COUNTER-DESIGNATION 13:**

> Q: Do you review the statements each month as to this account? So when I say this account, basically, for the duration of this testimony, I'm referring to account number J6K001193.

> A: Okay, thank you. No, other – generally, the only thing I look at of the statements is the front page showing up are we up, are we down, are we even. I generally did not go beyond the first couple pages.

SEC Tr. page 36:3-11.

**SCHULMAN COUNTER-DESIGNATION 14:**

> Q: When you did look for information, what were you looking for? You said you looked at the first couple pages. What were you looking for?
>
> A: Mostly just to see if the account went up or down. That simple.
>
> Q: That was it?
>
> A: That was it.

**TOPIC D:** **SCHULMAN'S STATEMENTS ABOUT HIS KNOWLEDGE OF PROHIBITED TRADING BASED ON MNPI.**

**SCHULMAN COUNTER-DESIGNATION 15:**

Schulman does not dispute his knowledge of prohibitions on insider trading. However, the government's designation from page 68 of the SEC transcript cut off Schulman's answer at "based on non-public information" Govt Motion at 9-10. Schulman designates the rest of his answer, which is necessary to provide context for his statements. The full answer reads as follows. The portion designated by the government is in bold.

> **Q: What understanding, and now sort of a step further, do you have of making trades in the market based on non-public information?**
>
> **A: My understanding is that you can't make trades based on non-public information.** In my field, being that, as I told you earlier, I'm involved with acquisitions all the time, I know a patent's going to issue before the public knows it's going to issue. I know a client's going to win a case before the public knows it's going to win a case.
>
> So you can imagine, in my field, it's practically a weekly event that I'm privy to some kind of information that is non-public and so, you know, I get that information all the time, I'm involved with acquisitions all the time and I think generally, in my own mind, the fact that I don't do any trading sort of was my own way of thinking, you know, I'm going to be careful about that.

SEC Tr. page 68:13-69:6.

## **CONCLUSION**

Rob Schulman did what the government asks of responsible citizens in SEC and criminal investigations. He fully cooperated, and gave his best, truthful memory of events that had happened years before. The government cannot truncate his statements to create misleading impressions without admitting their full context. Schulman asks that the Court admit his additional designations that "in fairness ought to be considered at the same time." FRE 106. Schulman also reserves the right to designate additional portions of the transcript or interview memo as necessary to rebut any unanticipated arguments by the government at trial.

                                                              Respectfully submitted,

                                                              _____/s/_____
                                                               Christopher B. Mead

cc:      All Counsel (by ECF)