UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-- against –

TIBOR KLEIN and
ROBERT SCHULMAN,

Defendants.

16-CR-442 (JMA)

DEFENDANT SCHULMAN'S CONSOLIDATED REPLY IN
SUPPORT OF MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

LONDON AND MEAD
1225 19th Street, NW, Suite 320
Washington, DC 20036
202-331-3334

MORVILLO ARBAMOWITZ GRAND
  IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
212-856-9600

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
212-969-3530

*Counsel for Defendant Robert Schulman*

## TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ...........................................................................1

I.   THE GOVERNMENT FAILED TO PROVE THAT SCHULMAN
     INTENDED THAT KLEIN TRADE OR THAT SCHULMAN
     INTENDED TO OBTAIN A PERSONAL BENEFIT.................................................4

     A.   The Evidence Lends Greater Support To The Inference That
          Schulman Did Not Have The Intent To Risk His Career,
          Substantial Income, And Freedom For An Unknown Potential
          Profit, Or To Make A Gift To Klein ...................................................4

     B.   That Klein Was Schulman's Financial Advisor Is Insufficient To
          Prove Schulman Intended Klein To Trade On MNPI...........................6

          1.   Klein's discretionary authority to trade in Schulman's
               account without Schulman's knowledge, and Klein's conduct
               with Shechtman, create much stronger inferences of
               innocence than guilt ...................................................8

          2.   The first pages of Rob Schulman's monthly IRA account
               statements say nothing about the King trades or Schulman's
               intent ...........................................................11

          3.   The government's "relationship of trust" argument does not
               support a reasonable inference that Schulman intended Klein
               to trade .........................................................13

     C.   Schulman's Knowledge of Klein's Previous Enzo Purchase Does
          Not Establish Beyond a Reasonable Doubt that Schulman
          Intended That Klein Trade ...........................................................15

     D.   The Government Now Concedes That "The Timing Of The
          Schulmans' Firing Of Klein Is Not Probative Of The Defendant's
          Intent At The Time Of The Trading"; The Jury's Sole Note
          Confirms That The Exclusion Of The SEC Complaint Allowed
          The Government To Convince The Jury Otherwise .........................17

     E.   It Was For The Jury, Not The Government, To Determine The
          Significance Of Klein Saying "Tell Rob I'm Sorry" Immediately
          After The Schulmans Fired Him In The Wake Of The SEC
          Complaint.......................................................................20

i

II. THE GOVERNMENT FAILED TO PROVE THE SINGLE
CHARGED CONSPIRACY BETWEEN SCHULMAN, KLEIN, AND
SHECHTMAN...................................................................................21

    A.   Shechtman Lacked Knowledge That Klein's Source Divulged
MNPI For Personal Benefit ...............................................................22

    B.   The Government Failed To Prove That Schulman's Purported
Agreement With Klein Encompassed Sharing MNPI With
Shechtman.........................................................................................24

    C.   The Variance Between The Charged Conspiracy And The Proof
At Trial Severely Prejudiced Schulman..............................................28

        1.   Klein's Hearsay Statements Are Not Admissible Against
Schulman................................................................................28

        2.   Prejudicial Evidence of the Overbroad Charged Conspiracy
Likely Affected the Jury's Verdict and Requires A New Trial ...................29

    D.   The EDNY Did Not Deny That Shechtman's Negotiations Or
Guilty Plea Were Based On The Exculpatory Theory That
Shechtman And Klein Misappropriated MNPI *From* Schulman.......................32

III. THE UNDISPUTED FACTS DO NOT SUPPORT AN INFERENCE
THAT ROB SCHULMAN SAID MORE THAN "IT WOULD BE
NICE TO BE KING FOR A DAY."............................................................35

    A.   What Schulman Actually Knew About The King/Pfizer Talks
Makes It Unlikely That He Said "Exactly" What The
Government Speculated He Did .......................................................37

    B.   Klein's Recommendation To Buy Options Expiring In One And
Two Months Is Not Consistent With The Government's Theory
That Schulman Shared The Details Of What He Knew With
Klein..................................................................................................38

    C.   The Government Mischaracterized The MJOA's Argument
About Klein Telling Shechtman in December 2010 That He
Heard A "King For A Day" Toast; That Evidence Demonstrates
That Rob Schulman Is Innocent.......................................................40

    D.   The Government's Inferential Arguments About Rob And
Ronnie Schulman's Testimony Are Demonstrably Incomplete
And Inaccurate ................................................................................45

E.     The Court Has Discretion To Grant A New Trial Because Of
       Shechtman's Inconsistencies And Ronnie Schulman's
       Truthfulness ..........................................................................................46

IV.   THE GOVERNMENT'S IMPROPER JURY ARGUMENTS
      SEVERELY PREJUDICED THE DEFENSE AND REQUIRE A
      NEW TRIAL..............................................................................................47


CONCLUSION..................................................................................................52

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*Applebaum v. American Export Isbandtsen Lines,*
  472 F.2d 56 (2d Cir. 1972)..................................................................................... 18

*Colon v. Mitchell,*
  93-CV-4951, 1999 WL 758776 (S.D.N.Y. Dec. 26, 1995) ...................................... 19

*Dirks v. S.E.C.,*
  463 U.S. 646 (1983)................................................................................................ 24

*Marcano v. United States,*
  11-CV-5551, 2015 WL 1276759 (E.D.N.Y. March 19, 2015)................................. 19

*Glob.-Tech Appliances, Inc. v. SEB S.A.,*
  563 U.S. 754 (2011)................................................................................................ 23

*Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.,*
  No. 11 CIV. 3130, 2012 WL 4049955 (S.D.N.Y. Sept. 14, 2012).......................... 24

*Salman v. United States,*
  137 S. Ct. 420 (2016)............................................................................................. 22

*United States v. Bray,*
  853 F.3d 18 (1st Cir. 2017).................................................................................... 23

*United States v.  Carpenter,*
  791 F.2d 1024 (2d Cir. 1986).................................................................................. 26

*United States v. Coplan,*
  703 F.3d 46 (2d Cir. 2012)................................................................................ 1, 37

*United States v. Geibel,*
  369 F.3d 682 (2d Cir. 2004).......................................................................... *passim*

*United States v. Gluk,*
  831 F.3d 608 (5th Cir. 2016) .................................................................................. 19

*United States v. Gupta,*
  747 F.3d 111 (2d Cir. 2014).................................................................................... 20

*United States v. McDermott,*
  245 F.3d 133 (2d Cir. 2001).......................................................................... *passim*

*United States v. Nektalov,*
    461 F.3d 309 (2d Cir. 2006) ................................................................. 22, 23

*United States v. Newman*,
    773 F.3d 438 (2d Cir. 2014) ............................................................ 22, 23, 24

*United States v. Powell,*
    469 U.S. 57 (1984) .................................................................................. 19

*United States v. Rivera,*
    22 F.3d 430 (2d Cir. 1994) ..................................................................... 29

*United States v. Serna,*
    799 F.2d 842 (2d Cir. 1986) ................................................................... 34

*United States v. Serrano,*
    192 F. Supp. 3d 407 (S.D.N.Y. 2016) .................................................... 21

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2005) ................................................................... 34

## <u>Rules, Statutes and Other Authorities</u>

Fed. R. Evid. 410 ....................................................................................... 34

Fed. R. Evid. 801(d)(2)(E) ......................................................................... 29

New York Rules of Prof'l Conduct 3.8 .......................................... 27, 33, 48

## SUMMARY OF ARGUMENT

This is an extraordinary case in which the only real disputes are about what inferences are reasonable from undisputed facts.  In this context, the relevant legal standard for Schulman's Motion for Judgment of Acquittal ("MJOA") has critical significance: "If the evidence viewed in the light most favorable to the prosecution gives *equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence*, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012) (emphasis added).

The government had to prove beyond a reasonable doubt that Schulman intended Tibor Klein to buy King stock.  Yet the government conceded that Rob Schulman did not direct or even discuss Klein's purchase of King stock; and the government told the jury that *maybe* Schulman expected to make more than $15,000.  Meanwhile, Schulman made more than $15,000 a week as a patent attorney.

The government argued that it was reasonable to infer Schulman's criminal intent because he disclosed MNPI to his broker. Yet the government's cooperator, Michael Shechtman, a broker himself, testified that he did not buy King for his clients because he was their broker and would not have put them at risk. Shechtman testified that nothing Klein said led Shechtman to believe that Klein's source intended to benefit, and Shechtman was surprised to learn later that Klein bought King for any of Klein's clients.

Moreover, SEC attorneys alleged that Schulman disclosed MNPI to his broker Klein, but they drew a different inference—that Klein misappropriated MNPI from Schulman.  Regardless of whether the SEC Complaint was admissible, it demonstrates that sophisticated government investigators did not agree that disclosing MNPI to a broker meant that Schulman intended to trade. The government's proof of Schulman's alleged criminal intent was insufficient.

Next, the government failed to prove the charged, three-person conspiracy between Schulman, Klein, and Shechtman, resulting in the improper admission of irrelevant and highly prejudicial evidence against Schulman.  In order for Shechtman to join an insider trading conspiracy with Schulman, the government had to prove the essential element that Shechtman knew the "tipper" (Schulman) intended to benefit.  The government preserved its options to charge either Klein alone, or both Klein and Schulman, by not identifying the tipper at Shechtman's guilty plea.  At trial, Shechtman testified that he did not know whether Klein's source of MNPI intended to benefit.  After trial, the government concedes that Shechtman lacked actual knowledge of a benefit to Schulman but argues that Shechtman consciously avoided knowledge of the benefit.  The case law is clear—just intoning "conscious avoidance" cannot substitute for evidence that Shechtman knew of a "high probability" of intended personal benefit to the tipper and "deliberately refused to confirm" such benefit.  The disclosure of MNPI, standing alone, is not sufficient to demonstrate a downstream tippee's (Shechtman's) knowledge that the tipper (Schulman) intended to benefit.  The government failed to prove that Shechtman knew *anything* about Klein's source other than that he disclosed MNPI.  Therefore, Shechtman was not Schulman's co-conspirator, his conduct and words could not be imputed to Schulman, and his testimony should have been stricken.

Further, because Shechtman was not in a conspiracy with Schulman, Klein's statements to Shechtman were not in furtherance of a Schulman-Klein-Shechtman conspiracy, and were inadmissible hearsay.  Even if the government belatedly tries to claim that it proved a two-person conspiracy between Schulman and Klein, Klein's statements to Shechtman were not in furtherance of a narrow Schulman-Klein conspiracy.  Again, the case law is clear—that a tipper (Schulman) disclosed MNPI to a tippee (Klein), without more, does not mean the tipper agreed

or foresaw that the tippee would disclose the same MNPI to an unconnected third party (or downstream tippee—Shechtman).  Here, the government argued in rebuttal that Schulman *did not expect Klein to disclose the MNPI to anyone*.  Thus, on the government's own view of the facts, Klein's hearsay statements could not be in furtherance of a Schulman-Klein conspiracy. Without Shechtman's testimony about Klein's statement that Klein thought he had inside information that Pfizer was going to acquire King, the government's case cannot survive.

Even putting aside Klein's hearsay statements, the variance between (1) the evidence presented in support of a purported Schulman-Klein-Shechtman conspiracy, and (2) any limited proof of a two-person Schulman-Klein conspiracy, unfairly prejudiced Schulman.  Specifically, the variance led to the admission of irrelevant, and highly prejudicial, evidence of a cover up and consciousness of guilt on the part of Shechtman.  The admission of this evidence is another reason the Court must grant Schulman's Motion for New Trial ("MNT").

In addition, the government failed to prove that Schulman told Klein something more than "it would be nice to be King for a day."  When Klein visited the Schulmans' home on August 13, 2010, Pfizer's acquisition of King was two months away (not "very far down the road" at all), and no one knew what Klein supposedly said to Shechtman: "Pfizer is going to acquire King." Schulman knew only that a merger was a possibility.  It is not reasonable to infer that Schulman, an experienced attorney who testified to the SEC that he knew many merger negotiations fall apart, would have told Klein with any certainty that "Pfizer is going to acquire King." Klein recommended risky options that would expire in one and two months, a trading strategy inconsistent with what Schulman actually knew, but consistent with hearing "it would be nice to be King for a day," which sounds more imminent than the reality.

Klein's statement that he thought he had inside information that Pfizer would acquire King was a conclusion, not a quote. When Klein actually told Shechtman what he had heard, Klein said he had been at a party when a friend offered a toast that "it would be good to be King" without mentioning Pfizer. Readily-available internet articles said that Pfizer had been interested in buying King in 2007-08. It is equally plausible to infer from the undisputed facts that Schulman said only "it would be nice to be King for a day," requiring a judgment of acquittal.

Finally, the government's last words to the jury in rebuttal summation made a completely new argument never previously mentioned in motions, argument, or questioning of any witnesses—that Klein's sale of Enzo stock in Schulman's IRA, on the same date that Klein purchased an airline ticket to visit Shechtman, proved Schulman's criminal intent. That argument was "outrageously unfair." Alone, and particularly in combination with improper arguments by the government, the government's misuse of innocuous Enzo trades requires a new trial.

## I.   THE GOVERNMENT FAILED TO PROVE THAT SCHULMAN INTENDED THAT KLEIN TRADE OR THAT SCHULMAN INTENDED TO OBTAIN A PERSONAL BENEFIT.

The government made three arguments to prop up its thin case that Schulman intended Klein to trade on MNPI: (1) Schulman had a financial motive to commit insider trading; (2) Schulman provided the information only to his financial advisor; and (3) Schulman was aware that Klein had previously bought stock in Enzo, another Schulman client. Opp. 42.

### A.   The Evidence Lends Greater Support To The Inference That Schulman Did Not Have The Intent To Risk His Career, Substantial Income, And Freedom For An Unknown Potential Profit, Or To Make A Gift To Klein

The government attempts to manufacture financial motivation out of a comment that Klein was "too bearish" in the aftermath of the 2008-09 crash, that Rob Schulman wanted the option to retire early, and generalities that $15,000 is "a great deal of money" and would be

4

"good" for retirement. Opp. 42-44.  These weak arguments cannot outweigh the far more reasonable inference that a lawyer with a seven-figure income and $4 million net worth would not make a one-time comment over wine at dinner about a client being in merger talks with the intent to obtain some unknown amount of money that would fly under some imaginary radar— and without evidence of any sort of plan or discussion of how the inside trading would be undertaken and concealed.

Putting the cart before the horse, the government argued at trial, and argued again in its opposition, that the lack of evidence about what Schulman thought he would make *if* he intended/anticipated that Klein would buy King stock for him is somehow proof *that* Schulman actually intended/anticipated that Klein would buy King stock for him. Opp. 44-45. But the opposite is true.  The government's choice of words reveals how speculative its case was. It is telling that, at trial, the government argued that "*[m]aybe* the defendant thought he was going to make more." Tr. 1200.  The government's opposition used similar speculative language: "he *could* have intended to make more." Opp. 44.  The argument that Rob Schulman intended to risk his million dollar income by having Klein trade because *maybe* Schulman thought he would make more than $15,000, or because Schulman "*could* have intended to make more," cannot satisfy the government's obligation to prove guilt beyond a reasonable doubt.

Given the weakness of Schulman's financial motivation, the government argues that Schulman was also motivated to benefit others.  The government claims it has "demonstrated that both Klein and the Mullens, who were close friends of the Schulmans, received significant financial benefits from the defendant's tip." Opp. 58.  The issue is not whether Klein and the Mullens received a benefit; it is whether Schulman intended to risk his career, substantial income, good reputation, and freedom to make gifts to Klein and the Mullens. The government

5

did not dispute the inherent contradiction between its first theory that Schulman was greedily passing on a tip for his own benefit, and its second theory that Schulman was a white collar Robin Hood risking everything to make a gift to Klein and his friends, the Mullens. Nor did it dispute evidence that the Schulmans already paid Klein one percent of their assets annually, and that Klein paid for dinners and tickets on social occasions because the Schulmans were his clients. MJOA 51-53. Finally, the government conceded that there was no discussion between Schulman and Klein about trading in King, meaning that there was no discussion of trading for the Mullens either. Nor was there any evidence about Schulman's relationship with the Mullens that might explain the crime allegedly to have taken place.

The evidence overwhelmingly suggests that a person at Rob Schulman's stage of life would not have committed securities fraud to make such gifts.

### B. That Klein Was Schulman's Financial Advisor Is Insufficient To Prove Schulman Intended Klein To Trade On MNPI

The government's opposition contended that the defendant "cannot rebut [the] argument" that Schulman's disclosure of MNPI to his financial advisor within nine days of learning about the August 4 Pfizer/King meeting is proof beyond a reasonable doubt that Schulman intended to willfully violate the securities laws. Opp. 45. There are many convincing rebuttals, but one is remarkably simple: SEC attorneys knew that Schulman learned about the August 4 meeting shortly after it happened, and knew that Schulman made a statement about King to his financial advisor on August 13. The SEC brought a complaint alleging that Schulman disclosed MNPI to Klein. Yet the agency responsible for enforcing the securities laws did not contend that those circumstances proved, even by a preponderance, that Schulman intended that Klein buy King in Schulman's account. Instead, the SEC brought suit based on a completely contradictory theory— that Klein and Shechtman misappropriated MNPI *from* Schulman. Regardless of whether the

6

SEC Complaint was admissible, it demonstrates what inferences sophisticated government attorneys and investigators drew from the same evidence.

The timing of Schulman's statement to Klein actually raises inferences more supportive of innocence. How many defendants who learn about a potential merger and intend to trade on that information wait nine days to do it? If, as the government falsely contended, Schulman knew the deal was "very far down the road," Opp. 77, why did he wait nine days to tip Klein? If he intended to tip Klein and make money from securities fraud, why would Schulman wait until a meeting where his wife might overhear him, even if she was out of the room briefly?

The MJOA argued that because brokers are highly regulated, and their client relationships and trades are documented and easily traceable, it is just as reasonable to infer that Schulman would not have believed that his broker would trade on a single, indiscrete disclosure. MJOA 33-34. The government did not respond to that argument. The MJOA argued that specific evidence contradicted the government's blanket assertion that because Klein was his broker, Schulman must have intended that Klein trade. The MJOA cited Shechtman's testimony that before August 16, Klein had never given Shechtman any indication that he was the type to engage in insider trading;[1] Shechtman's testimony that Klein's mentor at Ameriprise, Frank Marzano, wouldn't touch trading in King based on what Klein told him;[2] Shechtman's testimony that he never understood that Klein was buying King for his clients, and was surprised when he

---

[1] Tr. 345.

[2] Tr. 252-53, 260-61. In another context, trying to refute a mountain of evidence that Klein had been reckless in his conduct, the government argued that Shechtman's use of the present tense in recalling Klein's words in a phone call about Marzano more than six years earlier made it probable that Klein never actually talked to Marzano about the King tip. Opp. 54. That argument is outrageous. *See* section I.B.3. below. But if the government contends that Klein's statement meant that he understood that he should not even talk about potential inside information with Marzano because Marzano was a broker, that supports the defense argument that it is just as reasonable to infer that a broker would not trade based on inside information.

learned it;[3] Shechtman's testimony that his clients trusted him and looked to him for advice;[4] Shechtman's testimony that although he was willing to trade on inside information knowing it was wrong, he would not have put a client at risk by trading if a client disclosed inside information to him;[5] Shechtman's refusal to buy King for his clients even while buying it for himself;[6] Ronnie Schulman's testimony that she and her husband trusted Klein not to put their family at risk, and not to do anything so stupid;[7] and the government's failure to challenge that testimony from Ronnie Schulman on cross.[8] MJOA 34-36.

The government's opposition did not address Shechtman's testimony at all, made no attempt to demonstrate why Ronnie Schulman's testimony was not credible, and, citing only one part of Bruce Dubinsky's testimony where the Court sustained an objection, dismissed the defense arguments as "highly general and dubious testimony that clients usually trust their financial advisers not to trade on MNPI." Opp. 47. By contrast, the government cited no testimony or evidence to support the theory that a client should always anticipate that a broker will trade on a single, indiscrete disclosure.

> **1.    Klein's discretionary authority to trade in Schulman's account without Schulman's knowledge, and Klein's conduct with Shechtman, create much stronger inferences of innocence than guilt.**

It was undisputed that Klein had discretionary authority to trade in the Schulmans' accounts, without notice or permission.[9] The government acknowledged in summation that there was no evidence that Schulman discussed what trading Klein would do in his account. Tr. 1150.

---

[3] Tr. 366 (Shechtman cross).
[4] Tr. 366-67 (Shechtman cross).
[5] Tr. 486 (Shechtman cross).
[6] Tr. 376-77.
[7] Tr. 756.
[8] Tr. 783-95.
[9] *E.g.,* Tr. 726 (Ronnie Schulman direct).

8

And Case Agent DelGiudice admitted there was no evidence that Schulman ever directed Klein to trade King or any other stock. During its rebuttal summation, the government turned this utterly exculpatory evidence on its head, arguing that Klein's discretionary trading authority was somehow evidence of guilt, because it gave Schulman the opportunity to commit the "perfect crime" without having to say anything to Klein about trading. Tr. 1201. In other words, if Schulman discussed trading in King with Klein, Schulman would be guilty. If he didn't discuss trading in King with Klein, he would be guilty.

The MJOA argued that the government's "perfect crime" argument was sheer speculation. MJOA at 38-39. In response, the government opposition used this astonishing language:

> The defendant reiterates his arguments that because Klein had discretionary trading authority over the defendant's investment account, and there was no indication of communications between Klein and the defendant prior to or after the trading, he cannot be guilty of insider trading. (Rule 29 Br. at 38). . . . In response, the government argued the alternate, *equally plausible*, interpretation of the evidence. The discretionary trading arrangement provided the defendant with the perfect way to tip his investment adviser with inside information and then profit on that information without the trading being traced back to him.[10]

The government told the jury that Klein's discretionary trading authority was proof of guilt beyond a reasonable doubt, creating the opportunity for the "perfect crime." Yet here, the government argued that Klein's discretionary trading authority was no better than "equally plausible" with an inference of innocence. "Equally plausible" inferences mean that a judgment of acquittal is warranted.

---

[10] Opp. 48-49 (emphasis added).

The government did exactly the same thing with the evidence that Klein and Shechtman did not talk or share profits with Schulman as they coordinated their trading. MJOA 39-42. From this clearly exculpatory evidence, the government's opposition argued:

> Klein had discretionary trading approval over the defendant's account and the MNPI that Schulman had disclosed to him, and therefore did not need to communicate with Schulman to trade in King. Moreover, Klein and Schulman both knew that the defendant was the source of the tip and any ties between the two would later be viewed as incriminating. By comparison, Klein and Shechtman were in a partnership to trade options, a complicated security about which Shechtman knew little. (Tr. 262-63).[11]

That Klein did not "need" to communicate with Schulman to buy King shares in Schulman's account, but needed to communicate with Shechtman to persuade him to buy risky options and split the profits, is precisely the point. A lack of communication is a lack of evidence of intent to conspire. There was no evidence that Klein and Schulman intentionally did not call each other between August and October 2010 to avoid incriminating themselves. In fact, the evidence is to the contrary. The two men spoke on August 31, when the Schulmans were transferring money to Ronnie Schulman's stepmother.[12] That phone call shows that Schulman and Klein were not reluctant to call each other during the critical period at issue. The government's attempt to spin clearly exculpatory evidence is speculation, and does not outweigh the strong inferences of innocence from the same evidence.

Finally, it is absurd for the government to speculate that Klein and Schulman did not communicate from August-October 2010 because Klein was being careful about creating incriminating phone records that would tie him to Schulman. Klein's brokerage records already

---

[11] Opp. 49-50.
[12] Tr. 606-25 (DelGuidice direct); Government exhibits 620-23; Tr. 659, 661-70 (DelGuidice cross); Tr. 758, 760-61 (Ronnie Schulman direct); Defense Exhibit 5 (emails from August 31, 2010 between Ronnie Schulman and Tibor Klein's assistant related to transfer of funds to Ms. Schulman's stepmother).

tied him to Schulman. And Klein took no precautions whatsoever to minimize phone records of his communications with Shechtman as Shechtman was buying risky King options.

Michael Shechtman's testimony further undermines the government's theory that Schulman intended Klein to trade in King. Shechtman testified that Klein never gave Shechtman the impression that the source of Klein's "inside information" expected to benefit in any way. Klein and Shechtman shared the proceeds of Shechtman's risky options trading by writing checks to Klein's in-laws. But they gave nothing to Schulman.[13] The government's opposition failed to address any of this exculpatory evidence.

### 2. The first pages of Rob Schulman's monthly IRA account statements say nothing about the King trades or Schulman's intent.

The government objected to the proposed expert testimony of Bruce Dubinsky that many of his high net worth clients did not pay attention to the details of his discretionary trading in their accounts, and a FINRA study confirming Dubinsky's personal experience. The Court repeatedly expressed the view that Dubinsky's testimony was unnecessary because many people did not pay attention to their monthly brokerage statements. Defense counsel repeatedly raised the concern that the government would argue that Schulman knew that Klein bought King in his account because Schulman received monthly account statements. The government promised the Court that they would not argue that Schulman read more than the first page of his account statements, and persuaded the Court to exclude Dubinsky's testimony. Tr. 911-14.

Nevertheless, in rebuttal summation, the government made a tortured argument that Schulman knew that Klein had bought King stock in Schulman's IRA account.[14] The MJOA pointed out that the first pages of the monthly statements did not show trades or holdings in

---

[13] Tr. 376-77, 406-07 (Shechtman cross).
[14] Tr. 1201 (government rebuttal summation).

King, and that the government ignored that Schulman's IRA account had increased in value more during the month of September—when there was no trading in King stock—than it had in October, when Klein sold the King shares. MJOA 42-45.

The government's opposition responds that the first page of the August account statement showed an increase in total equities, and the first page of the October statement showed a decrease in total equities. But the government only introduced a few months of Schulman's IRA statements, and virtually none of the Schulmans' joint account statements. Thus, the government provided no evidence that increases or decreases in a particular line item in Schulman's monthly IRA statements were unusual in any way. Nevertheless, the government's opposition made the speculative argument that Dubinsky's testimony would have rebutted: "an investor, certainly one of the defendant's level of sophistication, would have noticed the increase in equity holdings, particularly when they were such a small part of the defendant's portfolio." Opp. 51.

Because government counsel waited until rebuttal summation to make this argument, the defense had no chance to respond to the utter speculation that Schulman noticed the change in one line of a page full of data and concluded that Klein was executing their unspoken conspiracy. The government's speculation was particularly inappropriate in light of its motion to preclude the defense from introducing Schulman's emails in April 2011 responding to the initial FINRA inquiry. The government did not want those emails coming into evidence because they demonstrated that Schulman first learned about Klein's King purchases in April 2011. Dkt. 60.

Moreover, the government's unsupported lawyer argument did not overcome the stronger inference of innocence from Ronnie Schulman's testimony that the Schulmans did not know Klein had bought King stock in Rob's IRA account until April 2011. MJOA 45; Tr. 761-62.

12

### 3. The government's "relationship of trust" argument does not support a reasonable inference that Schulman intended Klein to trade.

In rebuttal summation, the government speculated that Klein would not have taken the risk that there was a "chance" Schulman would "turn him in" for buying King stock unless Klein understood that Schulman expected him to trade. As the MJOA explained, there was no evidence that Klein considered any of the risks he incurred by repeatedly calling Shechtman, persuading Shechtman to buy risky, thinly-traded options in King, and surreptitiously sharing the option profits. Another reasonable inference was that it might have looked suspicious if Klein had not included the Schulmans in the trading he did for his other clients. MJOA 45-46.  Again, Schulman's guilt or innocence depends on speculation about what Klein might have been thinking based on scant facts—Klein did not testify.

The government's opposition argued that Klein did not take risks in persuading Shechtman to trade and split the profits because there was no connection between Schulman and Shechtman. Opp. 54. But there was a connection between Klein and Schulman that would be revealed in an inevitable, routine FINRA inquiry—a risk that Klein should have fully appreciated from his brokerage training and experience, but was reckless in disregarding. Although the government prevented the jury from hearing it, Dkt. 60, government counsel knew that Schulman turned Klein in immediately in response to the FINRA inquiry, making the government's "relationship of trust" rebuttal argument both speculative and prejudicial.[15]

---

[15] In a footnote, the government argued that the evidence showed that it is more "logical" that Klein never actually talked to his mentor Frank Marzano about his "thought" that he had heard potential inside information. Opp. 54 & n.21. This argument shows that the government's case is more about debating points than actual evidence. The government told the jury that Klein's conversation with Marzano *was proof of Schulman's criminal intent*: "It means it's illegal and Frank doesn't want to deal with it." Tr. 1133 (government opening summation). Moreover, the argument is nonsensical because it rests on a precise (but incorrect) parsing of Shechtman's

The government's opposition argued that the only testimony in the record was that Klein bought King shares for 48 of his clients, but non-record evidence showed that Klein had approximately 150-200 clients. The government argued that this refuted the MJOA's argument that it was reasonable to infer that Klein thought it would look suspicious if he did not include the Schulmans when he was buying King stock for his other clients. Opp. 54-55 & n. 22.

Not so. As Agent DelGiudice conceded on cross, the government did not investigate or present evidence about how Klein allocated the blocks of King shares he bought Monday morning. Tr. 645-46.  Klein had to use client funds he had on account to make those purchases. To make phone calls necessary to persuade 48 clients to approve the purchase of King shares would have taken more than one morning, likely more than one day. It is therefore reasonable to infer that Klein bought the King shares early Monday morning for all clients who had given him discretionary trading authority, which would make the omission of Schulman's account highly suspicious.

In the end, this is all speculation, because the government introduced no evidence that would allow the jury to do anything but guess about how Klein's brokerage operation came to buy King shares in Schulman's IRA account.  Such speculation cannot prove beyond a reasonable doubt that Schulman intended Klein to trade on MNPI.

---

grammar when testifying about a conversation that had happened more than six years earlier. Shechtman testified that he asked Klein what Marzano thought. Shechtman did not recall that Klein said he didn't talk to Marzano. Instead, Shechtman testified that Klein said, "Frank wouldn't touch this." Tr. 261. From that record, ignoring the context that Klein was answering a question without denying that he talked to Marzano, the government argued that Shechtman used the "present tense," and therefore it was more logical that Klein never actually talked to Marzano. "Frank wouldn't touch this" is not present tense. *See https://learnenglish.britishcouncil.org/en/english-grammar/verbs/modal-verbs/will-or-would: "***would** is the **past** tense form of *will*. Because it is a past tense it is used: to talk about the past."* (bold and italics in original).

**C.    Schulman's Knowledge of Klein's Previous Enzo Purchase Does Not Establish Beyond a Reasonable Doubt that Schulman Intended That Klein Trade**

The MJOA noted the substantial evidence that the Schulmans had good reasons to trust that Klein would not put them at risk by trading on a single, indiscrete disclosure of confidential information. MJOA 34-36. The government's argument that Klein's previous trading in Enzo rebuts that "trust" evidence does not work *because Klein's trading in Enzo was not based on any disclosures of MNPI that would put the Schulmans at risk.*[16] It is a far more plausible inference that the Schulmans had no reason to believe that Klein's innocuous Enzo trades meant that he would put them at risk by trading in another stock based on an indiscrete disclosure of MNPI.

The government introduced Schulman's statements during his EDNY interview that he reprimanded Klein for buying stock in Enzo, and told him not to buy stock in companies he represented.[17] That is the only direct evidence of Schulman's intent with respect to trading in his clients' shares. Unless the government can demonstrate inferences from non-direct evidence that Schulman did not say that to Klein, the government's Enzo argument cannot prove that Schulman intended Klein to trade on MNPI.

The government's opposition argued that because Schulman's SEC testimony did not mention his direction to Klein not to trade in client shares, Schulman's statement to the EDNY was a lie. Opp. 56-57. Schulman did not testify at trial. This Court is in just as good a position as the jury to compare Schulman's SEC testimony to his EDNY interview. Schulman's testimony to the SEC was that he recalled being upset at Klein for buying Enzo because of the company's CEO, but that he did not recall what happened with the Enzo stock, and was not asked, and

---

[16] Klein sold Schulman's Enzo shares at a loss, and government counsel admitted in closing there was nothing wrong with Klein's Enzo trades. Tr. 644, 1202; Government Exhibit 719.

[17] Tr. 165 (Cinnamo direct).

therefore did not have the opportunity to affirm or deny, that he gave instructions to Klein about not trading in clients' companies. Tr. 168. Schulman's statements to the EDNY did not mention, and therefore did not refute, that he told Klein that trading in Enzo was a bad idea because its CEO was certifiable. Tr. 165-66.

In both statements, Schulman was trying to recall the details of conversations that happened years before. It is at least an equally plausible inference that both the SEC testimony and EDNY interviews were incomplete, not contradictory. Schulman's failure to mention instructing Klein not to trade in Enzo stock in a moment of SEC testimony cannot mean that he is guilty beyond a reasonable doubt of lying to the EDNY and violating the securities laws.

The government's opposition also argued: "There was no reason for the defendant to disclose this information, particularly if he believed that Klein had improperly traded in the recent past and had objected to it." Opp. 57. First, Schulman never said, and had no reason to believe, that Klein's Enzo trading was based on MNPI and was "improper" under the securities laws. Second, does the government really contend that every word spoken over a Friday night dinner has a specific, actionable purpose? Rob Schulman said something he shouldn't have said. His explanation, under oath, accepted by the SEC as the basis for securities fraud claims against Klein and Shechtman, had an undeniable ring of truth: "it would have been much more in the nature of 'hey, wouldn't it be great to be king for a day, ha, ha, ha,' kind of like telling him, like acting like I am a big shot and I know this thing." Tr. 175.

The reaction to Shulman's explanation is a function of life experience.  Some older male lawyers will occasionally try to make themselves seem more knowing and important than they really are.  The government has no evidence that can create an inference stronger than the truth of Rob Schulman's self-aware SEC testimony.

16

**D.     The Government Now Concedes That "The Timing Of The Schulmans'
Firing Of Klein Is Not Probative Of The Defendant's Intent At The Time Of
The Trading"; The Jury's Sole Note Confirms That The Exclusion Of The
SEC Complaint Allowed The Government To Convince The Jury Otherwise.**

Because the government offered threadbare evidence of Schulman's intent, the jury

focused elsewhere. The jury's sole note demonstrated that the jury believed that Schulman's guilt

or innocence turned on the timing of the Schulmans' firing of Klein.  The jury asked for the

transcript of Ronnie Schulman's testimony about the timing of when the Schulmans ceased

working and speaking with Klein.

Meanwhile, the government's opposition concedes that "[t]he timing of the Schulmans'

firing of Klein is not probative of the defendant's intent at the time of the trading." Opp. 67. And

rightly so.  It is absurd to suggest that Schulman's guilt or innocence should hang on whether he

and his wife should have immediately fired a trusted friend before learning that the SEC

concluded that there was no innocent explanation for Klein's trading in King stock, and that

Klein had misappropriated MNPI from Schulman.

If the government now concedes that "the timing of the Schulmans' firing of Klein is not

probative of the defendant's intent at the time of the trading," why did the jury focus on that

irrelevant issue? And why did the government cross-examine Ronnie Schulman about not firing

Klein immediately, Tr. 792, about inviting Klein to their daughter's wedding, Tr. 793, or ask her

to confirm that she had consulted *trial counsel* about whether to fire Klein in October 2011?[18]

---

[18] Tr. 794. Schulman's motion argued that if the Schulmans had fired Klein immediately, the
government doubtless would argue that they did so to create a false impression that they
disapproved of Klein's trading. The motion also said that it was hard to imagine the relevance of
asking questions about the Schulmans consulting trial counsel about whether to fire Klein "other
than to invite negative speculation about trial counsel's role during the investigation. MNT 7 &
n.22. The government did not respond to either argument.

Why did the government move to admit evidence of a "continued relationship" between Schulman and Klein? Dkt. 36.

The government moved to exclude Rob Schulman's emails in April 2011 turning Klein in to FINRA as his broker in response to an inevitable, routine inquiry into pre-merger trading that Klein should have anticipated as a result of his brokerage training and experience. The government moved to exclude the SEC Complaint, which relied on Schulman's testimony to charge Klein. The government successfully precluded Ronnie Schulman from testifying that she fired her trusted friend Tibor Klein because the SEC Complaint demonstrated that he had misappropriated confidential information from her husband. The government successfully precluded Ronnie Schulman from testifying that within a week of hearing that the Schulmans had fired him as a result of the SEC Complaint, and never wanted to speak to him again, Klein called and said, "Tell Rob I'm sorry."

After excluding all that truth, the government then argued for the first time in rebuttal summation that Klein had trusted Schulman not to turn him in for buying King stock in Schulman's IRA. Tr. 1202. That argument was sheer speculation about the motives of a man who did not testify. But because the jury did not hear about Rob Schulman's response to the FINRA inquiry, or what the SEC Complaint actually said, the jury asked for Ronnie Schulman's testimony related to when she fired Klein, and voted to convict five minutes later.

The government's opposition argued that courts generally hold that jury notes should not be considered in attacking jury verdicts. Opp. 66-67. The government's argument had the context wrong, as demonstrated by its citation to *Applebaum v. American Export Isbandtsen Lines,* 472 F.2d 56, 63 (2d Cir. 1972). In that case, the Second Circuit analyzed jury notes concerning a specific evidentiary question in rejecting a harmless error argument. Rather than disregarding the

18

jury notes, the Second Circuit held that they *supported the importance of the excluded evidence*. The defense asks the Court to consider the jury note not to attack the jury verdict, but to demonstrate the importance of the excluded evidence.[19] The jury's verdict five minutes after receiving the requested transcript portion demonstrates that if exclusion of the evidence was error, that error was extremely prejudicial to the defense, requiring a new trial.

The government's opposition contended that the SEC Complaint was "prejudicial" because it would create a mini-trial about whether the SEC's charging decision was the correct one. Opp. 67 & n.27. But the relevance and probative value of the SEC Complaint did not depend on whether it was "correct" or not. The SEC Complaint was relevant because it constituted "factual findings from a legally authorized investigation" that adopted exculpatory inferences contrary to the government's theory of prosecution. There was nothing confusing or misleading about that. There was no mini-trial necessary to determine whether the SEC filed the Complaint, or what the Complaint said.

It was undisputed that the SEC did not have access to Shechtman's testimony when it filed the Complaint. The jury was perfectly capable of determining whether Shechtman's testimony refuted the SEC Complaint's theory.[20]  It did not. The SEC did not know that Klein manipulated Shechtman into opening an options account and secretly sharing the profits from his

---

[19] None of the government's other cases involved a jury note's relevance to the importance of an evidentiary issue, and none involved a verdict five minutes after a note. *United States v. Powell,* 469 U.S. 57 (1984) is an inconsistent verdict case, not a jury note case. *Colon v. Mitchell,* 93-CV-4951, 1999 WL 758776 (S.D.N.Y. Dec. 26, 1995) was a habeas case briefly considering a jury note requesting the re-reading of a jury instruction. *Marcano v. United States,* 11-CV-5551 (RJD), 2015 WL 1276759 (E.D.N.Y. March 19, 2015), involved a jury note about a legal question.

[20] "Of course, the jury was also entitled to hear that the government conducted an independent investigation and reached a different conclusion after securing the cooperation of Raffle and Applegate. Armed with all relevant information, the jury would then appropriately weigh the evidence and decide what to believe." *United States v. Gluk,* 831 F.3d 608, 616 (5th Cir. 2016).

options trading without including Schulman. The SEC did not know that Shechtman said that Klein never indicated that his source expected to benefit; that Shechtman was surprised Klein bought King for any of his clients; or that Klein said that a friend had made a toast that "it would be good to be King" without mentioning Pfizer.

In light of the government's arguments at trial, the probative value of the SEC Complaint was overwhelming.  It was literally the difference between guilt and innocence. The government's opposition contained this heading: "Schulman's Disclosure of the Inside Information to Klein, His Financial Advisor, Was Overwhelming Evidence of his Intent to Commit Insider Trading." Opp. 45. The SEC Complaint alleged that Schulman disclosed MNPI to Klein, his financial advisor.  But that fact was not enough to lead SEC attorneys to conclude that Schulman intended Klein to trade.  On the same facts, they alleged instead that Klein misappropriated MNPI *from* Schulman. The government kept that undisputed truth from the jury, and then exploited its absence to make speculative arguments to secure a conviction.

**E.     It Was For The Jury, Not The Government, To Determine The Significance Of Klein Saying "Tell Rob I'm Sorry" Immediately After The Schulmans Fired Him In The Wake Of The SEC Complaint.**

The MNT argued that Klein's hearsay statement to Ronnie Schulman, "Tell Rob I'm sorry," was admissible as a statement against civil or penal interest. MNT 10-12.  Klein made that apology to Ronnie shortly after the SEC charged him with misappropriating MNPI from Schulman.  The government contends that Klein's apology is not self-inculpatory because it is subject to various "possible interpretations." Opp. 69.  But there is no requirement that a statement against interest have *only one possible meaning*. The standard is whether the statement would be "probative" in the SEC's case against Shechtman, *United States v. Gupta*, 747 F.3d 111, 127 (2d Cir. 2014), and there is no doubt a reasonable person in Klein's shoes would

understand that apologizing to Schulman could help the SEC prove his liability.  Indeed, the government conspicuously dodges the dispositive issue of whether the SEC could use the apology against Shechtman. Opp. 68-70.

Finally, the government's fallback argument that Klein's statement is unreliable is meritless. The government does not and cannot dispute that the corroboration requirement does not apply to statements against *civil* interest, and even if it did, "so much of a statement as simply implicates the defendant" is generally reliable. *United States v. Serrano*, 192 F. Supp. 3d 407, 413 (S.D.N.Y. 2016).

## II.     THE GOVERNMENT FAILED TO PROVE THE SINGLE CHARGED CONSPIRACY BETWEEN SCHULMAN, KLEIN, AND SHECHTMAN.

The government charged Schulman with participating in a *single, three-person conspiracy* between Schulman, Klein and Shechtman and the Court so instructed the jury. Tr. 1219.  But the government failed to prove the existence of a single conspiracy for two reasons.  First, the government failed to prove that Shechtman had the requisite *mens rea* to join the charged conspiracy, and the government's weak response confirms that conclusion.  Second, the government failed to prove that Schulman's purported agreement with Klein encompassed sharing MNPI with Shechtman.  The government's failure of proof led to a highly prejudicial variance between (1) the evidence introduced at trial in support of the purported Schulman-Klein-Shechtman conspiracy and (2) the government's meager proof of a narrower Schulman-Klein conspiracy.[21]  As a result, the jury heard inadmissible and highly prejudicial evidence against Schulman—including Klein's hearsay statements to Shechtman, Shechtman's attempted

_____

[21] As the MJOA demonstrates, the government failed to prove beyond a reasonable doubt that Schulman participated in *any* conspiracy, including a two-person conspiracy with Klein. As explained below, even assuming *arguendo* that the government proved a Schulman-Klein conspiracy, the prejudicial variance requires a new trial.

cover up of his partnership with Klein, and Shechtman's misleading testimony that he participated in an unproven conspiracy.  The government's failure to prove a conspiracy that included Shechtman requires a judgment of acquittal or, at a minimum, a new trial.

**A.      Shechtman Lacked Knowledge That Klein's Source Divulged MNPI For Personal Benefit.**

To establish that Shechtman had the requisite criminal intent to join a single Schulman-Klein-Shechtman conspiracy, the government had to prove that he knew that Klein's source (i) gave Klein MNPI and (ii) obtained a personal benefit. *United States v. Newman*, 773 F.3d 438, 450 (2d Cir. 2014) (government must prove that downstream tippee "knew the information was confidential and divulged for personal benefit").[22]  The present argument centers on Shechtman's knowledge that Klein's source obtained a personal benefit.

The government conceded that Shechtman lacked "actual knowledge" of personal benefit, but claimed he "consciously avoided learning" it. Opp. 61. To prove Shechtman's criminal intent under a conscious avoidance theory, the government had to show that (1) Shechtman was aware of a "high probability" that Klein's source divulged MNPI for personal benefit—that is, he "strongly suspected, but was not completely certain," of these facts—and (2) Shechtman "deliberately refuse[d] to confirm [what] . . . he believe[d] to be true." *United States v. Nektalov*, 461 F.3d 309, 315, 317 (2d Cir. 2006).  In short, conscious avoidance requires

---

[22] The Supreme Court's decision in *Salman v. United States*, 137 S. Ct. 420, 428 (2016), does not change this requirement.  The Department of Justice did not raise the issue of tippee knowledge in its petition for certiorari, thereby accepting *Newman*'s tippee knowledge requirement. Moreover, *Salman* explicitly stated that *Newman* "reversed the *Newman* defendants' convictions because the Government introduced no evidence that the defendants knew the information they traded on came from insiders or that the insiders received a personal benefit in exchange for the tips," and that "[t]his case does not implicate those issues." *Id.* at 425 n.1.

that Shechtman "can *almost be said have actually known*" that Klein's source divulged MNPI for personal benefit. *Glob.-Tech v. SEB S.A.*, 563 U.S. 754, 769 (2011) (emphasis added).

Confronted with this standard, the government tries to do an end-run around *Newman*'s requirement of tippee knowledge by diluting the conscious avoidance standard.  The government offers the following meager evidence of Shechtman's knowledge of personal benefit to Klein's source: (i) Klein told Shechtman that he "had inside information" and "Pfizer's buying King"; (ii) Klein's tone indicated "this was a serious conversation"; (iii) Klein "did not express any doubt about the information"; (iv) Shechtman testified "that he did not ask Klein where he had obtained the inside information because he 'didn't want to know the answers'"; and (v) Shechtman did not ask Klein about his source until they had completed their trading. Opp. 61.  The government has no other evidence—which it acknowledged by arguing to the jury that Shechtman "had *no idea* where the inside information came from." Tr. 1192 (emphasis added).[23]

The proof cited by the government does not remotely establish that Shechtman was aware of a *high probability* that Klein's source divulged MNPI *for personal benefit*.  Shechtman was not aware of any facts bearing on personal benefit that he could "deliberately refuse to confirm"—much less "facts that he believe[d] to be true." *Nektalov*, 461 F.3d 309, 315. The

---

[23] The government does not and cannot rely on Shechtman's testimony that, during Klein's December 2010 trip to Florida, Klein said "he heard about King at a party from a friend and there was no way to connect it to him." Tr. 325.  The government itself argued that Klein's statements about his source were not credible because Klein and Shechtman were in "full coverup mode" during that trip. Tr. 1192; *see also* Tr. 1144 ("What was the point of [the December 2010] trip? It was a cover up.").  Moreover, under Second Circuit law, the bare statement that Klein obtained MNPI from "a friend"—especially one that "there was no way to connect" to Klein—cannot support an inference that the source obtained a personal benefit. *See Newman*, 773 F.3d at 452 (government may not "prove the receipt of a personal benefit by the mere fact of a friendship, particularly of a casual or social nature"); *see also United States v. Bray*, 853 F.3d 18, 27 n.5 (1st Cir. 2017) (explaining that *Salmon* did not abrogate the Second Circuit's holding that a "meaningfully close personal relationship" is required to show personal benefit through friendship).

government's assertion that Shechtman "knew of the high probability . . . that the information was MNPI, divulged for personal benefit," Opp. 61, is a non sequitur.

At most, the government's evidence suggests that Shechtman believed that Klein had *confidential* information.  But that is not enough.  Confidential information can be disclosed for permissible reasons.  Indeed, "the Supreme Court affirmatively rejected the premise that a tipper who discloses confidential information necessarily does so to receive a personal benefit." *Newman*, 773 F.3d at 454; *see also Dirks v. S.E.C.*, 463 U.S. 646, 661-62 (1983) ("All disclosures of confidential corporate information are not inconsistent with the duty insiders owe to shareholders.").  Under *Newman*, that Klein's source had "inside information" cannot, without more, support an inference that the source disclosed MNPI for personal benefit. *Newman,* 773 F.3d at 455 ("[E]ven if detail and specificity [of information] could support an inference as to the nature of the *source*, it cannot, without more, permit an inference as to that source's improper *motive* for disclosure.") (emphasis in original).  Thus, the government failed to prove a single conspiracy between Schulman, Klein and Shechtman.

### B.     The Government Failed To Prove That Schulman's Purported Agreement With Klein Encompassed Sharing MNPI With Shechtman.

The government likewise failed to prove a single Schulman-Klein-Shechtman conspiracy because it did not prove that Schulman's purported agreement with Klein encompassed Shechtman.[24] "Nobody is liable in conspiracy except for the fair import of the concerted purpose

---

[24] These arguments are framed more broadly below than in Schulman's opening brief.  Because they are substantial arguments and go to the fundamental fairness of Schulman's trial, defense counsel is raising them in this reply.  We have no objection to permitting the government to file a limited sur-reply, if requested. *See Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.*, No. 11 CIV. 3130, 2012 WL 4049955, at *6 (S.D.N.Y. Sept. 14, 2012) ("Courts have broad discretion to consider arguments in a sur-reply, particularly when new arguments are put forth in a reply brief.").

or agreement as he understands it; if later comers change that, he is not liable for the change." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).  A "conspiracy is not defined by its purpose but rather by the agreement of its members to that purpose." *United States v. Geibel*, 369 F.3d 682, 690 (2d Cir. 2004).

Based on these principles, the leading Second Circuit decisions on the scope of insider trading conspiracies establish that an insider-tipper (like Schulman) does not join a conspiracy with a downstream tippee (like Shechtman) merely because "they had the same purpose, which was to trade on inside information." *Geibel*, 369 F.3d at 690; *McDermott*, 245 F.3d at 137-38 (same).  An insider-tipper does not enter a conspiracy with a downstream tippee unless the insider agrees, at least implicitly, to pass MNPI to both the direct tippee *and* the downstream tippee.  *See McDermott*, 245 F.3d at 137 (rejecting government's argument that "[insider-tipper] was part of the conspiracy even though he did not agree to pass information to both [the direct tippee] and [the downstream tippee]").  To prove that Schulman agreed to pass MNPI to both Klein and Shechtman, the government had to prove: (1) "the scope of [Schulman's] trading agreement" included Shechtman's trading; (2) Schulman "reasonably foresaw . . . information being passed to" Shechtman; (3) Schulman had "actual awareness" of Shechtman's role; or (4) "mutual dependence or benefits" between Schulman and Shechtman. *Geibel*, 369 F.3d at 690-92.

Under this standard, an insider-tipper's disclosure of MNPI to a direct tippee cannot, without more, support the inference that the insider agreed or foresaw that the direct tippee would pass the MNPI to an unknown, remote tippee.  In *McDermott*, McDermott, an insider-tipper, disclosed MNPI to Gannon, his paramour. Unbeknownst to McDermott, Gannon tipped Pomponio, with whom she was also having an affair, and they both traded on McDermott's MNPI. 245 F.3d at 135-36. The Second Circuit held that the government failed to prove a single

25

conspiracy because "no record evidence suggest[ed] that McDermott's agreement with Gannon encompassed a broader scope than the two of them," and it was not "within McDermott's frame of reference that Gannon would share stock information" with Pomponio. *Id.* at 138; *see also United States v. Carpenter*, 791 F.2d 1024, 1036 (2d Cir. 1986) (tipper not part of a conspiracy with downstream tippee because "trading agreement" was "limited to specific persons").

In *Geibel*, Freeman, an insider-tipper, agreed to provide MNPI to two tippees, Cooper and Erskine, for a percentage of their trading profits. Cooper obtained Freeman's permission to pass MNPI to certain individuals, but also tipped another person, Connor, without Freeman's knowledge.  Connor then tipped others. *Geibel*, 369 F.3d at 686-87.  The Second Circuit held that Freeman's trading agreement did not encompass trading by an unknown, remote tippee like Connor because Freeman "took steps to maintain the scheme's secrecy and exclusivity." *Id.* at 690.  Specifically, Freeman did not "broadcast" his tips, but "disseminated information in a specific chatroom, in code, to two individuals," and trading by others "would directly undermine the scheme by increasing [his] chance of detection." *Id.* at 691.  Additionally, the court found that Freeman lacked "mutual dependence" with Connor because "the sharing of information [with Connor] inured only to the benefit of [Connor and his tippees], not Freeman." *Id.* 691-92.

Like the insider-tippers in *McDermott* and *Geibel*, it was not within Schulman's "frame of reference," *McDermott*, 245 F.3d at 138, that Klein would pass MNPI to Shechtman. Schulman's purported tip to Klein was secret and exclusive.  The government concedes that the "*evidence at trial . . . demonstrate[ed] [Schulman's] intent to keep the information secret.*" Opp. 31 (emphasis added).  The government argued in summation that Schulman gave MNPI to Klein at his house on one occasion, told no one else, and waited for his wife to leave the room before telling Klein. Tr. 1149-50, 1196.  Further, Klein's disclosure of MNPI to Shechtman did not

26

provide any benefit to Schulman.  If anything, it "directly undermine[d] the [purported] scheme by increasing [Schulman's] chance of detection." *Geibel*, 369 F.3d at 691.  Finally, as the government emphasized in summation, and Ronnie Schulman testified, Schulman had a close personal and professional relationship of trust with Klein. Tr. 743-44; 1147-48.  Based on that relationship, the government took the position that Schulman *did not expect Klein to pass MNPI to anyone else*:

> Now, there's an old saying, admit what you can't deny and deny what you can't admit.  That's exactly what happened here. [Schulman] had to admit he told Tibor Klein something that day because the paper trail and the evidence went right to Tibor Klein. *[Schulman] thinks he's covered.  All this relationship of trust with Tibor Klein, [Klein's] not going to say anything.  We're in this together.*  I trusted him to trade on this information.  *I trusted him to tell him this information because I knew he wouldn't say anything.*  So he sticks with King for a day.  *But then something comes along that he doesn't know about, Michael Shechtman.*

Tr. 1189 (emphasis added).  Under *McDermott* and *Geibel*, the government's own argument forecloses the existence of a single Schulman-Klein-Shechtman conspiracy.[25]

The only other record evidence bearing on the scope of Schulman's purported agreement with Klein is that Klein was Schulman's financial advisor.  At the very most, that fact suggests that Schulman could have foreseen that Klein would trade for himself, Schulman, and Klein's other clients. Indeed, that is precisely how the government framed Schulman's alleged conspiracy for the jury in summation:

> [T]he defendant entered into an agreement to engage in insider trading when he shared [MNPI] with his investment advisor.  Klein took steps to further that conspiracy *when he traded on that information for his benefit, his clients' benefit and the defendant's benefit.*

---

[25] The government did not make any *Brady* or Rule 3.8 disclosures that the alleged conspiratorial agreement between Schulman and Klein included an understanding that Klein would not disclose MNPI to other persons.  Had the Court and defense counsel known that would be the government's position, the issue of the scope of the conspiracy would have been revealed, and the defense would have been in a position to object to the admissibility of Klein's hearsay statements and the evidence of Shechtman's trading partnership with Klein and cover up.

> [T]he defendant provided the inside information about the merger to Tibor Klein
> with every intent that Klein trade on that information, and that's enough for
> joining the conspiracy. *He doesn't need to have spoken to Michael Shechtman.*
> *He doesn't have to know who Mike Shechtman is.*

Tr. 1123-24 (emphasis added). Again, the government's own version of the facts confirms that

Schulman's purported agreement with Klein did not encompass sharing MNPI with Shechtman.

Thus, Klein's role as Schulman's financial advisor provides no basis to infer that Schulman

expected Klein to pass MNPI to Shechtman—an unknown third party with no connection to

Schulman or Klein's other clients.

In sum, given the government's exceedingly thin evidence on the scope of Schulman's

purported agreement with Klein, the evidence showing that any such agreement did not

encompass sharing MNPI with Shechtman, and the government's position that Schulman

*counted on* Klein *not* to share the MNPI with a third party, the government failed to prove a

single Schulman-Klein-Shechtman conspiracy.

### C.    The Variance Between The Charged Conspiracy And The Proof At Trial Severely Prejudiced Schulman.

The government's theory of the case at trial rested on a three-person conspiracy. Its

failure to prove that conspiracy grossly distorted the trial and severely prejudiced Schulman.

The government's failure of proof led to the improper admission of both Klein's hearsay

statements to Shechtman and all the evidence of Shechtman's attempted cover up and

consciousness of guilt. This prejudicial evidence certainly influenced the verdict.

### 1.    Klein's Hearsay Statements Are Not Admissible Against Schulman.

The government introduced Klein's critical hearsay statements to Shechtman on the

basis of a broad, but unproven, single Schulman-Klein-Shechtman conspiracy. These statements

included Klein's implicit assertion that he had "inside information" that Pfizer was acquiring

28

King, Tr. 258; his assertion that "Frank [, Klein's mentor,] wouldn't touch" that information, Tr. 261; and Shechtman's testimony about his conversations with Klein during their attempted cover up. *See, e.g.*, Tr. 324-29.  Because the government contended that these statements were admissible at trial (and now) based on *Shechtman's participation* in the conspiracy, Opp. 60, its failure to prove a Schulman-Klein-Shechtman conspiracy renders them inadmissible.

Moreover, the government did not argue, either at trial or its opposition brief, that Klein's hearsay statements were in furtherance of a narrower Schulman-Klein conspiracy.  Nor could it. A hearsay statement to a person who is *not* a member of the conspiracy cannot satisfy F.R.E. 801(d)(2)(e) unless it "is *designed* to help the coconspirators to achieve the conspiracy's goals." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994) (emphasis added).  Because the government failed to prove that the *agreed-upon* purpose of a Schulman-Klein conspiracy encompassed passing MNPI to Shechtman, and affirmatively argued that Schulman expected that Klein would not share MNPI with anyone else, Klein's statements to Shechtman were not "in furtherance" of such a conspiracy.  Given the centrality of Klein's hearsay statements to the government's case, their exclusion requires a judgment of acquittal or, at a minimum, a new trial.

### 2.     Prejudicial Evidence of the Overbroad Charged Conspiracy Likely Affected the Jury's Verdict and Requires A New Trial.

A substantial likelihood exists that the jury improperly considered evidence of the charged, but unproven, Schulman-Klein-Shechtman conspiracy against Schulman. "When a defendant is charged with a single conspiracy among multiple members, and the proof at trial shows that he conspired with some, but not all, of those members," the variance requires reversal of both conspiracy *and* substantive insider trading convictions if it "caused the defendant substantial prejudice." *Geibel*, 369 F.3d at 692–93; *McDermott*, 245 F.3d at 139 (reviewing variance between charged conspiracy and trial evidence for "potential prejudicial effect on [the

insider-tipper's] trial for the substantive counts of insider trading," and reversing both conspiracy and substantive convictions).

A conviction cannot stand if "there was a substantial likelihood that the jury considered evidence of the broad conspiracy charged in the indictment in deciding [Schulman's] guilt." *Geibel*, 369 F.3d at 693; *see also id.* ("[T]he essential question is whether the jury convicted the defendant on evidence unrelated to his own alleged activity.").  Courts also consider factors like "(1) whether the court gave a *Pinkerton* charge; (2) whether statements of persons not in the conspiracy were used against the defendant; (3) whether there was prejudicial spillover due to a large number of joined defendants; and (4) whether any inflammatory or shocking evidence came in against the defendant." *McDermott*, 245 F.3d at 139.

Here, the jury considered extensive evidence of a charged, but unproven, Schulman-Klein-Shechtman conspiracy.  The prejudice to Schulman was magnified because, as the Court understatedly observed, this was "not the strongest case I have ever seen." Tr. 701.  A substantial likelihood therefore exists that the jury convicted Schulman on evidence "unrelated to his own alleged activity." *Geibel*, 369 F.3d at 69.  First, as noted above, the erroneous admission of Klein's hearsay statements by itself requires an acquittal or a new trial.

Second, virtually all of Shechtman's testimony, which related to his partnership with Klein and cover up, came in as proof of an overbroad Schulman-Klein-Shechtman conspiracy. Tr. 1193.  Shechtman testified that he tried to "fly under the radar" to avoid "be[ing] caught," Tr. 276-77; that he was "nervous" because $110,000 in profits might not "still stay under the radar," Tr. 282; and that he paid Klein by writing checks to Klein's in-laws. Tr. 285-87.  After Shechtman completed his trading, he testified that he "tried to cover [his] tracks" by lying to Ameriprise; Tr. 290- 292; met with Klein in Florida "in case someone was listening" to their

30

calls," Tr. 320; spoke with Klein in a sauna "[l]ike it was a mafia movie," Tr. 327; and parroted

Klein's false explanations to Ameriprise on a call that he illegally recorded. Tr. 331-32.  This

damaging evidence would have been excluded or significantly curtailed had Schulman been tried

for a narrower conspiracy that did not include Shechtman.[26]

Third, Shechtman told the jury over and over that he was guilty of a crime that, on the

record before the Court, he simply did not commit.  Shechtman testified that he conspired to

commit securities fraud, Tr. 245; knew what he did was "wrong" because "[p]art of the training

as being a financial advisor is understanding the basics of what insider trading is," Tr. 279; had

not "touched" his "profits from [his] insider trading" because it was "dirty money," Tr. 335; and

that "engag[ing] in insider trading" "ruined [his] life." Tr. 337-38.  Shechtman also testified that

when Ameriprise confronted him about his trading, "[m]y head was spinning, my heart sank, and

I went numb," and "I immediately knew it was about the trades." Tr. 289-90.  Shechtman's

admissions of guilt, combined with the dramatic description of his consciousness of guilt, were

not admissible against Schulman and were highly prejudicial.[27]  Moreover, the Court's limiting

---

[26] Notably, the government leveraged Shechtman's involvement in the overbroad conspiracy in its summation and rebuttal.  The government referenced the Klein-Shechtman "cover up" no less than *seven times*, Tr. 1142-44, 1155, 1192, 1198; and its final argument to the jury emphasized that Klein sold Schulman's Enzo on the day he booked his December 2010 trip to visit Shechtman. Tr. 1204.  In addition, the government argued that Schulman intended that Klein trade based on the following evidence that was *unrelated to Schulman's conduct*: (1) Shechtman's trading activity, constant communications with Klein, and the fact that Shechtman "felt nervous about" "trading on inside information," Tr. 1152-53; (2) that Shechtman made "the biggest bet in securities he's ever made" while not including his own clients "because he knew it was wrong," Tr. 1194-95; and (3) Shechtman's testimony that he "didn't know how much [he] was going to make" and "just invested," which, the government argued, supported the inference that Schulman similarly just "gave [Klein] the information with the intent to trade and knew it would be there." Tr. 1200.

[27] Again, the government's summation and rebuttal emphasized that Shechtman was guilty of a crime he did not commit. *See* Tr. 1145-46 ("Ask yourself why [Shechtman] would get up on that stand and say I'm guilty of insider trading and face the penalties if he's not guilty of insider

instruction as to Shechtman's guilty plea, Tr. 1216-18, was ineffectual because Shechtman was *not actually guilty*, and it would take a "feat[] of mental dexterity" to disregard the "prejudicial spillover" from the testimony of his consciousness of guilt. *McDermott*, 245 F.3d at 139.

In addition, the specific prejudice factors listed in *McDermott* and *Geibel* reinforce the conclusion that Schulman must receive a new trial. The Court gave the jury a *Pinkerton*-style instruction, which invited the jury to consider Shechtman's statements and acts against Schulman. Tr. 1219-20; *Geibel*, 369 F.3d at 693. The statements and actions of a "person[] not in the conspiracy, [namely, Shechtman,] were used against" Schulman. *Geibel*, 369 F.3d at 693. And "inflammatory evidence," including Shechtman's repeated lies to Ameriprise, Mafia-style meeting in a sauna, and statement he went numb, all "came in against" Schulman. *Id.* Finally, as in *McDermott*, the "absence of anyone else at the defense table, *increased* the prejudicial effect of [Shechtman's] testimony on [Schulman's defense] by channeling all references to a source of securities information entirely onto [Schulman.]" *McDermott,* 245 F.3d at 139 (emphasis in original).

In sum, the jury could not help but view the evidence through the distorting lens of a broad Schulman-Klein-Shechtman conspiracy. The variance between that charged conspiracy and the government's thin proof was prejudicial and likely affected the jury's verdict.

> ### D. The EDNY Did Not Deny That Shechtman's Negotiations Or Guilty Plea Were Based On The Exculpatory Theory That Shechtman And Klein Misappropriated MNPI *From* Schulman.

Even if the government had proved the charged three-person conspiracy (which it did not), the Court erroneously curtailed Shechtman's cross to prevent the defense from developing

---

trading. He wouldn't and he didn't."); Tr. 1193-94 (arguing that the defense's argument that "Shechtman pled guilty to a crime in order to somehow help himself . . . . makes no sense").

32

affirmative evidence that the charged conspiracy did not exist.  That improper limitation also requires a new trial.  Schulman's MNT demonstrated that the government hedged its bets during Shechtman's Rule 11 colloquy and in all interviews with him.  The government literally never asked Shechtman whether he knew whether Klein's source obtained a personal benefit of any kind.  The government thereby preserved its options to charge Klein alone on the SEC Complaint's misappropriation theory, or to charge both Klein and Schulman on the contradictory theory that Schulman intended Klein to trade on MNPI.

At trial, Shechtman denied any knowledge of a benefit to Klein's source.  Yet the government sought to shut down defense counsel's attempts to question Shechtman about whether he pled guilty under the SEC Complaint's misappropriation theory; and succeeded in preventing the defense from introducing Shechtman's consent judgment agreeing that the SEC Complaint was true for purposes of discharge in bankruptcy. MNT 13-22.

Schulman's MNT contended that "if the government threatened Shechtman with prosecution under the theory of the SEC Complaint, or discussed preserving that option with Shechtman or his counsel, . . . such information would constitute *Brady,* Rule 3.8, and *Giglio* material." The motion also sought discovery "from Shechtman's counsel about their negotiations with the SEC and EDNY related to theories of liability." MNT 17 & n.43.

Sometimes silence speaks louder than words. The government's opposition did not respond to the MNT's showing that it had hedged its bets on theory of Shechtman's guilt, and did not deny that he pled guilty to the exculpatory theory of prosecution in the SEC Complaint.

Likewise, the government did not say whether Shechtman's negotiations included the SEC's exculpatory theory of prosecution. Opp. 71, 71 n.31.[28]  It merely said it complied with *Brady*.

Government counsel attacked the credibility of defense counsel in regard to Shechtman's guilt, and argued that Shechtman was credible and Schulman guilty, because Shechtman "took responsibility for it. He committed insider trading and he told you that." Tr. 1193-4. But the defense never had the chance to demonstrate that Shechtman "committed insider trading" by misappropriating MNPI *from* Schulman, not by conspiring *with* him.

It was not enough, as the government argues, that the defense questioned Shechtman about what he knew about Schulman and what "he did to be guilty of his crime." Opp. 71-72. What mattered was whether Shechtman and/or the EDNY understood that Shechtman was pleading guilty to a theory of prosecution that exculpated Schulman. And the government prevailed in preventing Schulman from developing evidence on that critical issue.[29]

Further, Shechtman's consent judgment admitting the allegations of the SEC Complaint as true was also clearly relevant. The government's opposition argued that the admission was not inconsistent with Shechtman's trial testimony, because Shechtman denied only misappropriating

---

[28] Shechtman's plea negotiations would not have been admissible against him in a criminal case, but they are discoverable and admissible when relevant at the trial of someone else. F.R.E. 410 excludes evidence of plea negotiations only "against the defendant who made the plea or participated in the plea discussions." *United States v. Serna,* 799 F.2d 842, 849 (2d Cir. 1986).

[29] The government's citation to *United States v. Stewart,* 433 F.3d 273 (2d Cir. 2005) is inapposite. Opp. 71. In *Stewart,* the government did not charge the defendant with insider trading. Stewart's broker's assistant cooperated, and testified about providing a tip to Stewart. Stewart was convicted of obstruction offenses for denying that her trading was based on the tip. The Second Circuit upheld the district court's refusal to allow cross based on the theory that the broker's assistant was concerned about his exposure for insider trading. The result would have been far different if the broker's concern about insider trading exposure somehow exculpated the defendant. But those concerns were *not* exculpatory for Stewart—both the cooperator and Stewart had some exposure for the same uncharged insider trading theory.

MNPI "directly" from Schulman. Opp. 73. But the government's objection was responsible for that limitation.  Defense counsel tried to ask the question "broadly on purpose." The Court directed counsel to insert the word "directly" into the question. Tr. 448-52.  That word play was not the reason the Court excluded the consent judgment in the sidebar that followed. Tr. 454-67.

The government also argued that "the SEC complaint does not include any allegation that Shechtman was more than a tippee who traded on the information misappropriated by Klein." Opp. 73.  No, the SEC Complaint said more. It contained a specific allegation that was completely inconsistent with the government's theory of prosecution—that Klein misappropriated MNPI in breach of a relationship of trust and confidence with Schulman. After Shechtman proffered to the SEC and EDNY, and while the SEC and EDNY were coordinating their investigations, the SEC and Shechtman asked a federal judge to enter an order that Shechtman had committed insider trading based on those allegations. At this trial three years later, Shechtman and the government said that those allegations were not true.

## III. THE UNDISPUTED FACTS DO NOT SUPPORT AN INFERENCE THAT ROB SCHULMAN SAID MORE THAN "IT WOULD BE NICE TO BE KING FOR A DAY."

The government's opposition confirmed that its case relies completely on the speculative proposition that Rob Schulman said more to Tibor Klein than "it would be nice to be King for a day." At trial, government counsel waited until closing argument to finally say that Schulman's "King for a day" testimony was a false exculpatory.[30] Schulman's MJOA argued that it would be fatally inconsistent for the government to claim that Klein and Shechtman's aggressive trading proved, beyond a reasonable doubt, that Schulman lied and said more than "King for a day," but then retreat to the position that Klein and Shechtman's trading proved that "King for a day" was

---

[30] Tr. 1136, 1142, 1190, 1195.

material. MJOA at 9 & n. 19. The government's opposition did not attempt to argue that its case could survive if all Schulman said was "it would be nice to be King for a day." But the government failed to prove that Schulman said anything more.

Schulman's SEC testimony and EDNY interview were the only direct evidence of what he said to Klein on August 13, 2010. Because Rob Schulman did not testify, the jury was in no better position than counsel or the Court to evaluate his credibility. Ronnie Schulman testified that she did not hear her husband say anything about a client and a potential merger with Pfizer, but she would not have picked up on the "King for a day comment."[31] Shechtman testified that on August 16, Klein asked what Shechtman would do if he had inside information. Shechtman told the government: "Klein told him he doesn't know much, but he heard a rumor that Pfizer is buying King."[32] Klein's tone was unusual and serious. Shechtman also testified that Klein later said he was at a party where "some unidentified friend made a toast that it would be good to be King," that Klein had not mentioned Pfizer in connection with that toast, and that Klein never told Shechtman where he got "Pfizer."[33]

In the absence of direct evidence to contradict Rob Schulman, the parties are arguing inferences based on this scant testimony, what Schulman knew as of August 13, and the conduct of Klein, Shechtman, and the Schulmans after August 16, 2010. The law is clear that that "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal

---

[31] Tr. 751-52, 754-56.

[32] Tr. 1096, 1103 (Agent DelGuidice direct and re-direct testimony); Defense Exhibit 208A (Agent DelGuidice's notes of first interview with Michael Shechtman on December 17, 2013.) Shechtman could not recall, and thus did not dispute, that the first words out of his mouth to the government were that "Shechtman said he asked Klein all kinds of questions regarding the inside information he had, but Klein told him he didn't know [] much, but he heard a rumor that Pfizer is buying King." Tr. 425-26 (Shechtman cross).

[33] Tr. 477-78 (Shechtman cross).

circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Coplan*, 703 F.3d at 69. The government's repeated mischaracterization of defense arguments, its failure to address critical defense inferences, and its demonstrably incorrect logic, reveal that the government's evidence came nowhere close to meeting its burden that Rob Schulman's "King for a day" testimony was a false exculpatory.

### A.     What Schulman Actually Knew About The King/Pfizer Talks Makes It Unlikely That He Said "Exactly" What The Government Speculated He Did.

The government told the jury three times that they knew "exactly" what Schulman said on August 13, 2010—"that Pfizer is going to acquire King."[34] In rebuttal, citing a preliminary due diligence checklist that never went to Schulman and was not in evidence, the government argued for the first time that Schulman "knew [that the deal] was far down the road. It was very likely to happen."[35] Schulman's MJOA demonstrated that as of August 13, the deal was not "very far down the road."  Pfizer did not announce the acquisition until two months later, on October 12, 2010.  Schulman told the SEC and EDNY that he only knew about a preliminary meeting on August 4 to discuss patent litigation, that he knew a partial or full merger was possible, but in his experience a lot of mergers did not materialize. MJOA 11-15.

The MJOA argued that because Schulman knew so little, he could not have told Klein that "Pfizer is going to acquire King" with any certainty, making it unlikely that Schulman said more than "it would be nice to be King for a day."  The MJOA argued that "it would be nice to be King for a day" was more consistent with what Schulman actually knew on August 13, two months before the acquisition, and that the government never speculated to the jury that Schulman exaggerated what he knew. MJOA at 11-15.

---

[34] Tr. 1189, 1190, 1194.
[35] Tr. 1189.

The government's opposition did not argue that Schulman exaggerated what he knew, or cite any evidence from the record that the deal "was very far down the road." The opposition did not mention the "exactly" argument to the jury. The government did not dispute that when counsel told the jury Schulman knew the deal was "very far down the road," they knew that King rejected Pfizer's initial offer in September and went looking for other buyers.[36] Instead, the government created a straw man—that the MJOA was arguing that Schulman did not possess "significant" or "material" information. Opp. 36 & n.9.

To be clear, Schulman's argument has nothing to do with whether he possessed MNPI. Instead, Schulman contends that the evidence of what he actually knew supports a more likely inference that he said no more than "it would be nice to be King for a day." The government's opposition did not explain how a sophisticated lawyer, who knew merger talks often fall apart, would believe that a single meeting to discuss patent litigation meant "exactly" that "Pfizer is going to acquire King," and that he would pass that idea along with any certainty. What Schulman actually knew supports a strong inference that it is more likely that all he said was "it would be nice to be King for a day."

**B.     Klein's Recommendation To Buy Options Expiring In One And Two Months Is Not Consistent With The Government's Theory That Schulman Shared The Details Of What He Knew With Klein.**

If Rob Schulman said more than "it would be nice to be King for a day," and the evidence is undisputed that no one knew on August 13 that Pfizer would actually acquire King two months later, what more "exactly" did Schulman say? The government's opposition did not

---

[36] "By telephone call on September 9, 2010, Mr. Markison communicated to Mr. D'Amelio that King's Board had rejected Pfizer's non-binding offer of $13.25 per Share in cash. Between September 9, 2010 and September 16, 2010, at the direction of King's Board, four parties were contacted to determine interest in a potential business combination transaction with King, none of which resulted in a proposal." Form SC 14D9, filed on October 22, 2010, at p. 13.

contend that Schulman exaggerated what he knew. If Schulman had told Klein everything he knew as of August 13, 2010, here's what he would have said: "I know that Pfizer and King lawyers met on August 4 to discuss the King patent litigation. That probably means that the two companies are in discussions about whether Pfizer will buy King, or buy one or more of its product lines. I don't know where the negotiations stand, I don't know when a deal will happen, or whether it will happen at all. In my experience, lots of merger negotiations do not materialize."

Hearing "it would be nice to be King for a day," or hearing what Schulman actually knew about the August 4 meeting, might cause a retail broker like Klein to buy King stock in the hopes that a merger might happen over the long term. That's what Klein did. The MJOA detailed the evidence that Klein's long positions in King were not very risky, and, with one exception, Klein did not invest more than eight percent of any single client's portfolio in King. MJOA 16-17.

But Klein did more than buy King shares for himself and many of his clients. He recommended that Shechtman invest $15,000 in high risk options that would expire within one and two months, on September 18 and October 16. MJOA 16-17. Shechtman lost over $6,000 when the first set of options expired worthless, and the second set of options would have expired only four days after Pfizer announced the King acquisition. In contrast to what Schulman actually knew, "it would be nice to be King for a day" hints at something more imminent. The MJOA argued that Klein and Shechtman's trading behavior was more consistent with Schulman telling Klein "it would be nice to be King for a day" than with Schulman telling Klein what he actually knew about the Pfizer/King talks.

The government's opposition did not address why what Schulman actually knew would cause Klein to recommend risky options more than hearing "it would be nice to be King for a

day." Instead, the government erected another straw man: "Schulman tries in vain to come up with alternative explanations for Klein's and Shechtman's extensive trading that do not involve Klein basing those trading decisions on inside information from Schulman regarding the Pfizer-King merger." Opp. 38.  Again, to be clear, Schulman's argument has nothing to do with whether Klein acted based on something he heard from Rob Schulman on August 13. The defense is arguing about what it is reasonable to infer that Schulman said.

Assuming that Klein bought King stock and recommended risky options to Shechtman based on what he heard from Rob Schulman on August 13, the SEC Complaint demonstrates that it is more likely that Klein's behavior was based on hearing "it would be nice to be King for a day" rather than hearing the details of what Schulman actually knew. SEC counsel knew that Schulman had learned about the August 4 King/Pfizer meeting. SEC attorneys knew that Schulman remembered saying "it would be nice to be King for a day." SEC attorneys knew that Klein bought King stock for himself and many clients, that Klein called Shechtman repeatedly in mid-August 2010, and that Shechtman immediately bought risky options in King as a result. The SEC brought a lawsuit based on its conclusion that "it would be nice to be King for a day" was a truthful and sufficient explanation for Klein and Shechtman's trading. Again, regardless of whether the SEC Complaint was admissible, it demonstrates what inferences sophisticated government attorneys and investigators drew from the same evidence.

### C.   The Government Mischaracterized The MJOA's Argument About Klein Telling Shechtman in December 2010 That He Heard A "King For A Day" Toast; That Evidence Demonstrates That Rob Schulman Is Innocent.

Shechtman testified that Klein specifically mentioned Pfizer during their calls in August, 2010.  Because Rob Schulman did not recall mentioning Pfizer to Klein, the government

contended that Shechtman's testimony proved that Schulman said more than "it would be nice to be King for a day."

The defense produced evidence that even if Shechtman's cooperation-motivated memory three years after the fact was accurate, there were equally reasonable inferences that Klein got "Pfizer" somewhere else. Readily-available internet articles from 2007-2008 said that Pfizer was interested in acquiring King.[37] Shechtman's cross examination established that Klein persuaded Shechtman to open an options account to buy risky King options and split the profits with Klein, while Klein could just as easily have opened his own options account and split the profits with Shechtman. With the benefit of hindsight, Shechtman acknowledged that specifically mentioning Pfizer made it sound like Klein had more credible information, and helped persuade Shechtman to make the risky options trades in his own name. Tr. 368-70, 490.

In December 2010, when Ameriprise began investigating Shechtman's options trading, Klein emailed Shechtman some research dated August 16, 2010. That research did not include the numerous internet articles saying that Pfizer had been interested in acquiring King several years before.[38] From all this, the government's opposition argued that there was no evidence that Klein was manipulating Shechtman, Opp. 40, and that "if Klein had reviewed these articles, even as part of post-hoc efforts to create a reason to buy the stock, common sense and logic dictate that he would have sent them to Shechtman or at least made some reference to them when they were covering up the crime." Opp. 39.

From that same evidence, the MJOA argued that Klein was manipulating Shechtman into making risky options trades in his own name. The MJOA argued that Klein would not have

---

[37] Tr. 1003-09 (Dubinsky direct); Defense Exhibits 13, 42, 53.
[38] Tr. 301-02 (Shechtman direct, describing Government Exhibit 209, email from Klein with attached research articles).

included the 2007-08 internet articles in his email to Shechtman because the articles would not have been persuasive to Ameriprise, and because they would have revealed that Klein had persuaded Shechtman to take risks that could ruin his career (and persuaded Shechtman to split the profits), based on readily-available internet articles. MJOA 23-24.

Klein did not testify. There are no documents that can demonstrate whether Shechtman's memory was accurate, or whether Klein was speculating about Pfizer, or got Pfizer from the internet, from Schulman, or from someone else. Lawyer arguments based on an email Klein sent to Shechtman in December 2010 do not prove beyond a reasonable doubt that Schulman mentioned Pfizer to Klein four months earlier.

Critically, there is additional exculpatory evidence that overwhelms the government's speculation based on Klein's December 2010 email. Shechtman testified that Klein said that he was at a party where "some unidentified friend made a toast that it would be good to be King," that Klein had not mentioned Pfizer in connection with that toast, and that Klein never told Shechtman where he got "Pfizer."[39] That testimony directly corroborated Schulman's testimony that he had said "it would be nice to be King for a day," but had not mentioned Pfizer.

The government argued for the first time in rebuttal summation, and repeated in its opposition, that Klein was lying to Shechtman about the toast because he did not mention it until December 2010 or later, when he was in "full cover up mode."[40] The government's opposition acknowledged that Shechtman had testified that Klein told him about the toast at a face-to-face meeting, either in December 2010, or in June 2013, but cited Shechtman's testimony on redirect

---

[39] Tr. 417-18, 477-78 (Shechtman cross).
[40] Tr. 1192; Opp. 41.

that he "best remembered" learning about the "King for a day" toast when he visited Klein in July 2013 and they reviewed Klein's SEC transcript together.[41]

      The MJOA pointed out that if Klein told Shechtman in December 2010 that he heard a toast from a friend "that it would be good to be King for a day," that would blow up the government's central theory that "the King for a day story is a lie."[42] Shechtman, Klein, and Schulman did not testify before the SEC until 2012. In December 2010, Schulman had not told his "King for a day" memory to anyone—he didn't even know that Klein had bought King in Schulman's IRA account.[43] In December 2010, Klein could not have heard a toast that "it would be good to be King" from anyone other than Schulman during their meeting four months earlier.

      The government did not respond to this critical argument, and mischaracterized it in a way that is difficult to reconcile with ordinary reading comprehension. In a footnote, the government wrote that the MJOA was arguing "that Shechtman and Klein were not covering up their crime in December 2010 because the SEC was not yet investigating the trading." Opp. 41 & n.12. No. The MJOA never contended that Klein and Shechtman were not attempting to cover up *their* conduct (entirely independent of Schulman) in December 2010; it argued that because the SEC had not yet begun its investigation, in December 2010 Klein could only have heard the "it would be good to be King" toast directly from Schulman four months earlier. That means

---

[41] Opp. 41 & n.11. In fact, Shechtman first recalled Klein talking about the "friend at a party" during direct examination, when describing his December 2010 visit to Klein. Tr. 325. Shechtman repeatedly testified that he did not recall whether Klein told him about the friend at a party offering a toast that "it would be good to be King for a day" at their face-to-face meeting December 2010 or in 2013. Tr. 416, 417, 503. It is at least equally plausible that Klein told Shechtman about the "King for a day" toast in December 2010.
[42] Tr. 1190.
[43] Tr. 761-62.

Schulman told the truth when he recalled telling Klein "it would be nice to be King for a day." That means Rob Schulman is innocent.

Almost as bad, the government's "cover up mode" argument is nonsensical. Klein was trying to provide information to Shechtman so that Shechtman could cover up the reason for his trading in conversations with Ameriprise. That is why Klein sent Shechtman research articles about King. But there is no evidence that Klein told Shechtman about the "good to be King" toast with the idea that Shechtman would tell Ameriprise about it. How would telling Ameriprise about the "good to be King" toast help "cover up" Shechtman's conduct? Shechtman's "cover up" lies to Ameriprise said that he and Klein had done research about King, not that they had heard a toast from someone at a party.

And even if Klein told Shechtman about the toast when they were reviewing Klein's SEC transcript in the summer of 2013, that would not have been a "cover up" either. The government attached Klein's SEC transcript as an exhibit to its opposition. At page 76, Klein denied remembering that Schulman said "it would be nice to be King for a day." Klein denied that he would have understood the comment as a reference to King stock, or that he would have traded on the comment. Klein SEC Tr. 76-77. If Klein told Shechtman that he recalled hearing a friend at a party make a toast that "it would be good to be King" as an explanation for his trading, he was admitting perjury. Admitting perjury is hardly "cover up mode." It is at least equally plausible that Klein was telling the truth when he made that admission.

Shechtman was utterly clear; he did not get the "good to be King" story from reading Klein's transcript—he got it from Klein.[44] Shechtman's unequivocal testimony about what he heard from Klein demonstrates that Schulman was telling the truth, and kicks the legs out from

---

[44] Tr. 524-25.

under the government's case. In the absence of direct evidence, where both sides are arguing inferences, not credibility, the stronger inferences of innocence require a judgment of acquittal.

### D.   The Government's Inferential Arguments About Rob And Ronnie Schulman's Testimony Are Demonstrably Incomplete And Inaccurate.

The government argued at trial that Rob Schulman's inability to remember the context that prompted him to make the "King for a day" comment proved that he was lying. Schulman's MJOA argued a more reasonable inference: if Schulman had consciously made up a false exculpatory, surely he could have made up a memory of the context. MJOA 10. The government's opposition made no response to that common sense argument. There is none.

The government's opposition said that Schulman gave "evasive and incomplete answers." Opp. 34-35. Other than the "lack of context" argument, the government did not provide any specifics. Attorneys for the SEC had a chance to question Schulman under oath, and brought a civil action relying on his testimony as truthful. That is enough to confirm that there is nothing in the substance of Schulman's testimony and EDNY interview to create a stronger inference of guilt than innocence. Regardless of whether the SEC Complaint was admissible, it demonstrates what inferences sophisticated government attorneys drew from the same evidence.

At trial, the government did not argue that Ronnie Schulman's testimony was false; instead, counsel argued: "She told you she didn't hear anything about King or King for a day or Pfizer. . . . Logic tells you that he said it when she wasn't around."[45] The government's opposition repeated that argument: "the evidence at trial established that the defendant provided the information to Klein at a point when his wife was not present in the room, demonstrating his intent to keep the information secret." Opp. 31. Ronnie Schulman's testimony directly

---

[45] Tr. 1195-96.

contradicted that inference. She testified that she probably would not have picked up on the "King for a day" comment because it would have meant nothing to her, but would have noticed if her husband had said something improper.[46]

After incorrectly relying on the truth of Ronnie Schulman's testimony in a failed attempt to establish Rob's supposed intent to conceal his improper disclosure to Klein, the government argued that it was alternatively reasonable to conclude that Rob had said something more than "King for a day" when Ronnie was in the room and that she was lying, "in light of [her] inherent bias and the general implausibility of portions of her testimony." Opp. 35.  But the government does not identify a single lie.  That the government is resorting to alternative arguments about two diametrically different fact scenarios illustrates that the government is speculating about things that it has no evidence for. Schulman's MJOA argued that the government's cross did not contend, or demonstrate, that Ronnie Schulman had lied. MJOA at 10-11, 31, 36 & n. 105, 42-3 & n. 118, 45, 51. The government's opposition did not respond to any of these arguments or citations, or specify any evidence in support of its "general implausibility" statement.

### E.     The Court Has Discretion To Grant A New Trial Because Of Shechtman's Inconsistencies And Ronnie Schulman's Truthfulness.

The defense attack on Shechtman's credibility is narrowly focused on his testimony that Klein never expressed doubt that a King/Pfizer deal would happen. Shechtman repeatedly said otherwise in his government interviews. Klein's purported certainty is inconsistent with what actually happened during the King/Pfizer negotiations. No human being could have been certain that Pfizer would acquire King in August and early September, 2010. The government built this purported certainty into a speculative argument that Schulman must have said more than "it

---

[46] Tr. 751-52, 754-56.

46

would be nice to be King for a day." The Court should exercise its discretion to grant a new trial based on Shechtman's demonstrably inaccurate testimony.

The government's opposition argued that the jury rejected Ronnie Schulman's testimony. The Court observed Ms. Schulman on the stand. There was no basis for the government to call her a liar. If the jury did reject Ms. Schulman's testimony, the Court should grant a new trial. If her testimony was true, the Court must grant a judgment of acquittal.

## IV.    THE GOVERNMENT'S IMPROPER JURY ARGUMENTS SEVERELY PREJUDICED THE DEFENSE AND REQUIRE A NEW TRIAL.

Government counsel's last argument to the jury in rebuttal summation was that Rob Schulman willfully intended to violate the securities laws because Klein sold the Enzo stock in Schulman's IRA on the same date (December 9, 2010) that Klein booked a flight to visit Shechtman during Ameriprise's investigation of Shechtman's trading in King stock. Defendant's MNT argued that making this alleged connection between the two events for the first time in rebuttal summation was "outrageously unfair." MNT 27-28.

The government's opposition cited no evidence in the record connecting Klein's sale of Enzo stock and his booking of a flight to visit Shechtman. Opp. 85-86. The government's opposition desperately tried to defend its surprise Enzo rebuttal with the following argument:

> The timing of Klein's decision to sell the Enzo stock in Schulman's account is probative of Schulman's intent. Up until the scheme began to unravel in December 2010, the defendant and Klein participated in it together as part of the same conspiracy. However, when it became clear to Klein that their trading had been uncovered (when he had outside scrutiny to fear), Klein began to eliminate connections with Schulman. In other words, once the scheme began to come apart, Klein severed the ties that he and the defendant both knew linked them to trading in Schulman's account. This sequence was not, as the defendant contends, confusing to the jury. Instead, it showed the jury that the defendant's intent to trade with Klein, and his trust of Klein as a co-conspirator had come apart and Klein was severing ties.

Opp. 57-58.

The government did not make any *Brady* or Rule 3.8 disclosures that on December 9, 2010, Klein was "severing ties" with Schulman and their alleged conspiracy was over. If that was true, on what basis did the government elicit testimony from Shechtman about post-December 9 conduct? Nor did the government make any *Brady* or Rule 3.8 disclosures that Schulman's trust of Klein had come apart as of December 9, 2010. The government's pre-trial motion in limine seeking to introduce evidence of a continuing relationship between Schulman and Klein said just the opposite. Dkt. 36.

Most importantly, the suggestion that Rob Schulman's trust in Klein as a co-conspirator had come apart made the Schulmans' continued relationship with Klein seem more sinister. The jury's only note focused on the timing of the Schulmans' decision to fire Klein in September 2013. The jury never heard that the Schulmans fired Klein because the SEC Complaint alleged that Klein had misappropriated MNPI *from* Schulman, eliminating the Schulmans' hope that there was an innocent explanation for Klein's trading in King.

Because the government waited until rebuttal summation to spring this surprise, the jury never heard a factual response from defense counsel. Defense counsel could have responded that there was no evidence that Schulman ever knew about the Ameriprise investigation, and there was no communication between Klein and Schulman about Klein's visit to Shechtman or his sale of the King stock in Schulman's IRA. Defense counsel also could have responded that there was no way for Klein to "sever[] the ties that he and the defendant both knew linked them to trading in Schulman's account" by selling the Enzo stock in Schulman's IRA. Klein's purchase and sale of King stock in Schulman's IRA was already a matter of record.

No legal or factual justification exists for the government's final rebuttal argument to the jury. That argument cannot support an inference of guilt to overcome Schulman's MJOA. The

48

government's opposition did not deny that it planned this surprise as the last argument it would make to the jury, yet argued that the argument was "harmless" error. Opp. 84-86. The government's indefensible tactics require a new trial.

This section separately addresses additional improper government arguments. The government sandbagged the Court into excluding Dubinsky's expert testimony by suggesting that it would only mention the first pages of Schulman's monthly account statements. Without giving the defense a chance to respond, the government then constructed a tortured argument in rebuttal that the changes in the "total equities" line meant "He was making money. Everything was clear . . . . He knows he's going to trade."[47] *See* Section I.B.2. above. Bizarrely, the government's opposition argued that this was not a "new" argument, but cited only defense arguments as support for that proposition. Opp. 82-83.

The government argued for the first time in rebuttal that Klein could run the risk of trading in King because Schulman knew what was going on and would not turn him in for insider trading. The government did not say it would make that argument when it persuaded the Court to exclude the SEC Complaint relying on Schulman's testimony to bring claims against Klein, or when it persuaded the Court to exclude Ronnie Schulman's testimony about why the Schulmans fired Klein when they did. This argument was entirely speculative. The jury's sole note demonstrated that this improper argument substantially prejudiced the defense. *See* Sections I.B.3. and I.D. above.

The government's opposition said that this argument just raised a "different interpretation" of the Klein/Schulman relationship in response to defense arguments that the Schulmans trusted Klein not to trade on a single, indiscrete disclosure. Opp. 83. The defense

---

[47] Tr. at 1201.

made that argument from the beginning of trial; the opposition did not even attempt to explain why the government made this argument on rebuttal for the first time.

There was no evidence to support an inference that Schulman knew the King/Pfizer talks were "very far down the road." Opp. 82; *see* Section III.A. above.

It does not matter whether the government argued that there was other evidence proving Schulman's intent; it was improper for the government to argue that the jury should consider Schulman's alleged false exculpatory as substantive evidence of guilt. Opp. 78-79; MNT 29.

The government argued to the jury that Klein's discretionary trading authority proved Schulman's criminal intent. The government's opposition now acknowledges that Klein's discretionary authority created no more than an "equally plausible" inference of guilt. Opp. 48-49; *see* Section I.B.1 above. By the government's own words, the "perfect crime" argument was wrong and highly prejudicial.

Shechtman's first words to the government were that Klein said he heard a "rumor." After sharp questioning from the government, Shechtman denied that Klein ever said "rumor." That is not being "nervous" and "then really, really, really quickly clarify[ying] what [he] said and ma[king] it the right thing."[48] The government may vigorously respond to attacks on witness credibility, but not by inaccurately vouching. NMT 29-30, 32-33; Opp. 81 & n.33.

_____

[48] Tr. at 1191-92. Postal Inspector DelGiudice testified during the defense case: **Q.** –when Mr. Shechtman said the word 'rumor,' [at the December 17, 2013 interview] the lawyers in the room started asking him pointed questions, didn't they? **A.** No. **Q.** Your interview memo says he corrected himself, right? **A.** Yes. They—they asked—when he gave his first statement they asked him to clarify what he meant by rumor. **Q.** And then he started denying that Klein had ever said the word rumor, didn't he? **A.** No, he didn't deny it." Tr. at 1096-97. The next witness for the defense, Agent Dane Wesley, testified about the government's interview of Shechtman three years later, on December 16, 2016, with AUSA Pitluck present: "**Q.** . . . Your notes say, 'Re: Tibor Klein never said acquisition of King was a rumor.' Is that correct? **A.** Correct. **Q.** That's what Michael Shechtman told you on December 16, 2016, right? **A.** That's what I wrote down." Tr. at 1106-07.

These improper arguments separately and cumulatively prejudiced the defense and warrant a new trial. MNT 30-31. As the Court observed, this was "not the strongest case I have ever seen." Tr. 701. The government did not deny that it intentionally saved many of these arguments for rebuttal, when the defense would not have an opportunity to respond.

## <u>CONCLUSION</u>

Rob Schulman is innocent. For the foregoing reasons, the government's evidence of guilt was insufficient, and Schulman's motion for a judgment of acquittal should be granted. The Court should also conditionally grant a new trial.

Respectfully Submitted,

_____/s/_____
Christopher B Mead
London and Mead
1225 19th Street, NW, Suite 320
Washington, DC 20036
202-331-3334
Fax: 202-785-4280
cmead@londonandmead.com


_____/s/_____
Jonathan S. Sack
Curtis B. Leitner
Morvillo Abramowitz Grand
Iason & Anello P.C.
565 Fifth Avenue
New York, NY 10017
212-856-9600
Fax: 212-856-9494
jsack@maglaw.com
cleitner@maglaw.com


_____/s/_____
Mark D. Harris
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
212-969-3530
Fax: 212-960-2900
mharris@proskauer.com

*Counsel for Defendant Robert Schulman*
