806

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :   16-CR-442(JMA)
                            :
                            :
                            :
        -against-           :   United States Courthouse
                            :   Brooklyn, New York
                            :
                            :
                            :
ROBERT SCHULMAN,            :   Friday, March 10, 2017
                            :   1:00 p.m.
        Defendant.          :
                            :
                            :
                            :
- - - - - - - - - - - - - - -X

    TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING AND JURY TRIAL
         BEFORE THE HONORABLE JOAN M. AZRACK
            UNITED STATES DISTRICT JUDGE

            A P P E A R A N C E S :

For the Government:     ROBERT L. CAPERS, ESQ.
                        United States Attorney
                        Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201
                        BY: DAVID C. PITLUCK, ESQ.
                            JULIA NESTOR, ESQ.
                            Assistant United States Attorneys

For the Defendant:      LONDON AND MEAD
                        Attorneys for the Defendant
                            1225 19th Street, NW
                            Suite 320
                            Washington, DC 20036
                        BY: CHRISTOPHER B. MEAD, ESQ.


For the Defendant:      MORVILLO ABRAMOWITZ
                        Attorneys for the Defendant
                            1225 565 Fifth Avenue
                            New York, New York 10017
                        BY: CURTIS LEITNER, ESQ.
                        BY: JONATHAN S. SACK, ESQ.

*ANGELA GRANT, RPR, CRR*
*Official Court Reporter*

807

Court Reporter:   Angela Grant, RPR, CRR
                  Official Court Reporter


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Proceedings                                       808

1           (In open court; outside the presence of the jury.)

2           (Time noted:  1:15 p.m.)

3           COURTROOM DEPUTY:  All rise.

4           THE COURT:  Hi.  Good afternoon.

5           Please be seated.

6           So here's the plan.  I thought we would do our

7    hearing.  I'll hear you after the witness and then I'll give

8    you a ruling.  And then I will give you a copy of the

9    proposed charge.  I'll give you as much time as you want to

10   sit here and go over it, but I really would like to do the

11   charging conference today, even if we're doing it at

12   4 o'clock.

13           MR. MEAD:  As would we.

14           THE COURT:  Okay.  Good.  We're on the same page.

15           MR. PITLUCK:  That's fine, Judge.

16           MR. MEAD:  Your Honor, may I begin with something

17   preliminary which I don't want to sidetrack things, but

18   because, as you will hear, it involves a request for

19   information that the government might be able to run down in

20   a couple hours this afternoon that might make a discussion

21   about it more profitable as we continue, I'd like to bring

22   it up now.

23           THE COURT:  Okay.

24           MR. MEAD:  So I know how bitterly disappointed you

25   and the government counsel would be if a single day passed

Proceedings                                    809

1     in court where I didn't raise the SEC civil proceedings

2     again, but I've got a new argument for you that I actually

3     think is pretty irrefutable.  So if I --

4               THE COURT:  You think all of your arguments are

5     irrefutable.  Your problem is me.

6               MR. MEAD:  Yeah, but this one is pretty cool.

7               So in the context of briefing the admissibility of

8     the SEC complaint itself, we didn't have the 3500 material

9     for Mr. Shechtman at that point.  And so -- and I really

10    want to make it clear, I'm not alleging any

11    misrepresentations by the government in any way.  We were

12    briefing what had happened in September, if you recall.

13              So we said the SEC complaint filed in September of

14    2013 reflected both an 8038 report of a law enforcement

15    agent, you know, after investigation dually authorized by

16    law.  We also argued it was a party opponent state.  And the

17    briefing there was, there was no joint investigation as of

18    September 2013, therefore, the complaint -- and Your Honor

19    ruled that because DOJ was not involved at that stage, it

20    couldn't be held as a party opponent statement by DOJ.

21    Understand.

22              So now that we've got the 3500 material, here's

23    the sequence of events.  On December 17, 2013, several

24    months after the SEC complaint was filed, Mr. Shechtman

25    testified and the interview memos confirm that he was

Proceedings                                    810

1    interviewed at the SEC offices in Florida December 17, 2013,

2    and that John Nowak of the Eastern District of New York was

3    present as was agent DelGiudice.  So by December 17, 2013

4    there was now a joint investigation of the SEC and the DOJ.

5              THE COURT:  You call it joint just because Nowak

6    was at the interview?

7              MR. MEAD:  Sure.  They're now working together

8    now.

9              THE COURT:  They're sitting at a table together.

10             MR. MEAD:  But they're working together.

11             So here's what we know.  Amongst the 3500

12    material --

13             THE COURT:  Why do you say they're working

14    together?

15             MR. MEAD:  They jointly interviewed this witness,

16    and let me continue the chronology because I think it's

17    pretty clear they were working together.

18             THE COURT:  Okay.  Okay.

19             MR. MEAD:  So we have in the 3500 material a

20    proffer letter suggesting that another interview was

21    scheduled for Shechtman on December 26, 3013.  The proffer

22    letter is dated that day.  We have no interview notes that

23    day.  I'm guessing it got rescheduled.

24             THE COURT:  I hope so for your sake.

25             MR. MEAD:  Right.  Exactly.

Proceedings                                    811

1        On December 30, 2013 the SEC and Mr. Shechtman

2   jointly filed the consent filing to have a consent order

3   entered.  Remember, that's Defense Exhibit 203.  I tried to

4   introduce it through Mr. Shechtman and you refused that

5   request.

6        THE COURT:  Yes.

7        MR. MEAD:  It is reasonable to infer -- and just

8   two more facts quickly.  That order was entered in

9   January 2014 by a United States District Judge based on the

10  allegations of the complaint that was filed in September.

11  There was no amendment.  In other words, the government

12  filed a pleading asking a judge of the United States to

13  enter a judgment against a human being for violation of

14  insider trading.  To do that the judge had to make a finding

15  of actual liability based on the fact that the allegations

16  in the complaint why neither admitted nor denied.

17        The only basis for judgment of one element of that

18  offense, both civilly and criminally, is that there is a

19  breach of a duty of confidentiality.  The only breach of

20  duty of confidentiality alleged in that complaint was a

21  misappropriation, a breach of Mr. Schulman's confidence, not

22  that that they acted together.  Different theory.

23        It is reasonable to infer, Your Honor, that in

24  coordination with each other, the Department of Justice,

25  EDNY, and the SEC jointly said, let's get the consent

Proceedings                                                    812

1   against Shechtman entered first because we, the EDNY, are

2   going to move for a stay of discovery which they did in

3   February of 2014.

4           It is reasonable to infer from that chronology

5   that the timing was coordinated between the two offices,

6   that the Department of Justice was aware of and approved the

7   filing of the consent.  Even though it was done by a

8   separate agency, it's now a coordinated effort.  And that,

9   that, and so what I'd ask, when I say it would be helpful

10  for us to get information to discuss this later this

11  afternoon, what I'd like to request is that the U.S.

12  Attorney's Office provide for us, for you in camera,

13  whatever else, documents related to that period of time in

14  coordination between the two offices and the EDNY's

15  knowledge that that consent order was being filed, because

16  that document, that inference, the chronology and everything

17  else, reflects that the Eastern District of New York was

18  involved in making a request to a United States District

19  Judge to enter judgment based on factual allegations of that

20  complaint.  That means it becomes a statement of a party

21  opponent because you remember the rule that you relied on.

22          It also, it also changes the analysis with respect

23  to your 8038 analysis.  Because your 8038 analysis said a

24  complaint itself is mere allegations, therefore, not as

25  probative.  Very different thing for -- in terms of analysis

Proceedings                                     813

1    of a court pleading -- for the SEC and the EDNY to now tell

2    a judge there's a basis for liability against a human being.

3    We ask you to enter judgment.  It's a very serious thing.

4    And we ask you to enter judgment based on these factual

5    allegations.  That reflects -- these are no longer mere

6    allegations from the SEC.  They are now saying these are

7    facts that we ask a United States District Court Judge to

8    rely upon in entering judgment.

9          That changes the analysis.  This is something new.

10   I think it is yet another basis for both allowing into

11   evidence the filing of the consent and the underlying SEC

12   complaint because without it, you can't know the basis for

13   on which the consent was entered.

14         MR. PITLUCK:  Judge, I would like to make a couple

15   points.  One is that, as the Court is aware, the 3500

16   material was provided almost two weeks ago.  And this is the

17   first we've ever heard of this argument.  And I think it's

18   clear to the Court that after numerous attempts to get this

19   complaint in under different basis, all of which the Court

20   has very properly denied, that didn't work so now we're

21   going to this.

22         And, Judge, if we had been prepared with this

23   argument, we could have pointed the Court to voluminous case

24   law that the Court is aware of that says that even if true,

25   that is not the basis to find a joint investigation between

Proceedings                                              814

1   the SEC and the Department of Justice.  We don't think we

2   need to provide anything related to this.  We have provided

3   everything that would be necessary to show the allegations

4   that he's complaining of now.

5          The fact that the SEC entered a summary judgment

6   motion, resolution motion in Florida, was not entered by the

7   government.  And the fact that they were at the same proffer

8   does not change it.  The fact that a discovery order was not

9   changed.  This is a completely separate investigation.  This

10  is not even close to the high standard in the Second Circuit

11  for a joint investigation.  We think this request is

12  untimely and improper, and we do not think we have to

13  provide that material.

14          MS. NESTOR:  Your Honor, I did cite case law in my

15  initial briefing which talked about what a joint

16  investigation means.  This does not fall under that case

17  law.  It was very specific.

18          Joint investigations have found that hundreds of

19  interviews are conducted simultaneously.  Not where a

20  complaint is filed initially and then the government gets

21  involved where the government had absolutely no power over

22  filing the complaint.  This is yet another backdoor attempt.

23  It is completely contrary to case law and that's why he

24  doesn't cite it.

25          MR. MEAD:  So, again, we're not talking about the

Proceedings                                               815

1    complaint.  I really want to make that clear.  What we're

2    talking about is a motion, consent motion filed by Shechtman

3    and his counsel and the SEC after the SEC and DOJ met

4    together.  And remember Mr. Shechtman's testimony.  His

5    testimony was not --

6                THE COURT:  Met together?

7                An assistant was at an interview.

8                MR. MEAD:  And they coordinated their activity,

9    Your Honor.  It is pretty clear from this chronology that

10   the two parties agreed, look, the EDNY wants to move for a

11   stay of the proceedings.  We don't want discovery while

12   we're doing an investigation.

13               The SEC says we want to get a civil consent

14   judgment entered before you do that.  So we ask as a

15   coordinated effort your approval --

16               THE COURT:  You keep saying coordinated.  What is

17   the U.S. Attorney's Office, what are they doing in this that

18   they're coordinating?

19               MR. MEAD:  So I would be surprised, and this is

20   why I'm asking for the information.  The short answer is of

21   course I can't answer unless I get this information from the

22   government.  But it is reasonable, it is certainly

23   reasonable to --

24               THE COURT:  Well, what's the information?

25               MR. MEAD:  The information --

Proceedings                                    816

1          THE COURT:  A hearing having an Assistant U.S.

2     Attorney say all the assistant did was go to Florida and be

3     present at the interview and ask questions at the interview?

4          MS. NESTOR:  Your Honor, we can't even get this

5     witness here for that kind of hearing.  He's not at the U.S.

6     Attorney's office.

7          MR. MEAD:  So, Your Honor, the evidence for

8     Mr. Shechtman is not just that EDNY attorneys and the SEC

9     met once with Mr. Shechtman, that's not the evidence.  The

10    evidence is that on January 8, 2013 there was another joint

11    interview attended by both the SEC and the EDNY.  On

12    April 3, 2014 there was yet another joint interview

13    conducted by the SEC and the EDNY.  That is a joint

14    investigation.

15          In a case of this size, we're not going to have

16    hundreds of simultaneous interviews.  This is the only

17    investigation that's going on.  It is coordinated.  And so,

18    once again, virtually guaranteed.  You know, I know how the

19    system works.  I'm sorry.  You know, I don't have the pieces

20    of paper in front of me, but I guarantee you this is what

21    happened.  Mr. Nowak said I want to move for a stay because

22    we're going to do an investigation.  The SEC said we want to

23    file a consent judgment against Shechtman first, get it

24    signed before you intervene and virtually guaranteed the

25    EDNY said yes, go ahead.

Proceedings                817

1           THE COURT:  But why --

2           MS. NESTOR:  Why is that coordinated?

3           THE COURT:  Hold on.  Hold on.

4      Why does that make it a joint investigation?  I

5  don't think that makes it a joint investigation.

6           MR. MEAD:  They are acting in -- so, first of

7  all --

8           THE COURT:  Wait.  If that's your argument that

9  that's what makes it a joint investigation, it's not going

10 anywhere.

11          MR. MEAD:  So, Judge, I guess I'm confused.  What

12 is it that would cause coordinated activity between the

13 Eastern District of New York and the SEC to be a joint

14 investigation?  I'd like to understand because if that's not

15 it, what is?

16          MR. PITLUCK:  Judge, we'd be happy to point to

17 some case law that shows what it is.  And it's a very, very

18 stringent test that the Second Circuit has set forth on

19 repeated occasions.

20          This doesn't even come close.  Judge, if that was

21 the case, any time the Eastern District or any U.S.

22 Attorney's Office intervened in or even participated in a

23 joint SEC -- in an SEC investigation at the same time, that

24 would constitute a joint investigation.

25          THE COURT:  Or there was any overlap.

Proceedings                          818

1          MR. PITLUCK:  Or there was any overlap or even

2    communication between the two to schedule something, that

3    would be a joint investigation.  That is not what the law

4    says.  I think the Court is aware of that.  But this is -- I

5    mean, this is, Judge, this is really beyond the pale.

6          MR. MEAD:  So, Your Honor, what if, and I suspect

7    there is.  What if there is an email exchange between the

8    EDNY and the Southern -- I'm sorry -- and the SEC where SEC

9    counsel tells them we're going to file for a consent

10   judgment based on the complaint and the EDNY says, yes, go

11   ahead.

12         THE COURT:  I don't think that makes it a joint

13   investigation.

14         MR. MEAD:  It makes it a statement by a party

15   opponent.

16         THE COURT:  I've heard enough.  I don't want to

17   waste any more time.  Let's do the Daubert hearing.

18         I'm going to consider your arguments.

19         MR. MEAD:  Thank you, Your Honor.

20         Should I call Mr. Dubinsky?

21         THE COURT:  Yes, please.

22         MR. MEAD:  We call Bruce Dubinsky.

23         Your Honor, I assume you have Mr. Dubinsky's CV.

24         THE COURT:  I do.

25         MR. MEAD:  Okay.  Understand in front of the jury

1    we'll mark it as a separate exhibit, but we're not quite

2    that coordinated yet.

3              THE COURT:  Finally here.

4              THE WITNESS:  It's been a while.  It will be nice

5    to sit in a comfortable chair.

6    BRUCE DUBINSKY,  called as a witness, having been duly sworn,

7    was examined and testified as follows:

8              COURTROOM DEPUTY:  State your name for the record

9    and spell it for the court reporter.

10             THE COURT:  Bruce Dubinsky, B-r-u-c-e

11   D-u-b-i-n-s-k-y.

12             COURTROOM DEPUTY:  You may have a seat.

13             THE WITNESS:  Good afternoon, Your Honor.

14             THE COURT:  Good afternoon.

15             MR. MEAD:  Has the Judge -- oh, thank you, John.

16   I appreciate it.

17   DIRECT EXAMINATION

18   BY MR. MEAD:

19   Q    Mr. Dubinsky, good afternoon.

20   A    Good afternoon, Mr. Mead.

21   Q    How old are you, sir?

22   A    I'm 56 years old.

23   Q    Where did you grow up?

24   A    Rockville, Maryland.

25   Q    What did your folks do for a living?

Dubinsky - Direct - Mead                    820

1   A    My mother was a schoolteacher in Montgomery County,

2   Maryland, middle school and elementary school.  And my

3   father was an aeronautical engineer.

4   Q    Did you go to college?

5   A    Did they?

6   Q    Did you?

7   A    Oh, did I?  Yes, I did.

8   Q    Where?

9   A    I first started at Rutgers University in New Brunswick,

10  New Jersey.  I started out for premed.  I decided I didn't

11  want to be a doctor, and finished my studies at the

12  University of Maryland in business obtaining a bachelor of

13  science degree in accounting in 1983.

14  Q    Did you continue your education after that?

15  A    I did.  Several years later I enrolled at Georgetown

16  University in Washington, D.C. in the masters of taxation

17  program; graduated with high honors in 1986.

18  Q    After you graduated from Maryland in 1983, did you go

19  to work?

20  A    I did.

21  Q    In what capacity?

22  A    I went to work as an accountant.  I had not yet passed

23  the certified public accountant test.  You needed two years

24  at that time of work experience.  And I went to work for a

25  firm called Alexander Grant & Company.  They're now known as

1    Grant Thornton.  It was an international accounting firm in

2    Washington, D.C.  They're based out of Chicago, but I was

3    working in Washington, D.C.  And I started out working in

4    the audit department as a staff auditor.  And within several

5    years did an internal transfer to the tax department where I

6    worked on tax compliance matters, some basic financial

7    planning matters for tax clients and tax planning and estate

8    planning.

9    Q    And how long did you work at that Grant firm?

10   A    It was about three and a half years.  I left about

11   mid-1986 and went to work for a real estate syndication

12   company.  It was an investment company.  And I was in

13   charge -- I was the Assistant Vice President of Finance and

14   I was conducting due diligence and financial information on

15   real estate projects all around the country.  Hotels -- they

16   were commercial projects, hotels and apartment buildings.

17   Q    And in that period of time did you get your CPA

18   license?

19   A    Yes, I obtained it before I left Grant Thornton.  It

20   was in 1985 that I passed the examination and became

21   licensed.

22   Q    And how long did you work at that real estate company?

23   A    About -- it was probably less than four months.  They

24   ran into some financial problems in getting money for future

25   projects.  I saw the writing on the wall and I bailed pretty

Dubinsky - Direct - Mead                    822

1    quickly.  And I started my own -- there were two people that

2    I had met in the industry, and the three of us started a

3    real estate development company in Washington, D.C. called

4    Metropolitan Development Group where we developed urban

5    infill projects at that point in D.C. in --

6                    THE COURT:  You said infill?

7                    THE WITNESS:  Yes.

8                    THE COURT:  What is that?

9                    THE WITNESS:  So, Your Honor, there would be a

10   block and there would be some development going on.  And

11   there would be projects that we would infill between those

12   two developments.

13                   And at that time Washington, D.C., there were some

14   neighborhoods that were up and coming and we were going into

15   those transitional neighborhoods, building apartment

16   buildings, renovating townhomes.  And the other part of the

17   business was commercial real estate build out where I would

18   go into office buildings and build the offices.  And we did

19   things like eateries at malls.  We had an architecture firm

20   and the development company.

21   Q    And how long did you do that?

22   A    That was about four years.  And the economy tanked at

23   the end of '89.  And I had one baby already, another one on

24   the way and needed to go make some money at that point and

25   went back into public accounting.

Dubinsky - Direct - Mead                    823

1    Q    Okay.  Fair enough.

2           And 1989 is the test of real estate survival in

3    Washington, D.C.

4    A    It was not pretty.

5    Q    So when you went back into the CPA practice, what did

6    you do?

7    A    I went to work for a regional CPA firm in Bethesda,

8    Maryland and I was the director of their tax department.

9    That practice comprised of high net worth individuals,

10   doctors, lawyers, architects, business owners.  And I was in

11   charge of the tax department and IRS audits.  So as IRS

12   audits would come up, I was handling those audits.  I had my

13   master's in tax at that point, had gone through the program

14   at Georgetown and so that was one of my duties at the

15   accounting firm as well.

16   Q    What was the name of that firm?

17   A    It was called Whalen, W-h-a-le-n, Barsky, B-a-r-s-k-y,

18   and Associates.  And that was Bethesda, Maryland.

19   Q    How long did you work at Whalen?

20   A    About two, two and a half years.

21   Q    And then where did you go?

22   A    I had an offer to join another small CPA firm in

23   Bethesda, Maryland and was offered and opportunity to start

24   to build my own practice.  And eventually that led to a

25   partnership that was called Klausner, K-l-a-u-s-n-e-r,

1   Bartko, B-a-r-t-k-o, and Dubinsky.  And I was a partner for

2   16 years, about 16 years at that public accounting firm.

3   Q    And did its name change at all over those 16 years?

4   A    It did.  Mr. Bartko left the practice and then it was

5   just Mr. Klausner and myself.  And it was Klausner Dubinsky

6   & Associates for the remainder of the time that I was with

7   Mr. Klausner.

8   Q    So that 16 years was from roughly when to roughly when?

9   A    January 1992 to April -- I believe it was April 10,

10  2008.  I remember the day.

11  Q    Okay.  And what did you do in 2008?

12  A    So in 2008 -- let me just clarify.

13        In 2006, I think it was December 2006 Mr. Klausner

14  and I split the practice.  I kept my practice and my

15  clients; he took his clients.  And I continued practicing as

16  a CPA at that point up until the April 10, 2008.  That was

17  the point in which Duff & Phelps, the company I currently

18  work for, acquired my practice.

19  Q    So in that 16-year, roughly 16-year period from 1992 to

20  2008, could you describe what responsibilities you had for

21  providing financial counseling to your clients.

22  A    Sure.  During that period, Your Honor, I had about 475

23  individual clients and I had about 150-to-175, depending on

24  the time period, businesses.  Most of those were

25  closely-held businesses being owned by the individual

Dubinsky - Direct - Mead                    825

1   clients that I was also advising.

2          Most of these were high-net-worth individuals.  I

3   would say income probably north of half a million dollars a

4   year.  And assets anywhere from half a million to -- I had

5   one individual that was tens of millions of dollars.

6          And what I would do for financial planning, so I

7   would do their tax work and do their tax compliance.  As

8   part of that, as a CPA, I would do overall financial

9   planning for them, estate planning and retirement planning.

10  So I would help them look at their -- where they were going,

11  when did they want to retire, how long they were going to

12  work, and help them understand the financial kind of road

13  that they would need to take to get there.

14         In conjunction with that, during that period, I

15  would also work with them -- many of them at that point had

16  stockbrokers or investment advisors.  I would work with them

17  to look at what their investment advisors and stockbrokers

18  were doing for them.  And they would come to me as their

19  CPA, as their trusted advisor, and I would review that with

20  them on a fairly regular basis.  At least -- probably two

21  times a year I would sit down with clients to do that.

22         THE COURT:  So they would take what their

23  financial advisor told them and then come to you and say

24  does this sound right?

25         THE WITNESS:  That's correct.  That's correct.

Dubinsky - Direct - Mead                          826

1          THE COURT:  And pay both of you?

2          THE WITNESS:  They would.  Yes, Your Honor.  Yes.

3    A    At that time the investment advisor business was just

4    coming into being.  There was still a model of using

5    stockbrokers.  You know, some people had a level of comfort

6    that was higher with CPAs than just the stockbroker.  The

7    stockbroker was making a commission on their sales.  So from

8    a kind of bias standpoint.

9          There came a time, it was about 1999 where I sat

10   for the registered investment advisor Series 65 Uniform

11   Investment Advisor Examination.  The market was changing.

12   Clients were saying to me, you're already helping us, you're

13   doing this.  Why aren't you getting paid other than your

14   hourly rate?  I'm paying a broker to do this.  Why are we

15   paying both?

16         And the market started changing.  There was a big

17   push by the American Institute of Certified Public

18   Accountants to have accountants get licensed as an

19   investment advisor.  There was a big push in the industry.

20   And so I followed along with that and I went and got

21   licensed.  I took the examination.  I got licensed by the

22   State of Maryland.  And at that point I was then able to get

23   paid not only for the hourly advice that I was giving them,

24   because that was kind of wrapped into the overall client

25   relationship, but now I could charge a fee, what we call a

Dubinsky - Direct - Mead                    827

1   wrap fee, as a percentage of the assets that were under

2   management.

3           So we started transitioning a lot of clients away

4   from traditional brokers such as Merrill Lynch and other

5   houses to our platform.  We were trading through Charles

6   Schwab Institutional.  I was working for a company called

7   Sol Capital Management.  And they had -- they were a

8   registered investment advisor shop.  I was a registered

9   investment advisor representative, that's the way the Series

10  65 license works.  And then I was able to then counsel those

11  clients, talk to them about individual stocks, equities,

12  bonds, mutual funds, the whole gamut of investments, private

13  placement type investments, private equity investments,

14  whatever it was and I could get paid on doing that for them.

15          And so I started doing that.  I had a practice

16  of -- over the period from '99 to probably 2000 -- the end

17  of 2007, about a hundred clients.  Total assets under

18  management, it varied, but I would say about $150 million.

19  And had, again, it was focused on high net worth

20  individuals.  So these were individuals that came to me as

21  part of my accounting practice.  I wasn't out marketing

22  separately to get these clients.  They already trusted me.

23  And in that capacity they were high net worth individuals.

24          The vast majority of these accounts were

25  discretionary accounts.  I know there's been some talk, Your

1   Honor, this whole week about that, and I won't take too much

2   of the Court's time.  But as a discretionary account they

3   would sign the document authorizing me, as their investment

4   advisor, to trade on their behalf.  I didn't need to pick up

5   the phone and call them every time I wanted to do that.  It

6   was a blanket authorization.  And what we would do with

7   clients, just within that framework, they would give us a

8   basic framework of their asset allocation, their goals,

9   their retirement goals, their financial goals.  And within

10   that spectrum then I was able to operate and invest without

11   calling them.

12            I did have several clients that didn't have

13   discretionary accounts.  They had regular accounts where

14   before we made a move, pick up the phone, get their

15   permission, explain why we were doing it.  Not that they

16   distrusted us, they were just some people liked that kind of

17   control to keep their thumb on things.

18            THE COURT:  How painful is this for a government

19   employee to listen to, huh?

20            MS. NESTOR:  Your Honor, may I just ask a favor.

21   I'm having a hard time.  Just slow down just a tiny bit.  I

22   speak quickly, I know.

23            THE COURT:  Oh, all right.  Yes, slow down a

24   little bit.

25            THE WITNESS:  I will, Your Honor.

1           MS. NESTOR:   Thank you.   I really appreciate it.
2   Q    So, Mr. Dubinsky, why did the vast majority of your
3   clients want you to do this on a discretionary basis rather
4   than a preapproval basis?
5   A    The vast majority were busy business people.   They ran
6   their own business.   They were very busy.   They knew their
7   business.   They didn't know the investment business.   They
8   trusted me as their CPA.   Many of them using me for years.
9   And so they wanted me to handle that in a trusted capacity.
10  I had a duty as a licensed investment advisor, there's a
11  duty you owe to your clients, which I fulfilled.   And so
12  they would come to me looking for that trust and integrity
13  and the honesty of investing for them.
14  Q    Do you have any lawyer clients?
15  A    I had a lot of lawyer clients.   Washington, D.C., being
16  a big area of lawyers, I would say my practice, probably at
17  least 25-to-30 percent were lawyers.
18  Q    Now, I'm sure government counsel has been doing
19  research on the Internet.   Were there some glitches with the
20  registration of your financial advisor registration in some
21  way and can you explain that?
22  A    Sure.   So, Your Honor, I was originally licensed in
23  1999 by the State of Maryland.   It was around I think the
24  end of 2004, maybe the beginning of 2005 I got a notice from
25  the State of Maryland that my registration had lapsed.   I

Dubinsky - Direct - Mead                   830

1    was scratching my head.  The company that I was with -- the

2    company I was with had a compliance, outside compliance

3    company that would do the compliance for them.  And that

4    company was supposed to send in a hundred dollars to the

5    State of Maryland to keep my license active and they didn't.

6    And the upshot of that was the State of Maryland forced me

7    to take the examination again, which was not fun.  I passed.

8    I was not happy.

9            THE COURT:  How many years later is that?

10           THE WITNESS:  That was six years later, Your

11   Honor.

12   A    The information was still the same on exam, but,

13   nonetheless, you don't want to fail the exam.  I studied and

14   had to go do that again for a hundred dollars that they

15   didn't pay.

16           And so the relicensing occurred in January -- I

17   believe it was January of 2005 with the State of Maryland.

18           And then, as I explained earlier, when Duff &

19   Phelps came to purchase my practice, Duff & Phelps has a

20   regulated side of the business.  They have an investment

21   banking arm -- this is the company I work for now.

22           And as you know, there's a lot of regulatory red

23   tape with being licensed as an investment banker.  This is

24   not what I was going to do at Duff & Phelps.  I was in the

25   disputes.  I am in the disputes investigations practice, and

Dubinsky - Direct - Mead                    831

1   I'll explain that in a minute, and I opted to let the

2   license lapse.  It was just going to be crazy regulatory red

3   tape, and I wasn't going to practice in that area just to

4   keep the license active, and I made a decision to let it go

5   and I said I would never go take the examination again.

6   Q    So in that 16-year period where you've described having

7   responsibilities for giving clients advice about financial

8   matters and their investments, what kind of materials did

9   you review for your clients?

10  A    So the types of materials I routinely reviewed were

11  brokerage statements.  As I explained, when I got licensed

12  as a registered investment advisor representative, the

13  platform was through Charles Schwab Institutional.  So

14  Charles Schwab Institutional had set up a program for

15  registered investment advisors similar to what we heard in

16  court with Ameriprise.  These companies were going around

17  setting up platforms.  That platform allowed two things.

18  Well, many things, but two things of importance here.  One,

19  access to industry research.  So I had access in that

20  capacity not only to my client's statements and

21  confirmations and trade, all of that, of course, but there

22  was a whole section of institutional research such as

23  analysts reports, sector reports.

24          Sector reports are very important, Your Honor.

25  They're a little bit different than an analyst report.  An

1    analyst report will usually look at a particular stock at a

2    company.  They may have some industry information embedded

3    in the analyst report, but a sector report looks at the

4    industry as a sector.  And that becomes very important when

5    you're investing for clients based on sector analysis and

6    where things are moving in the market.

7            So we had access to very detailed information on

8    sector analysis.  We had information on the companies from

9    the SEC.  So the companies, all the SEC filings, the 10-K,

10   the 8-Ks, quarterly filings, things of that nature that

11   companies, when they make a material change, have to file

12   with the SEC.  We had access to all of that.

13           There was a wide variety of -- there were

14   background reports on principals of the companies that were

15   in there.  And that was at Charles Schwab Institutional.

16   There was another platform, I believe it was called Fortress

17   Investments at that time.  Fortress Investments is up here

18   in New York.  And Fortress investments allowed, they were

19   selling another service that allowed for investment advisors

20   to purchase into that service for their own research.  So we

21   had a wide variety of different research reports and areas

22   to go look at.

23           So those were the types of things that I looked at

24   on a regular basis.  In addition to those things, obviously,

25   news stories.  The Wall Street Journal, I had a daily

Dubinsky - Direct - Mead                    833

1   subscription to the Wall Street Journal, would read through

2   that.  Barron's Financial, had a subscription to that and

3   would read through Barron's.  And I think the Financial

4   Times were the three newspapers that I subscribed to for

5   that purpose.

6   Q    And how did your CPA training and experience and your

7   masters in tax assist you in reviewing those kinds of

8   information?

9   A    Both of those trainings, Your Honor, CPA and going

10  through a program at Georgetown and the masters, teach you

11  to think analytically, teach you to be critical, to look at

12  facts, to look at information.  And that experience I

13  brought to the table for my clients.  That's what they were

14  looking for.  They wanted an independent person.  I wasn't

15  getting paid on the trades.  The trades were going through

16  Schwab.  And so all of that background and information

17  helped me to counsel clients, to help them invest, to help

18  them build for their future and their retirements.

19  Q    So in that 16-year period, were you in the business of

20  giving clients advice about particular securities, I guess,

21  forgive advice.  Were you in the business of actually buying

22  and selling individual investments for your clients for whom

23  you had discretionary trading through?

24  A    I was.  Technically Charles Schwab Institutional

25  executed the trades at our direction because I was not a

1    broker.  I didn't have a Series 7 license.  But I would work

2    with the clients determining what that mix would look like.

3    If they came to me with a recommendation, I'd look at that.

4    I would make recommendations.  And then based on what we

5    were doing, we would make the trade through Charles Schwab.

6    Q    Okay.  And so before you made a decision about buying a

7    particular security or selling a particular security on

8    behalf of a client for whom you had discretionary authority,

9    what steps would you take?

10   A    It was a fairly rigorous analytical process of due

11   diligence.  Due diligence looking at information that I

12   could get, both publicly available or through a subscription

13   service, which, again, is publicly available but I had to

14   pay for that or through my platform at Charles Schwab.  And

15   look at that research, analyze it.

16         Being a certified public accountant, my training

17   was on the balance sheets of companies, income statements,

18   where they had been, but, more importantly, where was that

19   company going.  Recall, markets don't trade on yesterday's

20   information.  They trade on what's going to happen in the

21   future.  If a company lost money last year, it's a data

22   point, but it's looking at where you're going in the future.

23   Where does that market think that stock is going over

24   overall the market.

25         So I would analyze the reports, I would read them.

1    There was a lot of reading that went on.  I would rely on

2    research that I obtained, and then I would make

3    recommendations.

4    Q    When you talk about making recommendations, if you had

5    discretionary authority, would you actually make a

6    recommendation or just execute?

7    A    It's a fair point.  In the beginning of the year I

8    would sit down with clients and go through what their goals

9    were at a very high level.  I would then go through talking

10   been an asset allocation, how much in equities we were going

11   to put in, how much in bonds, fixed income, how much in a

12   mutual fund.  Then I would break that down into different

13   sectors, whether it's international, U.S., large cap --

14            THE COURT:  Excuse me one second.

15            (Brief pause.)

16            THE COURT:  Go ahead.

17   A    I would go through that process and then I would set

18   out to develop what we were going to invest in.  I would not

19   then go back to the client and ask for permission.  I

20   already had the permission being a discretionary account,

21   but I would always sit down, again, on this global basis and

22   figure out where I was going, was it in line with the

23   client.  Is that where they wanted to go?

24            My clients didn't pick individual stocks.

25   Sometimes they'd come to me and say I heard about a stock,

Dubinsky - Direct - Mead                          836

1   but it was my job because I was getting paid to develop that

2   portfolio for them and decide which stocks to purchase for

3   them, which mutual funds.  If I was buying a mutual fund,

4   for instance, what stocks were in that mutual fund.  The

5   mutual funds will list usually the top 20 holdings.  Then I

6   would do analysis of that mutual fund on the individual

7   stocks within the mutual fund.  Sometimes mutual funds, one

8   would weight a certain stock like Apple heavier than another

9   mutual fund.  If you already had Apple in the portfolio, I

10   didn't want to overlap that.  That all fell on me.  That's

11   what I was getting paid to do.

12   Q    And you mentioned annual meetings with clients.  I

13   think you heard testimony that the Schulmans were meeting

14   with Tibor Klein several times a year.  How often would you

15   meet with your individual clients?

16   A    I would say on average twice a year.  Some clients meet

17   quarterly.  They wanted to see how they were doing.  Other

18   clients met annually, and I had some clients that never met.

19   I would always send out, either a phone call or an email

20   saying, it's that time of year again.  Do you want to come

21   in and sit down?  Some clients just didn't care.  They

22   trusted me and they wouldn't come in and didn't sit down

23   with me.  But I would say on average probably about twice a

24   year.

25   Q    So we're just talking about your personal experience.

Dubinsky - Direct - Mead                          837

1   You'd agree with me, wouldn't you, that your experience with

2   close to a hundred high-net-worth folks that you were

3   working with was not a double blind statistical study,

4   right?

5   A    No.  These were my clients that I had for many years.

6   Q    Your experience?

7   A    That's correct.

8   Q    What kinds -- and understanding your practice may have

9   been different than Mr. Klein's, which is at issue here, but

10  what kind of paper would you prepare to show your clients at

11  these meetings?

12  A    So understand -- let me think about how to explain

13  this.  Charles Schwab Institutional would produce monthly

14  statements.  On my clients.

15  Q    Similar to stuff we've seen from Pershing, right?

16  A    Very similar.  The industry was very similar.  These

17  statements could run 15 to 30, 40 pages long.  My clients

18  didn't understand that.  It was too lengthy to go through.

19        There was a push in the industry to take that

20  information and I got an electronic feed from Schwab on all

21  of that information, and we had a reporting package that it

22  went into.  And in that reporting package it would generate

23  pie charts, graphs, things that, like the old saying, a

24  picture is worth a thousand words.  People understand

25  pictures.  If I show a graph of a line going this way down,

1    (indicating) people understand that's usually not good.

2    Q    You may be losing that client.

3    A    I may be losing that client.

4    Q    Did you actually ever lose a client?

5    A    I mean, I lost tax clients so I probably did along the

6    way.  People move, people -- I had people that died,

7    definitely had people that died.

8              But, anyway, I would take this other reporting

9    package -- and that was usually distilled down into about

10   eight pages.  Front page being two or three graphs,

11   overview, and it got more detailed as you went through that.

12   That was the document that I sat down with my clients and

13   went through and would explain to them, here's where you

14   were.  Here's the starting point, the beginning of last

15   year.  Here's where you are this year.  Here's what we did.

16             And there was an important other piece on that, we

17   would benchmark it, something called benchmarking.  So I

18   would benchmark my performance from my clients against could

19   be the S&P 500, the Russell 2000.  There were different

20   indices that I would benchmark it against to show them,

21   well, if I'm doing 6 percent and a Russell 2000 is doing 12,

22   they're going to ask me what's going on, right?  Why aren't

23   you performing like this?  And it was all allocated based on

24   the types of investments and where they fit into that

25   structure.  That was the benchmark for that particular set

Dubinsky - Direct - Mead                    839

1  of investments that I would then explain that benchmarking

2  to them.

3  Q    And how many pages back in those presentation packages

4  you presented would you have to turn before you got to

5  information about individual stocks you had bought that

6  year?

7  A    Probably about page 6 or seven.  Page 8 was the fees,

8  that always, by design, went on the last page.  But it was

9  usually 6 or 7 would list the actual individual

10 transactions, the buys, the sells of the year, and that

11 would usually be towards the end of that package.

12 Q    Folks are different.  Your clients were different?

13 A    I had a wide variety of clients, yes.

14 Q    In your experience, how many times did you get all the

15 way back to pages 6 and 7 where you start talking about

16 individual shocks?

17 A    It happened on occasion.  Again, I had some clients

18 that were very anal, would go through things.  I would say

19 the vast majority of the time we never even got close to

20 that.  It was more of a discussion on, okay, you know, the

21 markets did 8 percent this year.  We did 9 and a half.

22 Great.  What's next year going to look like?  Everybody was

23 always focused on next year.  Great what happened this year.

24 I mean, if it was a problem, and some years there would be

25 problems, the markets were down markets and you tried to

Dubinsky - Direct - Mead                    840

1    protect the clients in a down market.  That was part of my

2    job as an investment advisor, but they quickly wanted to

3    talk about, okay, what are you going to do for me for the

4    next year going forward?  How are we going to change this

5    up, and that's where most of the time sitting with clients

6    was spent.

7    Q    Did that Schwab platform generate what are called

8    confirmations or trade confirmations?

9    A    They did.  They generated two sets, one for the client,

10   and one for the investment advisor.

11   Q    And would the ones for the client get mailed to the

12   clients' homes?

13   A    They could either be mailed or there was an option

14   starting in about 2001 for electronic receipt by the client

15   of those.  You had to opt into that to get those.

16   Q    And so can you estimate for me if you got close to a

17   hundred clients and you're executing trades, how many trade

18   confirmations got sent to your clients in those 16 years?

19   A    I wouldn't begin to -- a lot.  Let's put it that way, a

20   lot.

21   Q    How often do you recall getting a phone call from a

22   client, hey, I just saw a trade confirmation?  What

23   happened?

24   A    A handful of times maybe over 16 years or the time

25   that, you know, I was investment advisor.  Maybe a handful

Dubinsky - Direct - Mead                     841

1    of times.

2    Q    Okay.  In addition to your experience about your

3    particular clients' review of their individual trade

4    confirmations and individual stocks in their portfolio, did

5    you do some research to see if there was any data out there

6    that was consistent with your personal experience?

7    A    I did.

8    Q    What did you do?

9    A    I started where everybody usually starts and hit Google

10   and went on Google and started to see are there any sort of

11   research reports on people understanding their brokerage

12   statements, people -- what are the patterns, if you will.

13          If you recall, I testified during that time

14   period, back in the early 2000s, there was a big push in the

15   industry to simplify the reporting.  Schwab, others knew

16   that clients just didn't understand these complicated

17   documents.  They were continually trying to simplify things.

18   And they would come to us as investment advisors and run

19   focus groups and talk to them about that.

20          And the research, in this case, one of the things

21   I found was a FINRA, the Financial Industry Regulatory

22   Authority who Your Honor heard, there was a witness from

23   FINRA the other day, put out a report in 2016, very recent,

24   it was an update of a report that they had done several

25   years earlier on investor behaviors.

Dubinsky - Direct - Mead                    842

1        FINRA -- and we can go through it, but FINRA

2   commissioned some researchers on their behalf, paid for by

3   the industry to go out and research investor behaviors.  And

4   in that study there were statistics about how many people

5   skim their statements, how many people read them thoroughly,

6   and those are statistics that, in general, support my

7   findings.

8   Q    Are you familiar with FINRA?

9   A    I am very familiar with FINRA.

10  Q    How?

11  A    I have worked on two, if not three occasions, as an

12  expert witness for FINRA's Department of Enforcement.

13  Q    In other words, they hired you?

14  A    Yes, sir, they hired me.

15  Q    And for what?

16  A    The most recent case was in 2015.  I was hired on a --

17  there was an investment advisor here in New York that was

18  under disciplinary investigation for improperly allocating a

19  bulk purchase of Facebook shares and then improperly

20  allocating those to clients and then basically cheating the

21  clients out of their proper share when Facebook went public.

22        I was hired by the Department of Enforcement as an

23  expert witness.  I testified for them in that proceeding

24  here in New York, in Manhattan.  And my understanding was

25  that that individual was barred for life.  That was his I

Dubinsky - Direct - Mead                              843

1    think second or third strike with FINRA and he was barred

2    for life from practicing.

3    Q    What kind of proceeding was this?

4    A    It was a FINRA arbitration proceeding.  So it's, you

5    know, they had court reporters similar to this, arbitration.

6            When you're a broker or an investment advisor in

7    the industry, one of the things you agree to is to be

8    subject to the disciplinary proceedings of FINRA.  They are

9    the self-regulatory organization for the entire brokerage

10   industry.  They're overseen by the Securities and Exchange

11   commission.  And so, as such, you agree that if there's a

12   disciplinary action brought, it will be heard by a FINRA

13   arbitration panel.  And FINRA has hearing officers.  Some

14   work for FINRA.  It's a mix.  Some work for FINRA and some

15   are from the industry to get a mix so there's a bias on the

16   panel, and then that's where FINRA brings their actions

17   against bad actors in the industry.

18   Q    And FINRA was asking you to testify as an expert in

19   evaluating a financial advisor's conduct toward his clients?

20   A    Yes, sir, that is correct.

21   Q    And was the adequacy of the research that that

22   financial advisor had done one of the subjects that FINRA

23   hired you to be an expert for?

24   A    It was.

25   Q    And did you give opinion testimony about the quality of

Dubinsky - Direct - Mead                    844

1    the research that investment advisor had done with respect

2    to a particular security?

3    A    There was basically no research done.  This individual

4    had gone around.  They were speculating that Facebook would

5    go public.  There was a lot of rumors in the marketplace.

6    And he was able to convince people that held stock at

7    Facebook, restricted stock that could not be freely traded

8    because they weren't public, to put their stock into a

9    partnership.  They set up a series of partnerships, and then

10   he sold those partnership interests to investors and that

11   became the issue of the proceeding that the way it was done,

12   from the very beginning there was allegations of fraud in

13   the setting up of the partnership, in the series trusts that

14   were set up, how the accounting was done, how the investing

15   was done, and I testified on those issues.

16   Q    Did FINRA ask you to serve as an expert in another

17   matter?

18   A    They did.  I'd have to look at the date, but several

19   years earlier I was hired again by the Department of

20   Enforcement for FINRA.  Both of these cases emanated out of

21   their enforcement division in Washington, D.C.  That case

22   was heard in Pennsylvania.  Again, arbitration panel.  It

23   was a disciplinary proceeding.  That --

24   Q    Disciplinary proceeding related to the conduct of who?

25   A    The conduct of a broker dealer and an investment

Dubinsky - Direct - Mead                           845

1    advisor.  They were basically two separate companies but the

2    same principals.

3    Q    So let me short circuit this if I can.

4         Were you hired by FINRA to provide expert advice

5    about the conduct of an investment advisor toward his

6    clients?

7    A    Yes, I was.

8    Q    Have you always been hired by other government

9    enforcement agencies?

10   A    I have.

11   Q    How many?

12   A    How many times or how many agencies?

13   Q    Good question.

14        Before we do that, while you were working as a

15   financial advisor in that 16-year period, eight of which you

16   mentioned you were registered as a financial advisor, did

17   you also branch out a little?

18   A    I did.

19   Q    Did you become a certified fraud examiner?

20   A    I did.

21   Q    What is a certified fraud examiner?

22   A    A certified fraud examiner is a professional

23   designation that I obtained through a proctored examination

24   and training, education and training.  It's issued by the

25   Association of Certified Fraud Examiners in Austin, Texas.

1   It's the largest antifraud professional organization in the

2   world currently with about 72,000 members worldwide.

3   Q    Do you know who started it?

4   A    It was started by a man, Joseph Wells, he was a former

5   FBI agent out of Washington, D.C., and he then moved to

6   Texas.  And when he retired from the FBI he started this

7   organization.

8   Q    And are current law enforcement members of that

9   organization?

10  A    Yes.  When it was first started in the 80s it was

11  predominantly law enforcement because that's where Mr. Wells

12  came from, from the FBI.  As I got involved in the

13  organization, I was making a push to get more people that

14  weren't law enforcement involved.  I thought it made sense

15  for the organization.  Today it's still predominantly law

16  enforcement, but it does have non-law enforcement members.

17  Q    How many members does it have?

18  A    About 72,000 worldwide.

19  Q    Have you served as a leader of that organization?

20  A    I did.  In 2014 I was elected to the Board of Regents.

21  That's the equivalent, Your Honor, of the Board of Directors

22  of the organization.  And in 2015 I was elected as the

23  Chairman of the board.

24  Q    And have you given training to FBI agents in fraud

25  examination?

Dubinsky - Direct - Mead                    847

1  A    I have.  I conducted a training to -- it was a national

2  training to FBI agents in, of all places, Your Honor, Las

3  Vegas.  And it was a training on data mining and data

4  analysis using software to go through large datasets and

5  find patterns when you're doing a fraud investigation.

6  Q    And is that data mining the same kind of skill that you

7  used as a financial advisor in picking stocks?

8  A    I never thought of it in that sense.  It's an

9  analytical skill that you use, so I would say yes.

10 Q    You got any other professional certifications?

11 A    There's a few others.  Let me run through those quickly

12 for the Court's time here.  I have a Certified Valuation

13 Analyst issued by the National Association of Certified

14 Valuation Analysts.

15        Your Honor, that's, again, a proctored

16 examination, training, education to value nonpublic

17 companies, so closely-held companies.  It's focused

18 primarily on valuation and finance.

19        I have a master analyst in financial forensics.

20 So unlike the certified fraud examiner that focuses directly

21 on fraud examinations, the master analyst and financial

22 forensics is a broader scope that looks at all types of

23 financial forensics.  And a lot of the training in that

24 helps me in cases that I work as a damage expert, for

25 instance.

Dubinsky - Direct - Mead                         848

1           If two companies have a breach of contract claim,

2    one suing the other in a civil case, what are the damages?

3    It comes down to the money.  That training focused on that.

4           We talked about the registered investment advisor.

5    I was a commercial arbitrator on the AAA panel.  I went

6    through all their training and went through the Commercial

7    Arbitrator 1 and 2 training, was put on the panel.  I was

8    one of about 25 people in the country put on the panel that

9    was a CPA.  At that time when I got it the AAA thought there

10   would be a benefit to having people with financial

11   backgrounds on panels because many times the lawyers didn't

12   have a financial background.

13   Q    I'd speak to that.

14   A    And so I went through all this training.  It sounded

15   great.  Only to find out that people don't want to hire CPAs

16   on panels.  They want lawyers or former judges on panels.

17   So I, again, let that lapse.  There was no sense in

18   continuing with that ongoing payment and training for that.

19           THE COURT:  Let me just interrupt.

20           I think we've covered his qualifications.  I want

21   to know if the government wants to voir dire on the

22   qualifications.

23           MR. PITLUCK:  Your Honor, we'd like to voir dire

24   or ask some questions about some of the specifics, not

25   necessarily about the certified fraud examiner, some of the

Dubinsky - Direct - Mead                                    849

1  specifics of the Mr. Dubinsky's investment advisory

2  experience.  But I think that's more relevant to the actual

3  issues here.

4           THE COURT:  Okay.  So then Mr. Mead can go

5  ahead --

6           MR. PITLUCK:  And I don't need to see his

7  certificate as a certified fraud examiner.  He seems very

8  credible.  I think we can move on to the substance of the

9  testimony.

10          THE COURT:  So Mr. Mead can offer him as an

11 expert?

12          MR. PITLUCK:  Yeah.  Well, I mean, obviously, Your

13 Honor, we have some questions on the specific issues to

14 which he's advised, some of our questions are going to go to

15 that issue, not on his general qualifications.

16          THE COURT:  I know, but I'm sure -- go ahead.

17          MR. MEAD:  So may I suggest, I mean, I want to

18 offer him and I would ask, you know, the background

19 question, what does all of this mean that you can tell a

20 jury that they might not know from their common experience.

21 I don't know if you want to hear that answer, but that's

22 part of the qualification process.

23          THE COURT:  Well, go ahead.

24          MR. PITLUCK:  I'd like to hear that answer too.

25          THE COURT:  Okay.

Dubinsky - Direct - Mead                    850

1    Q    So in terms of doing research on publicly available
2    information about King -- can I ask one more thing about
3    qualifications?  Forgive me.
4              So you branched out.  You become an expert.
5    Primarily you're in the expert witness business, is that
6    fair to say now?
7    A    I would say half my practice is providing expert
8    witness testimony.  The other half is conducting fraud
9    investigations.  I do that regularly.
10   Q    And have you -- King is a pharmaceutical stock, right?
11   A    It is.
12   Q    And you did research related to King's position in the
13   pharmaceutical world and potential for takeover by another
14   pharmaceutical company?
15   A    Correct.
16   Q    In your capacity as an expert witness, have you had any
17   experience in the pharmaceutical field?
18   A    I have.  I worked on a case for Actavis, which is a
19   very large pharmaceutical company.  I've worked on cases for
20   DuPont as well.  Those are the two that come to mind.
21   Q    And, again, without breaching confidentiality, do you
22   remember whether you testified publicly in either of those?
23   A    I don't believe.  I think they both settled.  There was
24   a DuPont case that I did testify on in federal court that
25   didn't deal with pharmaceuticals.  That dealt with Corian

Dubinsky - Direct - Mead                    851

1   countertops.

2   Q    Fair enough.  But without going into detail that might

3   breach a confidentiality order, was the nature of your

4   testimony related to valuation of particular products in

5   connection with patent lawsuits?

6   A    It was, yes.

7   Q    And so to do that, did you have to look at the

8   pharmaceutical industries as a whole and projected earnings

9   from pharmaceutical product?

10  A    I had to look at the company, the industry, the sector

11  of the industry, yes, all of that.

12  Q    So now that we've got that.

13          Understanding that you've been asked to give

14  opinions in two areas.  Let me start with the first.  The

15  first area is what publicly available information there was

16  in August 16, 2010 that might lead someone to consider

17  investing in stock of King Pharmaceutical --

18  A    Correct.

19  Q    -- roughly?

20          And so what does all your training and experience

21  give you to help you do that analysis that a jury of

22  ordinary lay people wouldn't have?

23  A    Well, I think a couple factors.  One, as I've

24  explained, I've done that professionally so I've done --

25  conducted research, I've advised clients and I think that's

1   very important.  I don't know the composition of the jury,

2   but my experience is most lay people are not very well

3   versed in financial matters, much less in doing industry

4   specific research on equities on a particular stock or an

5   industry.  There may well be one or two people, I don't

6   know.

7   Q    That's fair.

8   A    So I think that's number one.

9          Number two, the research that I did, Your Honor,

10  in my capacity as both a CPA and an investment advisor, was

11  research that I was trained to do.  I went into subscription

12  services that others may not have.  These are detailed

13  analyst's reports.  Many of them, as if you have looked or

14  will look, have pages of financial information; have

15  technical jargon on them.  There's a lot of words that

16  people, lay people, would never I don't think would

17  understand in my experience.  So I think assisting the jury

18  in explaining what those concepts are, what those terms mean

19  I think would be very helpful, and I think my experience

20  bears directly upon that.

21         Those are the things that come to mind in that

22  regard.

23  Q    How about opinion number two, you know, just the extent

24  to which high-net-worth folks who have hired financial

25  advisors pay attention to individual stock pay.

Dubinsky - Direct - Mead                 853

1          THE COURT:  Honestly, don't waste your time on

2     that.  I'm not going to permit it from the expert.

3          MR. MEAD:  Well, I'd like to make my record, if I

4     could.

5          THE COURT:  All right.  Go ahead.

6     Q    So what --

7          THE COURT:  I mean, we don't need an expert.  I

8     mean, it's common sense.  You know, we've already heard from

9     Mrs. Schulman.  You know, people have experiences with what

10    envelopes they open and what they don't.  I'm just trying to

11    move this along.

12         MR. MEAD:  So is the government --

13         THE COURT:  Go ahead.  Make your record.

14         MR. MEAD:  Thank you.

15         One way to make my record is to ask the government

16    do they intend to argue that the Schulmans actually knew

17    about the trades in King because confirmations and

18    statements were mailed to their home?  They introduced

19    evidence to that extent.  I need to know if that's going to

20    be a contention of the government.

21         MS. NESTOR:  Whether or not we actually argue

22    that, Your Honor, does not matter for purposes of this

23    testimony.  It's still not expert testimony.

24         THE COURT:  Yeah, that's my view.

25         Go ahead.  Make your record.  Make it quickly so

Dubinsky - Direct - Mead                    854

1    we can get out of here before Monday.

2    Q    So what experience have you had in terms of your

3    training and life experience that you believe a jury does

4    not have about the way high-net-worth folks review

5    individual stock picks made by financial advisors they hire

6    to trade on a discretionary basis?

7    A    Well, high-net-worth individuals are different than

8    ordinary people.  They have different patterns and

9    behaviors.  The fact that I've counseled directly for many

10   years high-net-worth individuals that had, and I think this

11   is an important distinction, discretionary trading accounts

12   because that's different than let me just open an account at

13   Charles Schwab or E-Trade, get my statement.  And I don't

14   think this is about opening the statement or not.  It's

15   about whether people understand the information and whether

16   they fully read the statement.  Or, as a discretionary

17   accountholder with an investment advisor, they're relying on

18   the investment advisor to do that for them, to explain those

19   investments.

20          And I think that's a big difference.  I think the

21   jury, again, I don't know the composition of the jury, what

22   their backgrounds are, but I think this goes beyond, at

23   least in my mind, beyond just opening an envelope or not.

24          In the FINRA study that I referenced, it talks

25   about -- it says that people, I think it was 93 percent open

Dubinsky - Direct - Mead                      855

1    it and skim it.  The more important statistics are the

2    statistics of people who fully read their brokerage

3    statements and then understand them.  And I think that's the

4    distinction that I can bring to the jury so they can have a

5    better understanding of the issues that are present in that

6    regard.

7    Q    In terms of the FINRA report itself, how did FINRA

8    prepare the information that went into the report?

9    A    They went out and did a study.  They surveyed

10   individual investors out in the marketplace, and it's

11   interesting in that study, there's a distinction between

12   high-net-worth individuals and others.  And they break down

13   statistics because they now and the study showed

14   high-net-worth individuals have different behavior patterns

15   when it comes to investing, when it comes to dealing with

16   their brokers.  The study goes through their backgrounds

17   with brokers and investment advisors, their attitudes

18   towards fees.  This is commissioned by the industry, by the

19   very industry that governs the brokerage industry.

20              (Continued on the following page.)

21

22

23

24

25

1        MR. MEAD:  Your Honor, should we let the Government

2   voir dire with respect to qualifications?

3        MR. PITLUCK:  Your Honor, I guess it depends.  If

4   you'd like me to voir dire on the envelope statements, I have

5   a lot of questions about practices and the FINRA study.  If

6   the Court wants to hear that, I'm happy to do it, but it

7   sounds like Your Honor's made a choice.

8        THE COURT:  I really don't need to hear it.  I've

9   made up my mind.

10       MR. PITLUCK:  Can I just ask a few questions?

11       THE COURT:  Yes.

12       MR. PITLUCK:  I just want to make sure I have

13  everything straight, Mr. Dubinsky.  You were going pretty fast

14  at the beginning.

15       THE WITNESS:  Sure.

16  VOIR DIRE

17  BY MR. PITLUCK:

18  Q    You said that in 1999, you were working as a CPA

19  primarily, correct?

20  A    That's correct.

21  Q    And you had -- and then you were helping people with

22  advisory planning and decided to go back and actually make

23  some money on it; is that right?

24  A    Correct.  The industry was changing.  Yes, that's

25  correct.

1   Q    I'm sorry.  I'm summarizing here.  But definitely correct

2   me if I'm wrong.

3         And in 1999, you went and got your investment

4   advisor license and had about a hundred clients that you said

5   you operated as investment advisor for, correct?

6   A    I think I said over the period of time there were about a

7   hundred clients, that's correct.

8   Q    And that ramped up to a peak of a hundred?

9   A    That's correct.

10  Q    How long did that take?

11  A    I would say probably about two to three years.

12  Q    And then did it remain at a hundred for the next five or

13  six, or did it go up and down?

14  A    There came a point where I sold the practice and I then

15  started up a second practice.  So the first practice that I

16  sold, those clients I couldn't go near.  You know, there was

17  an agreement that I couldn't go near those.  So I had to get

18  new clients.

19  Q    Yeah.

20  A    And so that was probably around 2004 time period.

21  Q    Okay.

22  A    And then it kind of ramped up again from there, probably

23  never to the level of a hundred at that point.

24  Q    So in about 2004, you sold your practice, had a

25  non-compete, couldn't go near them, and then you ramped back

*Dubinsky - Voir Dire / Pitluck*                    858

1   up again?

2   A    Correct.

3   Q    So when you said a hundred clients with about 150 million

4   under management, that was kind of the peak?

5   A    Correct.

6   Q    But that wasn't the whole time that you were practicing

7   in investments?

8   A    No, that is correct.

9   Q    And during that time, did you continue your CPA business?

10  A    Yes, yes.

11  Q    With more clients than you had as investment advisory

12  clients?

13  A    Yes.

14  Q    And during that time, I'm not going to beat around the

15  bush, you were also testifying as an expert witness a great

16  deal; is that correct?

17  A    That is correct.

18  Q    Sounds like a very busy practice?

19  A    It was, yes.

20  Q    Approximately what percentage of your practice between

21  1999 and 2007 was focused on this investment advisory

22  business?

23  A    Percentage of time?

24  Q    Percentage of time, percentage of revenue.  Feel free

25  to -- you're very descriptive.  Please break it down however

1    you want.

2    A    I would say percentage of revenue is maybe 20 percent of

3    revenue.

4    Q    How about time?

5    A    Time, boy, probably similar.  I mean, it might have

6    varied because, again, in some capacity I was meeting with

7    clients at the same time doing their taxes and going over the

8    investments, but I would say roughly that.

9    Q    Okay.  And before that, you said you were advising people

10   just as a CPA and then you mentioned that it wasn't really

11   paying off.

12          About how much percent of your time was helping

13   people with investment advice at that time?

14   A    Yeah, I don't think I said -- I'm sorry, your question

15   again.

16   Q    I'm sorry, I'm paraphrasing.  The record isn't going to

17   reflect that we're both smiling.

18          Approximately how much of your time was investment

19   advisory related before you became an investment advisor?

20   A    Probably 10 to 15 percent.

21   Q    And you had -- during this time, did you have help with

22   your advisory business, analysts and so forth?

23   A    Which time period?

24   Q    After 1999 when you became an investment advisor.

25   A    Yes, we did.

*Dubinsky - Voir Dire / Pitluck*               860

1   Q     And more junior accountants to help you?

2   A     Yes.

3   Q     Now, you mentioned, I want to make sure I understand, you

4   said high net worth.

5           What's your definition of high net worth?

6   A     It's changed over the years.  I would say typically in my

7   mind I was always thinking of about $250,000 of earnings per

8   year and above.  That's typically what the industry looks at.

9   The SEC I think uses that same benchmark rule.

10  Q     And you testified that the vast majority of your clients

11  were discretionary?

12  A     Correct.

13  Q     Can you try to quantify that a little bit more, please?

14  What constitutes vast majority?

15  A     I would say probably in excess of 90 to 95 percent.

16  Q     Throughout the time period including when you had a

17  hundred clients?

18  A     Yeah.  Well, just so the record's clear, the time period

19  that I was registered as an investment advisor.

20  Q     Yes.

21  A     Yes.

22  Q     Between 1999 and 2007, you testified a moment ago your

23  practice went up and down and it reached a hundred at its

24  peak, correct?

25  A     Correct.

*Dubinsky - Direct / Mead*                            861

1   Q      Did that percentage change at any point?

2   A      The 90 to 95 percent?

3   Q      Yes.

4   A      No.  So, to explain, the standard was the discretionary

5   account.  That was way that the practice was set up.  If they

6   didn't want it, they would basically opt out, and that's where

7   I think I testified that maybe a handful of clients had a

8   non-discretionary account.

9          MR. PITLUCK:  I think that's all I have for right

10  now, Judge.

11         MR. MEAD:  Do you want me to go to substance of his

12  testimony?

13         THE COURT:  Yes, I would like you to go to substance

14  in terms of the kinds of research a reasonable financial

15  advisor would do prior to recommending a particular stock and

16  the type of information about King that would have been

17  available to a financial advisor engaging in that sort of

18  research in August of 2010.

19         MR. MEAD:  Okay.  That's fair.

20         THE COURT:  Okay?

21         MR. MEAD:  Absolutely.

22         THE COURT:  So I've narrowed it.

23         MR. MEAD:  Okay.

24

25

*Dubinsky - Direct / Mead*                           862

1    DIRECT EXAMINATION (continued)

2    BY MR. MEAD:

3    Q    So, Your Honor's first question, I believe, was the kinds

4    of information that an investment advisor --

5              MR. MEAD:  Your Honor, my client is --

6              THE COURT:  It's fine.

7              MR. MEAD:  He needs to go to the restroom.  Can he

8    be excused for this?

9              THE COURT:  Yes.

10             MR. PITLUCK:  Judge, could we take literally three

11   minutes?

12             THE COURT:  An equal opportunity restroom break.

13             MR. PITLUCK:  There's no jury, so we can be really

14   fast.

15             THE COURT:  Yes.

16             (Recess taken.)

17             THE COURT:  Okay.  Go ahead.

18   BY MR. MEAD:

19   Q    So, I think Her Honor's question just before we broke was

20   what kinds of information did you look at that you believe in

21   your expert opinion an investment advisor would have looked at

22   before August 16, 2010, before making a decision about King's

23   stock or was there anything out there favorable, basically?

24   A    Yes, there were analyst reports.  These were analysts

25   that were covering the King stock in the marketplace.  There

1   were news articles, and there might have been a couple of blog

2   entries from a financial type of website out there.  Those are

3   the types of things that I looked for and that I found.

4   Q    Did you find kind of a core of positive articles about

5   King, kind of, in the summer, June, July, early August of

6   2010?

7   A    I did.  I think the earliest was around June of 2010

8   leading right up to I found one on the very day, August 16th,

9   which is the day of interest in this case, 2010.

10           MR. MEAD:  Your Honor, would you like us to run

11  through some of the Power Point slides?  I'll skip the ones

12  about his tasks and his conclusions, which I think you've

13  seen.

14           THE COURT:  Sure.

15           MR. MEAD:   If we could get the slide up to slide 5.

16           So, the Power Point itself is Defense Exhibit 38.

17           (The above-referred to exhibit was published.)

18  Q    First, Mr. Dubinsky, Defense Exhibit 38 is based on --

19  I'm sorry, slide 6 of Defense Exhibit 38 is based on

20  Defendant's Exhibit 12.

21           MR. MEAD:  So, Your Honor, the stack of documents we

22  gave you are the underlying documents summarized on the slide.

23  Q    So, Defense Exhibit 12 is what, Mr. Dubinsky?

24  A    So, Defense Exhibit 12 is an analyst report from Caris

25  and Company out of New York on King Pharmaceuticals.  It's

1   dated Tuesday, June 8th, 2010, and it's a pretty lengthy

2   analyst report, I think there's 18 pages to it, going through

3   why they are initiating coverage on it.  You could see that up

4   in the upper right-hand corner, which means they're now

5   beginning to cover the stock.  They believe something is

6   important enough to start coverage of the stock.

7           And what the screen is showing is on this date, when

8   they issued this, the stock over the left-hand market data is

9   trading at $7.98 a share and their price target up in the

10  upper right is $11.  So that just computes, the simple math is

11  a 39 percent increase from 7.90 up to $11.  And they are

12  initiating coverage of King, KG, that's the trading symbol,

13  with an above average rating, meaning an $11 price target.  So

14  that's pretty favorable right on the face of this analyst

15  report.  And of course then you have to say well, what else is

16  in this analyst report that becomes important.

17  Q    So, if we could move to slide 6.

18          Is that another excerpt from the same Defense

19  Exhibit 12?

20  A    It is.

21          So, again Tuesday June 8th, 2010, the highlight that

22  I did there was:  KG's profile screams acquisition target,

23  quote/unquote.  The rest of that line says:  "A pipeline of

24  assets, significant commercial infrastructure and some

25  execution problems."

*Dubinsky - Direct / Mead*                    865

1        So, there's very, very positive, a little bit of

2   negative at the end of that sentence.  But what they're

3   talking about is the pipeline of assets in a pharmaceutical

4   company are their drugs.  That's the life of the pharma

5   company, the drugs that go through FDA approval, clinical

6   trials and eventually reach the marketplace, and then the drug

7   company could commercialize those drugs at that point.  It's a

8   lot of heavy R and D that goes into it up to that point.

9        So this analyst company that's following this is

10  saying hey, there's a pipeline of assets, that's what they're

11  talking about, the drugs, and there's a lot of detail in this

12  report that talks about the different drugs.  Significant

13  commercial infrastructure, which is very important.  This is

14  not a start-up company.  This is a company with the

15  infrastructure, legal, finance, the ability to get drugs to

16  market, the ability to go through the FDA trial process, and

17  that becomes very, very important for somebody looking to

18  acquire.

19        And then, as I said, they say "some execution

20  problems."  Okay, they are having a little bit of problems

21  getting things to the marketplace.

22        But this is about two months, two-and-a-half months

23  before August 16th.  This is information that's out in the

24  market, and this is a piece of information in the overall

25  total mix of information that is out there.

1    Q     Can I focus you on the last sentence, the excerpt on the

2    slide that reads:  "As profits cash flow from the drug

3    business reach critical mass, in coming two to three years

4    divestitures could occur to unlock value."

5             Does that have any relevance to any testimony that

6    you heard as you attended trial?

7    A     It does.  What that's talking about is, as I said

8    earlier, businesses aren't valued on the past.  They're valued

9    on the future, what is expected the company is to do.  They're

10   talking about profits and cash flow.  If they increase,

11   divestitures mean it could be a segment of the business, it

12   could be they sell off patents to the drugs, they could

13   license the patents, not sell them, they could license to

14   monetize those patents to the drugs.  There's a lot of

15   different ways, to, quote/unquote, unlock the value held in a

16   corporate entity, and that's what they're talking about here.

17   That's what they're looking -- forward-looking type

18   projections.

19   Q     Do you recall statements introduced by the Government

20   from Mr. Schulman's SEC testimony related to what

21   understanding of the types of potential deals that could have

22   been in play between King and Pfizer?

23   A     Yes, I did.

24   Q     What did he say?

25   A     He was, again I'm paraphrasing, talking that he didn't

1    know if in the context of an acquisition it would be the whole

2    company being acquired, a division of the company, a product

3    line, or an individual product, and that's what I recall that

4    testimony said.

5    Q    How is this sentence consistent with that?

6    A    It's very consistent.  This is -- this is the way pharma

7    companies are valued, how they operate, and how they, quote,

8    unlock their value, how they get to the value of the company.

9    Q    When we get to slide 7, this is another excerpt from the

10   same article, Defense Exhibit 12?

11   A    It is.  So, they're talking about 2011 is this big

12   pipeline year.  That's kind of the heading.  Then it says:

13   "Remoxy, FDA approvals next year plus oxycodone completing

14   phase 3 trials provide KG with a multiple shots on goal to

15   eventually dominate the $5 billion plus opiate space."

16              So, what they're talking about again is the value of

17   the company is forward-looking.  That's what investors, people

18   how they value companies forward.  If the FDA approvals are

19   coming, that's what they're anticipating, that's a big

20   pipeline year because those can then be introduced into the

21   market and commercialized and that's where these companies

22   make their money.  That's how they make their money.  So

23   that's very, very positive and a very big statement there.

24   Q    Can we move to slide 8?  This is an excerpt of a

25   different report you looked at?

1   A    This is.  This is from Collins Stewart, another analyst

2   here.  I believe they're in New York on Madison Avenue.  And

3   they're putting out an analyst report.  I don't know what

4   defense exhibit, but it has --

5          MR. MEAD:  It's Defense Exhibit 14, Your Honor, if

6   that helps you.

7   A    I believe there's like 12 or 14 pages, a lot of

8   spreadsheets and analysis.  And what they're saying, among

9   other things, that are interesting here.  Now, this is August

10  9th, 2010, again a week before August 16th, 2010.  Prices

11  trading at 8.79 a share.  You can see that.  Their target

12  price is $15 a share.

13  Q    How does that compare to the announced merger price

14  between King and Pfizer on October 12th, 2010?

15  A    It's pretty close.  I think it's above it by about 85

16  cents a share.  And that represents -- what's important about

17  this is it's a 71 percent increase.  That's a huge increase

18  for an analyst to be projecting here.

19          And what the heading is, or what the statement that

20  I looked at here was:  "We are reiterating our buy rating at a

21  $15 price target."

22          So in other words, they are bullish on the stock.

23  You hear that term a lot, whether you're bullish or bearish.

24  Bulls in the market's going well, bears kind of retreat and

25  don't invest.  So they're bullish on this stock.  They think

1   it's going to increase 71 percent and they are reiterating

2   their buy rating.  In other words, telling people out there

3   hey, you should be buying this stock, something's good here.

4   Q    And you had looked at one article, the one before from

5   June of 2010 that talked about a potential acquisition.

6            Does this article base its projections on a

7   potential acquisition?

8   A    No, they don't explicitly state that.  What they do is

9   they go through what's called a discounted cash flow analysis.

10  So they go through their financials and they're projecting out

11  what will happen, and because of that, they back into their

12  target price and it's predicated on these drugs going to

13  market.  So they won't explicitly state that, but you can

14  infer easily from this that if that happens, and those drugs

15  are commercialized, it's a pretty valuable asset the company

16  has.

17  Q    Are those cash flow projections at Dubinsky 39 of Defense

18  Exhibit 14?

19  A    Yes, they're summarized at Dubinsky 35 and going to 36,

20  37, 38, 39, 40, 41.  So this is all the financial analysis

21  that the analysts will go through and talk that's how they

22  basically back into their target price.

23  Q    And in your work as a CPA, as a financial advisor, as an

24  expert witness on valuation, are you personally familiar, have

25  experience with these kinds of projections?

1    A    Every day.  I mean, I've prepared them myself.  I've

2    analyzed them.  Yeah, I've spent a lot of time with

3    spreadsheets like this.

4    Q    Okay.

5    A    And doing valuations.

6    Q    If we move to slide 9 on Defense Exhibit 15.  So one

7    article that mentions potential acquisition from June 2010,

8    one article from August 2010 that does not.

9         How about this one, which is Defense Exhibit 15?

10   What's the date on this one?

11   A    So, this one is August 10th, 2010, just one day later

12   than the previous one we saw.  This is from a different

13   analyst call Cowen and Company.  I believe they're here in New

14   York as well, they have offices here.  So, it's interesting,

15   the headline, not even in red, let me read that:  "Solid Q2

16   results and Remoxy MDA on track.  Getting our numbers in

17   line."

18        The company has just recently had their Q2 earnings

19   call in the market to apprise investors of the results.  This

20   analyst is saying that King posted solid Q2 results with total

21   revenues coming in 10 million above consensus, so that's

22   pretty good.

23   Q    When did they release those new performance results that

24   exceeded expectations?

25   A    It would have been after June 30th, 'cause that's the

1    second quarter, and some time before this.  I don't know

2    exactly, but somewhere in that time period.  And they try to

3    get it out pretty quickly to the market to have those calls.

4            And what they're commenting here is this

5    outperformed the market by 30 percent plus and they say, I'll

6    read the second half of what's highlighted down there.  It

7    says:  "Based on our sum of the parts and DCF" - that stands

8    for discounted cash flow - "valuation analyses, we believe KG

9    shares can outperform the market by 30 percent plus over that

10   period."

11           So, this is talking about when you do a valuation,

12   many times you'll look at the overall company.  Then you'll

13   drill down to the segment and even sometimes to the product

14   lines and the products because you have to -- you have to

15   project out, Your Honor, the sales, the projected sales from

16   these, and it's from the revenue.  You roll that up, you

17   subtract the expenses, you get the income.  That's what

18   investors are looking for.  And it's the ending of that income

19   when you put it all back together, the sum of the parts, equal

20   the whole company, and that creates the value of the company.

21           So, that's what they've done here.  They've looked

22   at the company.  They dissected it.  They've done their

23   valuation, and their conclusion on August 10th was

24   outperformed the market by 30 percent plus.

25   Q    When we move to slide 10, does this same article

1  explicitly mention the possibility of an acquisition or

2  takeover?

3  A    It does.  This is the same analyst report, August 10th,

4  2010, and it says, quote:  And King's focused pain management

5  commercial infrastructure and pipeline makes it a potential

6  takeout target for several large and mid-cap pharma companies.

7  Q    So, if we could, let's move to slide 11.  This is an

8  analyst report that we've actually seen in evidence during the

9  Government's case.

10          Do you recall that?

11 A    I do.

12 Q    And do you recall it coming up during the testimony of

13 Mr. Shechtman?

14 A    Yes.

15 Q    That this article was e-mailed to him by Mr. Klein?

16 A    That was my understanding, yes.

17          MR. MEAD:  Your Honor, I apologize, but we don't

18 have this separately marked as a defense exhibit.  At trial,

19 we will mark it as Defense Exhibit 23A.

20          THE COURT:  Okay.

21          MR. MEAD:  But you've seen it before.

22          THE COURT:  All right.

23 Q    So, has this slide -- first, what's CLSA?

24 A    Credit -- Credit Lyonnais Securities of Asia and Credit

25 Lyonnais is a French company that was acquired by Credit

1    Agricole.  Credit Agricole was, at least at that time, I think

2    it still is, is the largest French industrial commercial bank

3    that's all there in France and they have offices here in New

4    York.  I think it's on Sixth Avenue, Avenue of the Americas.

5    Q    Is there a building actually with their name on it?

6    A    There is, yes.  They're huge.

7    Q    Okay.  So, in terms of what you selected from this

8    article that was important -- that was important to your

9    opinion about what a financial advisor looking at

10   publicly-available information as of August 16, 2010 would

11   have focused on or potentially focused on?

12   A    Yes.  What it says is it's trading at 8.58 a share.  This

13   is August 16th, 2010, the date that's of issue here in this

14   case.  And it says:  "Our TP - our target price, that's what

15   they're projecting - "of U.S. dollars $11 a share implies

16   upside of 28 percent and so we believe that the risk/reward is

17   favorable."

18              So, what they're saying is that their target price

19   is 11, it's going from 8.58 a share up to 11, that implies a

20   28 percent increase, and that the risk/reward, any time you

21   invest, there's always risk in investing, even in U.S.

22   treasury bills.  Hopefully the U.S. Treasury will never

23   default, but there is implied risk in that.  And as you walk

24   the investment chain to different types of investments, the

25   rewards you get for taking on more risk has to be commensurate

*Dubinsky - Direct / Mead*                              874

1  with the additional risk that you take.  So that's what that

2  means here.

3          They're talking about that yes, there's some

4  volatility, and if you read through the actual analyst report,

5  there's some positives and some negatives baked into it, but

6  at the end of the day, the conclusion is that risk/reward is

7  favorable.  In other words, they would take the position it's

8  a buy position, and that's what it says at the top, they are

9  recommending buy, that they buy, that reward outweighs the

10 risk that you would take in the stock.

11 Q    Do you recall whether there's a specific mention of a

12 potential acquisition in this article?

13 A    I don't recall seeing that.  I'd have to go back and

14 look.  I don't think there was.

15 Q    So, we've seen two positive articles from the summer of

16 2010 that mention the possibility of the takeover and two that

17 are positive but don't mention the possibility of the

18 takeover?

19 A    That is correct.

20 Q    In your expert opinion, based on your experience as a

21 financial advisor, your experience with that industry, if you

22 were researching the stock yourself or if a investment advisor

23 who's researching the stock, would the mention of potential

24 takeover lead you to do another kind of research?

25 A    Absolutely.  Let me explain, Your Honor.

1           When companies are taken over, there's something
2    called a control premium or a premium on price, and that's
3    because even looking the context of this, we know Pfizer
4    acquired King at a premium.  It's much cheaper for a company
5    to pay that premium using their stock as legal tender than
6    going out and building more infrastructure, investing in R&D,
7    developing a pipeline of drugs.  So they are willing to pay
8    what's called a premium above the trading price to get control
9    of the whole entity.  And that's well-documented in investment
10   theory all the way back.
11          Control premiums at that time in the pharma industry
12   were anywhere from 35 to -- I mean, there were outliers at 95
13   percent, but they hovered around 40 to 50 percent.  That's
14   what the research shows.
15          When you see mention of a potential takeout, a
16   potential merger, that triggers okay, this stock may actually
17   bump higher than what they're saying.  We saw some that talked
18   about an $11 target price, 28 percent.  If I told you a minute
19   ago that control premiums were averaging 40 to 50 percent,
20   that 28 is short of the 40 to 50.  So there's upside room
21   there.
22          So, that would cause me as an investment advisor,
23   and it should cause others if they were out there, to question
24   what's going on and do additional research.  I wouldn't stop
25   here.

*Dubinsky - Direct / Mead*                                        876

1   Q     Did you personally do additional research?

2   A     I did.

3   Q     What did you do?

4   A     I went to Google and started Googling the Internet and

5   saw what I could find, and in addition to Google, there were

6   some documents produced by the Government in this case that --

7   matter of fact, all of the documents that the Government

8   produced I had access to, and I had access to documents that

9   you produced as well.  But in addition to that, I went to

10  Google.

11  Q     So, if we could look at slide 12, does slide 12 contain

12  kind of highlights from four different articles you found?

13  A     It does.  There's four articles.  I just put them up

14  there for ease.  One is Bloomberg in the upper left.  Moving

15  to the upper right --

16  Q     Slow down if you could and give us the date of each one

17  of those.

18  A     Sure.  The Bloomberg is August 5th, 2008.

19             Moving to the right --

20             MR. MEAD:  Your Honor, that we will mark as Defense

21  Exhibit 23B.

22             THE COURT:  Okay.

23  A     Moving to the right, it the CBS News article from

24  MoneyWatch, and that is dated August 6th, 2008.

25             MR. MEAD:  And Your Honor, that will be marked

1   Defense Exhibit 13.

2   A    There was an article from Street Insider, moving to the

3   bottom left, dated April 15th, 2009.

4        MR. MEAD:  Your Honor, that's Defense Exhibit 46.

5   A    And moving to the bottom right, from Thompson Reuters,

6   there's an article Friday, November 30th, 2007.

7        MR. MEAD:  And that, Your Honor, is Defense

8   Exhibit 42.

9   Q    What do all four of these articles in the period from

10  2007, 2008, and 2009 share in common?

11  A    They all mention potential takeover for King

12  Pharmaceuticals.

13       And let me just see for a minute.  One, two, three

14  of them actually mention Pfizer in them.  I don't think the

15  Street Insider actually mentions Pfizer, but the Bloomberg

16  article --

17  Q    From what year?

18  A    This is in 2008.

19  Q    Mentions Pfizer, right?

20  A    Yeah.  It says:  "King Pharmaceuticals Inc.'s call option

21  trading was the busiest since 2004 and its shares rose to an

22  11-month high on speculation Pfizer Inc., the biggest U.S.

23  drug maker by market value, will buy the company."  And then

24  there's some other things.

25       Moving to the right, to the MoneyWatch article from

1  CBS News, it says in red:  "King's shares rose to an 11-month

2  high on rumors that Pfizer may be interested in acquiring it."

3  And then it talks about that:  "Pfizer's CEO, Jeff Kindler,

4  made a lot of noise a few years ago about making acquisitions

5  to beef up Pfizer's dwindling pipeline."

6           As I explained to you earlier, the pipeline of these

7  companies is the lifeblood of the pharma company.

8           Moving to the Street Insider, bottom left, title:

9  "King Pharmaceutical sees upside on takeover rumor."  And it

10  talks about:  "Shares of King Pharmaceuticals are moving

11  higher today on unsubstantiated takeover speculation."

12  Q    What's the date there?

13  A    August 15th, 2009.

14  Q    How about the one on the bottom right, what year is that?

15  A    November 30th, 2007.  Title:  "King Pharma options up on

16  takeover talk."  And hard for me to read the whole thing, but

17  it says, part of it:  "Fueled by speculation that drug maker

18  may be acquired according to several option analysts.  There

19  are rumors that Pfizer might be very interested in acquiring

20  King Pharmaceuticals."

21  Q    Did you find another article specifically mentioning

22  Pfizer as you did further research last night?

23  A    I did.  I've been sitting, as Your Honor pointed out,

24  through the trial from the very beginning, and as an expert I

25  continue to listen to everything.  And I went home and did

1  some research back on the Internet and found yet another

2  article that is not in here but I gave to you this morning.

3  Q    Do you recall which -- what press it was?  Who wrote it?

4  A    I think it's the futures -- I don't recall the name.  I

5  think something about futures in it.

6             MR. MEAD:  May I approach, Your Honor?  I think we

7  gave it to you in your package, Defense Exhibit 53.

8  Q    Is that the article you found on the Internet last night.

9  A    It is.  This is from Future Magazine, so it's a trade

10  publication, and this was dated August 5ths 2008.  And it

11  says:  "King Pharma moves on takeover talk."

12  Q    So there are articles from 2007 and 2008 it looks like

13  specifically mentioning Pfizer?

14  A    That is correct.

15  Q    And then another one from 2009 not mentioning Pfizer but

16  talking about takeover rumors?

17  A    That is correct.

18  Q    And how would this be relevant to a financial advisor

19  evaluating publicly-available information about King stock as

20  of August 16, 2010?

21  A    These are all important pieces of information in the

22  overall mix of information.  And given this information as an

23  investment advisor, you could go then look at Pfizer.  You

24  could start to do analysis on Pfizer.

25             Talks about in one of these articles Pfizer's CEO

*Dubinsky - Direct / Mead*                    880

1   was rumored to have said he wanted to fill the pipeline.  They

2   were looking to do acquisitions to fill that pipeline.  You

3   could certainly look at Pfizer, look at the information about

4   Pfizer that's out there.  Look at option trading on Pfizer.

5   Look at option trading on King.  In other words, this is sort

6   of a gateway to conducting the rest of the due diligence if

7   you were an investment advisor about to put your clients into

8   King stock or to buy options.

9   Q    So, as a sideline.

10           MR. MEAD:  I wouldn't do in front of the jury, Your

11  Honor.

12  Q    They mention Jeff Kindler being the CEO of Pfizer?

13  A    Yes.

14           MR. MEAD:  He was on my floor at Williams and

15  Connolly in 1998.  You want to talk about lives going in

16  different directions.  I'd hate to think about his net worth

17  right now.

18           THE COURT:  He was an associate at Williams and

19  Connolly?

20           MR. MEAD:  Yes.  Smart man, a really smart man.

21  Q    So, to be fair, you have looked for favorable articles

22  from this time frame, right?

23  A    That's correct.  I was asked to do that, correct.

24  Q    And is there a way to kind of -- in your experience, is

25  there a way to kind of summarize the overall picture of what

*Dubinsky - Direct / Mead*                              881

1   analysts were doing in that time frame related to King?

2   A    Sure.  I mean, generally in the analyst world, there's

3   something called consensus ratings where ratings agencies or

4   services or reporting services will go out and poll analysts

5   that are covering a stock and they will poll them as to

6   whether they think they should buy it, hold it or sell it, and

7   then they will publish that information out to the market, and

8   then they usually will go through an analysis of that to

9   determine on a percentage basis how many are saying buy, how

10  many are saying hold, how many are saying to sell, to give

11  readers a sense of, you know, where are people on this

12  particular stock.

13  Q    So, did you look for that kind of consensus evaluation?

14  A    I did.

15  Q    Can we turn to slide 13, please?

16        What is this, Mr. Dubinsky?

17        MR. MEAD:  Your Honor, this single sheet is marked

18  as Defense Exhibit 30, and unfortunately it has Mr. Dubinsky's

19  highlighting on it in the exhibit because we didn't have a

20  clean copy.  Expert messed up.

21        THE WITNESS:  I did.  I apologize.

22  A    This is information pulled from Bloomberg, the Bloomberg

23  terminal.  So I pulled this -- at Duff & Phelps we have access

24  at, because of the investment banking work we do, we have a

25  subscription to Bloomberg.  And this is as of July 31, 2010,

*Dubinsky - Direct / Mead*                                882

1  so a couple of weeks before August 16th, 2010.

2  Q    Did you see the same report as of August 31, 2010?

3  A    I did.

4  Q    And were the numbers roughly the same?

5  A    They were.

6  Q    Why did you pick July 31 as opposed to August 31?

7  A    Well, it's easy to play armchair quarterback after

8  something happens, an event, and the event in this case was

9  August 16th, that's when the King shares were being purchased.

10 So I didn't think it would be fair to look post facto.  I said

11 let's look at the month immediately prior to when this action

12 took place.

13 Q    Okay.  Now, this report by Bloomberg, the summary, only

14 talks about 15 analysts covering the stock.

15 A    Correct.  And you can see that, Your Honor, where it says

16 buys, holds and sells.  Next to the percentages there are

17 numbers.  So that 8, the 5 and the 2 added up is 15.  So they

18 went out and did a consensus rating from 15 analysts and they

19 do a weighted average of that and they said 53.3 percent of

20 the analysts, 8 divided by 15 in other words, said buy, 33 .3

21 said hold, and 13.3 percent said sell.  So two analysts are

22 saying hey, time to sell the stock, five are saying hold it,

23 don't do anything, and 8 are saying buy.

24 Q    Now, in your experience, Mr. Dubinsky, you would expect

25 more than 15 different companies that purport to be following

1   companies to have been following King at this time.  Would

2   that be accurate?

3   A    You will find that -- I didn't look specifically to King.

4   You will find in the industry, depending on the stock,

5   sometimes there could be 50 or 60 people that claim to be

6   following it.  But what you will find is usually there is a

7   core group of analysts that make it their business to follow

8   that particular stock.  They may be sector specialists in the

9   health care or pharma and they know that industry, they know

10  the players.  This is what they're doing.

11         So, Bloomberg when it does its consensus rating will

12  go out and try to find the more reputable or the ones that are

13  really having the deep analytics because Bloomberg is putting

14  this out on their information, they're selling the service.

15  So that's why there's 15 here from that standpoint.

16  Q    All right.  So, I think we showed four articles, analyst

17  reports from the summer of 2010, and there are 8 saying buy,

18  right?  Do you see that?

19  A    Correct.

20  Q    So from that number, will you conclude that there are

21  probably four other favorable articles that if we could find

22  would say something favorable that you could put up on a

23  slide?

24  A    I'm sure you could find four favorable, four that are

25  holds, maybe one --

1    Q     Well, then let's get to that.

2          So at a minimum we know there are going to be five

3    holds, right?

4    A     Correct.

5    Q     So those reports probably aren't going to be as favorable

6    as the four that we've shown, right?

7    A     I would agree with you.

8    Q     And then there are two that say sell, right?

9    A     Correct.

10   Q     And those two obviously are going to be negative?

11   A     They would be bearish on the stock.  In other words,

12   telling their people hey, sell the stock.

13   Q     Did you find those two negative ones?

14   A     Did I find them?

15   Q     Yes.

16   A     I don't recall.

17   Q     So you're not suggesting in any way that the four

18   articles that we've talked about that contain favorable

19   information is all of the information that was available?

20   A     No, not at all.

21   Q     Okay.  But again, understanding that it is a selection,

22   why is it relevant to your opinion?

23   A     Well, again, when you're trying to analyze a stock and

24   you go into the market and you see the information that's out

25   there, especially if you're focusing on a particular stock and

*Dubinsky - Direct / Mead*                                    885

1   you're seeing enough information about a potential takeover,

2   about upside potential, even, Mr. Mead, this particular one up

3   on the screen talks about a 20.4 percent return potential.  So

4   if you look at what Bloomberg is saying, the last price 8.76

5   12-month targeted price of 11 and a quarter, they're putting

6   out too there's huge return potential.

7           So, if you're looking to invest in a stock and you

8   see this information, it becomes very important then in the

9   overall analytics, due diligence, and thought process to

10  consider this.

11  Q    But there are going to be other stocks out there that are

12  also going to have favorable analyst reports, right?

13  A    Absolutely.

14  Q    And an investment advisor has to pick and choose between

15  which stocks you want to invest in and which analyst reports

16  you find are more reliable?

17  A    Absolutely.

18  Q    Okay.  How do those specific articles from 2007 and 2008

19  that specifically mention Pfizer as a potential buyer of King

20  and the 2009 article that talks about rumors of the takeover

21  without mentioning Pfizer, how do they play into your opinion?

22  A    Well, again, the analyst reports that we saw in the 2010

23  time period talk about potential acquisition.  One said

24  "screams acquisition target."  It supports that what these

25  analysts are reporting on and what they believe might happen

1    is supported by prior rumors in the marketplace, prior

2    information in the marketplace, and so that becomes part of

3    the overall information that you have as an investment advisor

4    to look at to determine do I want to buy this stock for a

5    client, do I want to recommend this stock for a client, do I

6    want to stay away from it.  Those are all things that would be

7    considered in the process of doing that due diligence.

8    Q    Can we turn to slide 14, please?

9         What is slide 14, Mr. Dubinsky?

10   A    This was -- I went and put just the four main product

11   lines or the biggest product lines of King's business.  So the

12   EpiPen, I know there's been a lot of talk in the news, but

13   they had the EpiPen.  Remoxy was their painkiller drug, the

14   Animal Health line.  So these are different lines of business

15   within King, and the point here is it supports the analyst

16   reports that we read where they were talking about the sum of

17   the parts and whether somebody would come in and buy just the

18   EpiPen, there might be a patent left on that of ten years, and

19   I don't know specifically, but drugs would have a patent, and

20   that has value to people.  So they could come in and buy that.

21   They could buy the Remoxy if it's been FDA approval.  Again,

22   when companies look to buy companies, sometimes they want the

23   whole thing, sometimes they want a segment, sometimes they

24   want within a segment of the division, sometimes they want a

25   product line.  It's just different -- and no one would know

1   until either it's announced or you're involved in the deal

2   part of, you know, your deal counsel or your accountants, like

3   if I was doing due diligence on it as part of the deal team,

4   you might know what they're looking at at that point.

5   Q    Can we turn to slide 15, please?

6           So, does slide 15 summarize your opinion about your

7   research in publicly-available information on King stock as of

8   August 16, 2010?

9   A    It does.

10  Q    And what is that opinion?

11  A    My research showed that it was publicly-available

12  information about King stock as of August 16th, 2010, that

13  contained positive information about King that an investment

14  advisor and reasonable investor would consider in evaluating

15  whether or not to make an investment in King stock.

16  Q    Is an investment advisor part of the category of

17  investors?

18  A    Yes, as an investment advisor, I invest.  I mean, I had

19  money in the market, absolutely.

20  Q    Do you now as you speak?

21  A    I do, yes.

22  Q    So do you do anything different in terms of evaluating

23  your own personal selections of stock than you did as an

24  investment advisor?

25  A    I would say I'm probably a little more critical now

1  because I'm involved in a lot more litigation, so I see things

2  that go on in companies.  So I just come at it with a little

3  more critical eye, but in general, no, I approach it the same

4  way.

5          MR. MEAD:  Your Honor, I take it you do not want me

6  to go into the slides related to the other opinion?  I think

7  we've made our record with respect to --

8          THE COURT:  Yes, I do not want you to.

9          MR. MEAD:  Just to preserve the record, we've shown

10 you the Power Point.  You've heard our basis.  You understand

11 what we would seek to introduce.

12         THE COURT:  I do.

13         MR. MEAD:  Okay.  Thank you, Your Honor.

14         MS. NESTOR:  Mr. Mead, can I ask you a question?

15         MR. MEAD:  Sure.

16         MS. NESTOR:  Do you plan on admitting this into

17 evidence?

18         MR. MEAD:  No, but I wanted to mark it for

19 identification so we could talk about it.

20         THE COURT:  Ms. Nestor, what's this that you're

21 referencing?

22         MS. NESTOR:  The Power Point.  I just wanted to make

23 sure he wasn't trying to admit it.

24         THE COURT:  Okay.  Did you want to examine?

25         MR. PITLUCK:  Very briefly, Your Honor.  Can I just

Dubinsky - Cross / Pitluck                    889

1    do it from here?

2             THE COURT:  Yes.

3    CROSS-EXAMINATION

4    BY MR. PITLUCK:

5    Q    Mr. Dubinsky, you mentioned a FINRA proceeding in which

6    you testified as an expert witness recently, correct?

7    A    Yes.

8    Q    That was related to Facebook stock?

9    A    Yes.

10   Q    And were you opining on what that original -- what that

11   specific investment advisor was doing?

12   A    Yes.

13   Q    And as part of that, did you review any information for

14   Facebook stock that was publicly available?

15   A    I did not.

16   Q    And you didn't make any independent assessment as to

17   whether it was proper to buy or sell Facebook stock at that

18   time?

19   A    That is correct.

20   Q    Have you ever testified as an expert on that specific

21   topic matter, on the propriety of an investment advisor in

22   evaluating investment decisions?

23   A    I would have to go back to the list of testimony.  I know

24   there was a proceeding in arbitration involving a pension

25   plan, and I believe that was the subject of it.  I'd have to

*Dubinsky - Cross / Pitluck*                    890

1    go back and look.  That was the --

2    Q    When was that?

3    A    I don't know.  I'd have to look at the -- it was the, I

4    think, Borax case.  If you had a list of cases I could --

5    Q    I do because I was able to find it online.  It wasn't

6    provided to me by Mr. Mead.

7              But you filed something in the Madoff proceeding,

8    correct?

9    A    In the criminal case in the Southern District.

10   Q    In the criminal case with a list of your expert

11   testimony?

12   A    That is correct.

13   Q    Do you remember approximately what year this Borax case

14   was?

15   A    I don't.

16             MR. PITLUCK:  Your Honor, if I may, I'm just showing

17   him it was publicly filed on ECF (handing).

18   A    It's on page 5 of 6.  It was a what used to be called the

19   NASD arbitration.  That was the predecessor to FINRA.  So

20   again was a proceeding in that, and it was the Phil Adams

21   Company Profit Sharing Plan versus Trautman Wasserman, and I

22   believe, and this is back in 2002, I believe there were issues

23   in that case dealing with propriety of the investments that

24   were being made for the profit sharing plan by Trautman and

25   Wasserman.

1           And let me just take a minute and look through, if I

2    can, the other cases.

3    Q    Sure, of course.

4    A    (Perusing document.)

5           There's a case on page 2 of 6, Sands Capital

6    Management versus Scott O'Gorman.  This was an American

7    Arbitration Association hearing in 2010.  That dealt with

8    investment advisors and it dealt with compensation related to

9    the breakup of that firm and what the investment advisor had

10   done, so I don't think it directly beared [sic] on your

11   question.

12          Let's just see.

13          (Perusing document.)

14          There's a host of cases against KPMG.  These arose

15   out of, and you'll see them spread out in the list, arose out

16   of their share of fraudulent tax shelters declines.  So I

17   testified against KPMG in a number of depositions and some

18   trials regarding the propriety of them.  They were also

19   registered as a -- they had an investment advisory arm for

20   KPMG that was not a proper investment.  These were fraudulent

21   tax shelters and that was part of the testimony in those --

22   there's about 8 or 10 of those cases.  Actually, there's

23   probably more of those than 10.

24          (Perusing document.)

25          I think those are it.

1  Q    So, is it safe to say you've never actually been

2  qualified as an expert on the scope of testimony that you're

3  purporting to give today?

4  A    No, I don't think so.  In the Madoff case, Judge Swain

5  qualified me in what she called SEC investment matters, and I

6  talked a lot about the types of investments Mr. Madoff

7  purportedly was selling the clients, the split strike

8  analysis, a convertible arbitrage.  I was proffered on a

9  variety of topics, qualified in front of Judge Swain on all of

10  those topics, and testified for four days for the U.S.

11  Government in that capacity.

12  Q    Did you testify to the underlying investments that Mr.

13  Madoff made and whether or not they were appropriate?

14  A    Well, the fact was he never made any investments, but I

15  was analyzing the investments that he purportedly made for

16  people, the information surrounding those, the lack of trading

17  tickets, confirmations, account statements, computer -- I

18  mean, on and on and on.  I was on the stand for four days.

19  Q    As a fraud examiner, right?

20  A    Well, I was qualified as -- Judge Swain qualified me in

21  investment -- SEC investment matters as it related to Bernie

22  Madoff's registered investment advisor practice.  He had

23  registered, that's what it was, and that's what I was

24  qualified for.

25  Q    Now, you testified, I want to ask you specific questions,

1   I think I may have missed it.  There was a Collins Stewart

2   report, which is Defendant Exhibit 14, and I think I may have

3   just missed this, so this is more for my clarification.

4           You testified as to the DCF.

5   A    Yes.

6   Q    Discounted cash flow analysis.  I want to make sure I

7   understand it.

8           Was your testimony that the DCF indicates from

9   Collins Stewart that King was a likely acquisition target?

10  A    No, I didn't say that.

11  Q    Okay.  I thought I may have been writing and I wanted to

12  make sure I didn't miss it.

13  A    Sure.

14  Q    And you testified a little bit from when Mr. Mead was

15  questioning you that you've had some experience in the

16  pharmaceutical arena, correct?

17  A    Correct, pharmaceuticals and health care, yes.

18  Q    And I think you said Novartis?

19  A    No, Actavis.

20  Q    Actavis, I'm sorry.

21          What kind of experience did you have testifying as

22  expert for those companies, or performing expert analysis for

23  those companies?

24  A    So, it was involved with a drug compound, as best I could

25  recall, and patent issues and I was dealing with the damages

1  relating to potential patent infringement, so when somebody

2  fringes on a patent, there's statutory damages and I'm called

3  in a lot to calculate those damages.

4  Q     You've never worked for King before, correct?

5  A     No, I have not.

6  Q     And so your preparation for this case was focused on King

7  primarily, correct, King Pharmaceuticals?

8  A     For this opinion, yes.

9  Q     Yes.

10 A     Yes.

11 Q     And approximately how long did you spend preparing for

12 that?

13 A     I was hired, I believe, in January of this year.  So I've

14 been working on it since January.

15 Q     And in that time, that's when you've been reviewing the

16 research reports and the news articles and things like that,

17 correct?

18 A     Yes.

19 Q     Fairly time-consuming process?

20 A     Yes.  I have other cases going on and a heavy workload,

21 but yes.

22 Q     And you would agree with me, wouldn't you, Mr. Dubinsky,

23 that the financial markets are fairly fluid?

24 A     Depends.  I mean, in 2008, they weren't.  If you're

25 talking about today in most sectors, I would agree with you,

*Proceedings*                                                    895

1   but there have been times when it's been very illiquid and

2   locked up.  So I wouldn't say it's fluid.

3   Q    And how would you describe the period between 2007 and

4   2010?

5   A    In some sectors very distressed and if you looked at the

6   mortgage sector, we all know the subprime sector, I did a lot

7   of work on cases on that, very distressed.  The fact that

8   there was totally illiquidity in the market caused a lot of

9   problems.  The market started coming back after that, but, you

10  know, markets go up, markets go down.  We're at a good time

11  right now with the markets going up, but things change.

12            MR. PITLUCK:  Judge, I have nothing further.

13            THE COURT:  Anything else?

14            MR. MEAD:  Nothing further, Your Honor.

15            THE COURT:  Do you want to be heard?

16            MR. PITLUCK:  I'm sorry?

17            THE COURT:  Do you want to say anything else?

18            MR. PITLUCK:  Judge, I'd like to be able to argue,

19  at least related to --

20            THE COURT:  You can step down.  Thank you.

21            THE WITNESS:  Thank you, Your Honor.

22            (The witness leaves the witness stand.)

23            MR. PITLUCK:  -- to the scope of some of this and to

24  make sure that we cabin the appropriate issues because there

25  was --

*Proceedings*                                                    896

1          THE COURT:  I think I'm cabining it.

2          MR. PITLUCK:  Okay.  Well, there was analysis of the

3     sale of product lines and going through the research reports

4     to say, you know, this specific acquisition divestiture of

5     this specific provision can unlock value in a corporation.

6     That's very different --

7          THE COURT:  Let me just give you my ruling.

8          MR. PITLUCK:  I'm sorry.

9          THE COURT:  Because I think I cabin it appropriately

10    for the issues that are relevant in this case to this jury,

11    and then if you want to say, "Well, I think that's wrong, we

12    should be able to say this," I'll hear you on it.

13         I find that Mr. Dubinsky's proposed testimony is

14    admissible insofar as it concerns, A, the kinds of research

15    that a reasonable financial advisor would do prior to

16    recommending particular stocks;  and B, the type of

17    information about King Pharmaceuticals that would have been

18    available to a financial advisor engaging in that sort of

19    research on August 16th, 2010.

20         As an initial matter, Mr. Dubinsky is clearly

21    qualified to testify as to this information.  He's represented

22    that he's worked as an investment advisor and financial

23    planner for high net worth clients for over a decade and

24    currently holds numerous relevant certifications.  He has

25    previously been admitted as an expert witness in federal court

*Proceedings*                                                    897

1  on similar issues.  I find his experience and expertise

2  impressive and that he's qualified to testify as an expert on

3  this issue.

4           I'm admitting his proffered testimony because I find

5  that it will be helpful for the jury for three reasons.

6  Frankly, I'd be inclined to allow Mr. Dubinsky to testify

7  based on any one of these reasons standing alone.  The fact

8  that his testimony is helpful on all three grounds only

9  strengthens my finding.

10          First, Mr. Dubinsky's proffered testimony will be

11  helpful in evaluating the materiality of the information

12  allegedly disclosed by Mr. Schulman.  As Mr. Schulman's

13  counsel has rightly noted, materiality is examined under an

14  objective standard that turns on whether there is a

15  substantial likelihood that the alleged inside information

16  would have been viewed by the reasonable investor as having

17  significantly altered the total mix of information made

18  available to investors at the time.  The type of information

19  that was available to a reasonable investor on August 16th,

20  2010 is clearly relevant to this determination and is not the

21  type of lay issue that a jury is able to determine based on

22  their own experience.

23          Second, Mr. Dubinsky's testimony will be helpful to

24  supplement the articles already entered into evidence by the

25  Government in their case-in-chief.  Without Mr. Dubinsky's

*Proceedings*                                                    898

1    testimony, the jury will be left with the potentially

2    misleading impression that those articles comprise the

3    entirety of the information available to a reasonable investor

4    at the time.

5          Third, and related to the second point, Mr.

6    Dubinsky's testimony will be helpful in potentially

7    reconciling the conflict between Mr. Schulman's testimony that

8    he never mentioned Pfizer to Klein, and Shechtman's testimony

9    that Klein told him that he had inside information that Pfizer

10   was acquiring King.  The Government has suggested that it will

11   argue that the jury should resolve this conflict by concluding

12   that Mr. Schulman is lying.  Mr. Dubinsky's testimony may be

13   helpful to the jury in evaluating Mr. Schulman's likely

14   counterargument that Klein himself determined that Pfizer was

15   involved after hearing Schulman's statement.

16         On the other hand, Mr. Dubinsky's proffered

17   testimony that high net worth individuals often do not review

18   the details of their brokerage statements is not admissible.

19   I find this to be a lay issue with which the jury needs no

20   expert help.  The members of the jury are no doubt aware that

21   many people do not carefully review their mail, even if

22   they're not high net worth investors themselves.

23         Through the testimony of Ronnie Schulman, Mr.

24   Schulman's counsel has laid the groundwork to allow them to

25   argue that the Schulmans did not carefully review their trade

*Proceedings*                                                            899

1    confirmations and monthly and quarterly statements.  Mr.

2    Dubinsky's testimony would add little or nothing to Mr.

3    Schulman's case and would present a substantial risk of either

4    confusing the jury or prejudicing the Government.  For that

5    reason, it's inadmissible.

6           All right.  Do you need any clarification?

7           MR. PITLUCK:  Well, Judge, I guess I do because the

8    devil's sort of in the details.

9           I understand the Court's ruling.  We obviously are

10   in total agreement, but the issue here was there were some

11   points of proffered testimony that I think went outside of

12   that in terms of interpreting the information.

13          THE COURT:  No, I foresee him testifying about "This

14   is the universe of information that was out there.  This is

15   how some -- a financial advisor would look.  These are the

16   kinds of places he or she would look and these are the kinds

17   of things that came up when I looked."  Not "And therefore it

18   would be a prudent investment decision to buy options in

19   King."

20          The second leg is not happening, but the first leg

21   is happening.

22          MR. PITLUCK:  And I understand and --

23          THE COURT:  If they choose to use him.

24          MR. PITLUCK:  But my concern was there were things

25   like:  "And did you see any testimony, did you hear any

*Proceedings*                                              900

1   testimony that was relevant to that issue?"  And he said:

2   "Why, yes, that Mr. Schulman said he didn't know if it was a

3   partial merger or a full merger."

4            And that's, I think, outside of the scope of the

5   Court's ruling.

6            THE COURT:  I don't foresee that being part of his

7   testimony.

8            MR. PITLUCK:  I mean, it just was, Judge.

9            THE COURT:  But it's not going to be before the

10  jury.

11           MR. PITLUCK:  Thank you.  I just want to make sure I

12  understood it.

13           THE COURT:  Okay?

14           MR. MEAD:  Well, I'm obviously grateful for

15  everything except opinion number 2 and what you just said.

16           So, I understand your ruling.  I'm not here to

17  violate.  But it was certainly my intention to preview for you

18  essentially what I will ask him in front of the jury.

19           THE COURT:  Right.

20           MR. MEAD:  So, I'm not going to step 2.  You know, I

21  want to reassure you I'm not doing that.

22           THE COURT:  Okay.

23           MR. MEAD:  What you heard is what you're going to

24  get.

25           THE COURT:  But I think you went a little further in

*Proceedings*                                                        901

1    some areas.  I don't have it committed to memory, but I think

2    he's not going to be able to say:  "And therefore, on August

3    16th, it was a prudent investment decision to buy King."

4              MR. MEAD:  He never said that here, and I'm not

5    going to ask him.

6              But the one specific point, there are things in the

7    publicly-available information that talk about the possibility

8    of King stock realizing value from different product lines,

9    breaking it up.

10             THE COURT:  He can recount what he saw in the

11   information, because otherwise it's just saying there was an

12   article in the FT.  I expect he's going to recount what he saw

13   in the information.  He's just not going to be able to draw

14   conclusions from it.

15             MR. MEAD:  I'm not -- but I do want to flag for the

16   jury -- you know, one of the things that's personally

17   frustrating to me is we treat jurors like, you know, we can't

18   talk to them.  You know, for example, the specific references

19   to product lines is consistent with Rob Schulman's testimony

20   before the SEC.  You remember what he said, the Government

21   introduced it, that "I didn't know whether there would be a

22   merger involving the whole company or just particular product

23   lines."

24             The publicly-available information is corroborative

25   of that general understanding, and all I wanted to do, which I

*Proceedings*                                                     902

1    did in this drill here and what I would want to do in front of

2    the jury, is say is that relevant to -- and I asked him, you

3    remember I asked him: "Do you recall hearing Mr. Schulman's

4    testimony before the SEC that it could have been potentially a

5    whole merger or potentially a product line?  Is this statement

6    of publicly-available information consistent with that?"  He

7    said:  "Yes."  I want to flag that for the jury so they get

8    it, you know.

9             THE COURT:  Well, he can talk about what is in the

10   public universe that a financial advisor would look at, you

11   know, what kinds of things he would research and what was in

12   that universe at that period of time.

13            MR. MEAD:  Right.

14            THE COURT:  But he can't draw conclusions from it.

15            MR. MEAD:  It's not a conclusion.  I'm trying to

16   flag for the jury hey, this is relevant to something Rob

17   Schulman said.

18            THE COURT:  Tell me the question so maybe I need to

19   hear it that way.

20            MR. MEAD:  Yes.

21            "Do you recall the introduction of Mr. Schulman's

22   testimony before the SEC?"

23            He sat through that.

24            "Yes."

25            "Do you recall that Mr. Schulman said to the SEC

*Proceedings*                                                    903

1   that he was aware of negotiations and it could have meant that

2   the whole company's being acquired or it could have meant that

3   particular product lines might be acquired?  How is this

4   statement in the public record, you know, that the company

5   could recognize value from particular product lines, relevant

6   to Mr. Schulman's statement?"

7          Right.  And he's going to say:  "It reflects what

8   analysts would have understood, which is the company could be

9   sold in pieces, could be sold entirely.  You know, there's

10  publicly available information talking about the company being

11  sold."

12         All I'm trying to do is show the jury so that they

13  could actually understand when they're hearing it, Hey, this

14  is relevant to something Rob Schulman said.

15         THE COURT:  Well, if one of the articles says that,

16  he can talk about the fact that the article says that.

17         MR. MEAD:  Sure.  All I'm trying to do is flag for

18  the jury when they hear it why that's important.  I'm trying

19  to educate folks who are trying to keep track of information,

20  and there's nothing objectionable about that.  I'm just

21  pointing out to them why it's relevant.  They need to

22  understand what they're hearing.

23         THE COURT:  Well, they're going to know why it's

24  relevant.  It's relevant because you're going to argue that

25  there was enough information out in the marketplace that Klein

*Proceedings*                                                   904

1   could have decided to do this on his own or if he heard a

2   random remark, it wasn't your client passing on material

3   inside information that was material with the intent that it

4   be traded on.  It was just a random remark and Klein put two

5   and two together and did research.

6           MR. MEAD:  We're talking past each other.  This is a

7   very specific separate issue.

8           THE COURT:  I know, you want to connect the dots

9   between Mr. Schulman's testimony and --

10          MR. MEAD:  Just about the part that it could mean

11  you're buying some of the company and not all of it.  The

12  publicly-available information --

13          THE COURT:  Let me stop you there.

14          Is your objection to the fact that he's going to

15  say:  "Do you remember Mr. Schulman testifying to this and

16  isn't it right that they could buy a product line or a whole

17  company?"

18          Because you stood up.

19          MR. PITLUCK:  My objection, Your Honor, is that

20  using an expert witness opinion testimony to bolster the

21  proffered testimony of Mr. Schulman.

22          THE COURT:  Right.  So your answer is "yes."

23          MR. PITLUCK:  Yes.

24          THE COURT:  So you don't -- I mean, he certainly can

25  testify that in the course of this research, it may suggest

*Proceedings*                                                      905

1    that a product line may be sold or the whole company, but you

2    object to exactly what my point is, which is taking Mr.

3    Schulman's testimony and saying:  "So isn't that so?"

4              MR. PITLUCK:  Yes.

5              THE COURT:  Okay, fine.  You can't do it.

6              MR. MEAD:  Your Honor, I have interviewed jurors --

7              THE COURT:  You can argue it at the end of the day.

8              MR. MEAD:  I understand.

9              THE COURT:  Which I'm sure you'll do very

10   effectively, but you're not going to do it with this witness.

11             MR. MEAD:  Your Honor, I lost a criminal case when I

12   was an AUSA when I stood up in rebuttal --

13             THE COURT:  You lost a criminal case when you were

14   an AUSA?  Shocking.

15             MS. NESTOR:  Shocking.

16             MR. MEAD:  I thought so too.  They were guilty and I

17   knew they were guilty.

18             THE COURT:  All right.  So what's this got to do

19   with us?

20             MR. MEAD:  So, I stood up in rebuttal and I said to

21   the jury:  "If anybody in that jury room says that they're

22   innocent, focus on this one transaction.  It proves absolutely

23   that the defendant lied, they are guilty."  I spent ten

24   minutes, it's the last thing I said to them.  They were out a

25   week.  They come back not guilty.

*Proceedings*                                                906

1          We're allowed to interview the jurors.  I grabbed

2    one, I was like:  "Did you talk about that last transaction?"

3    Obviously I'm joking around.  I was polite.  I was at a

4    reasonable distance, whatever.  "Did you guys, what did you

5    think about that last transaction?"  Never talked about it.

6          Judge, jurors need a flag from lawyers when they're

7    hearing testimony --

8          THE COURT:  That's summation.

9          No, don't argue with me.  I'm not going to permit

10   you to do it through this witness.  I've given you a lot of

11   latitude.  I think this is a generous ruling.  You cannot do

12   that.

13         MR. MEAD:  I understand your ruling.  I'm trying to

14   explain why I feel it's appropriate.  I'm just making a

15   record.

16         THE COURT:  That's what summations for, to argue

17   what you think the testimony has shown and to connect the dots

18   for the jurors.

19         MR. MEAD:  Jurors need --

20         THE COURT:  They need a framework for analysis.  I

21   know, but they're not going to get it during this expert

22   witness because I'm limiting what he's going to be able to

23   opine about.

24         MR. MEAD:  I understand your ruling.  We have a real

25   difference of philosophy on this point.  I understand.  I'm

1    not going to violate your ruling.  I get it.

2            THE COURT:  I don't think it cuts the legs out from

3    under you on the argument.

4            Okay.  Thank you.

5            Anything else?

6            MR. PITLUCK:  Judge, one more thing to raise in the

7    interest of preventing sidebars.

8            THE COURT:  We're going to be doing a charge

9    conference at 6 o'clock if this continues to go on.

10           MR. PITLUCK:  I understand.

11           This is related to exhibits we received today from

12   defense counsel related to slides, interpretations,

13   demonstratives of evidence that the Government produced in our

14   summary chart, and when we talked to defense counsel this

15   morning, we still haven't had a chance to review the data in

16   these and compare them to ours, but they indicated that they

17   wanted to present them through Mr. Dubinsky.

18           THE COURT:  Okay.  Well, what are they?

19           MR. PITLUCK:  I'll hand them up.  They are financial

20   analysis of Tibor Klein's client's portfolio as comprised of

21   King and Mr. Schulman's portfolio comprised of King.

22           And our concern, Judge, is the mixing of fact and

23   lay witness, cloaking these in Mr. Dubinsky's authority as an

24   expert witness in the area of investment.  And I believe that

25   the paralegal's going to testify on some summary exhibits.

1          THE COURT:  I don't see why these don't come in --

2    do you object to these coming in -- you don't object to these.

3    You object to Dubinsky opining on them.

4          MR. PITLUCK:  Judge, assuming the information is

5    accurate in them, we haven't had a chance to review, we don't

6    object to them coming in.

7          THE COURT:  Yeah, they can come in, but Dubinsky

8    can't talk about them.  That's beyond my ruling.

9          MR. MEAD:  Your Honor, I understand.  I would make

10   it clear -- let me talk about two things here.

11         THE COURT:  You really want to be here at 6 doing a

12   charging conference.

13         MR. MEAD:  I'm sorry, but every piece of information

14   may save my client's life.

15         Mr. Dubinsky did the math for these charts.  I will

16   make it really clear to the jury:  "Mr. Dubinsky, I'm not

17   asking you as an expert about this.  Not at all.  All I'm

18   asking you to do is talk about some math you did.  Did you

19   look at -- did you do the math adding up these percentages?"

20         THE COURT:  But this doesn't require anybody to

21   explain it.  Even I understand this.

22         MR. MEAD:  If the Government stipulates to their

23   admissibility, all I need is him to say:  "I did the math and

24   the charts are accurate."  That's literally all I'm asking.

25         THE COURT:  Well, I think if they're convinced that

1   the math is right, we don't need Dubinsky, right?

2          MR. PITLUCK:  I agree, Judge.  Our objection is to

3   them going in through Mr. Dubinsky.  I haven't heard the

4   questions, but the mere fact --

5          THE COURT:  Do you have any reason to doubt the

6   math?

7          MR. PITLUCK:  I have no reason to doubt the math,

8   Judge, but I have to do my job.  Assuming they're right, we

9   have no problem with them coming in.

10         THE COURT:  I think they come in.  I just don't

11  think Dubinsky can talk about them.

12         MR. MEAD:  So let's --

13         THE COURT:  And they're self-explanatory, as I said,

14  even to someone who doesn't open her account statements.  But

15  I'm not a high net worth individual.

16         MR. MEAD:  Actually, you are.  I guarantee you are.

17         But in any event.

18         THE COURT:  What do you know about me?

19         MR. MEAD:  Two daughters at Yale.

20         So, Judge --

21         THE COURT:  529.

22         MR. MEAD:  -- if the Government objects to the math,

23  I can't get them in through any human being.

24         THE COURT:  Will you check the math?

25         MR. PITLUCK:  Judge, we'll check the math.  We got

1    them today.  We were preparing for the hearing, I'm sorry.

2           THE COURT:  I know.  I think the math is probably

3    correct.

4           MR. MEAD:  Judge, I wanted to alert you one more

5    thing.

6           You understand our objection to your denial of his

7    opinion about the opening the mail.

8           THE COURT:  Yes.

9           MR. MEAD:  I wish I had you on our jury for that

10   issue.  You have a very strong personal opinion that it's

11   ridiculous to believe that the Government can prove beyond a

12   reasonable doubt that they knew about the trading just because

13   the envelopes were mailed.  I want you on my jury.  I really

14   do.  But you're not on my jury.

15          THE COURT:  Say that again.  Wait, what?

16          MR. MEAD:  You keep expressing a view that I share.

17   You keep saying as a matter of common sense, it is ridiculous

18   to believe that the Government could prove that the Schulmans

19   knew about the trading in King just by the fact that envelopes

20   were mailed to their house.  Some people open, some people

21   don't.

22          THE COURT:  I don't think that's their position.

23          MR. MEAD:  I keep trying to tell you this, Judge.

24   Because you're not -- I keep pointedly asking them: Are you

25   going to argue that?  And they keep ducking the question.

*Proceedings*                                                            911

1          You keep assuming the Government would never make

2    that ridiculous argument.  They will.  Ask them.  And if

3    they're going to make that argument, you have to let me put

4    Dubinsky on the stand for that purpose.

5          Ask them.  Preclude them from making the argument.

6          MR. PITLUCK:  Judge, I'm a little confused.  What's

7    the request to preclude us from entering?

8          THE COURT:  I don't want to speak for Mr. Mead,

9    because you're far more articulate and persuasive than I am,

10   but I think he's wanting to know are you going to make the

11   argument that the Schulmans knew about the trades because of

12   their account statements.

13         Is that right?

14         MR. MEAD:  Yes.

15         MR. PITLUCK:  Judge, there is SEC testimony that was

16   admitted from Mr. Schulman where he admitted to opening his

17   statements and reviewing the first page of the document.  How

18   are we not allowed to argue that?

19         MR. MEAD:  First page of the documents is consistent

20   with Ms. Schulman's testimony.  First page doesn't have King

21   on it.  Has the pie charts and the summary.  She testified:

22   "That's all we looked at."

23         The Government is announcing to you in code:  "No,

24   no, no, we're going to call them liars just because the whole

25   statement was mailed to them."  That's what the Government's

*Proceedings*                                                    912

1   going to argue.

2          I share your belief that that argument is absurd.

3   It should be barred under 403 absolutely.  I want you on my

4   jury.  But they are going to make the argument.

5          MS. NESTOR:  Your Honor, we talked about this

6   earlier when I told you that we didn't have to disclose what

7   argument we're going to make because either way, whether we

8   argue to the jury, and I'm not saying we're going to, but

9   whether we argue to the jury that "Mr. Schulman did open his

10  statements, ladies and gentlemen," how is that expert

11  testimony?  Why does expert testimony come in to tell them

12  that?  They can make their own judgment based on what he said

13  to the SEC and based on, I'm sure, articulate arguments by

14  defense counsel that that didn't happen.

15         THE COURT:  Well, also based on Ronnie Schulman's

16  testimony.

17         MS. NESTOR:  Exactly, Your Honor.

18         MR. MEAD:  If they call her a liar -- assistant

19  United States attorneys are going to stand up in front of this

20  jury and call her a liar on that point.  If they do and we're

21  not allowed to put Dubinsky on the stand, we are sitting here

22  naked in front of an earnest government public servant telling

23  lay people that they know better than Dubinsky or my client.

24  It is outrageous.

25         Put them to the test.  Ask them.

*Proceedings*                                                   913

1          THE COURT:  Don't raise your voice.

2          Just remind me what day was the SEC, I want to

3  review the record on the SEC testimony.

4          MS. NESTOR:  Would you like us to tell you the

5  government exhibit?  Does that help you?

6          THE COURT:  Yes.

7          MR. PITLUCK:  108A, Your Honor.

8          MS. NESTOR:  She's giving it to you right now, Your

9  Honor.

10          THE COURT:  I mean, I remember Ronnie Schulman

11  because it was just yesterday.

12          Page, line?

13          MR. PITLUCK:  Sorry, Judge.

14          (Pause.)

15          THE COURT:  So, you want to put Mr. Dubinsky on for

16  his opinion and based on his expertise that high net worth

17  individuals don't open their account statements or read them

18  carefully, right?

19          MR. SACK:  Or read the details.

20          THE COURT:  Just say "yes" or "no."

21          MR. MEAD:  Yes.  And I want to make an oral motion

22  under Rule 403 to preclude the Government from making the

23  argument that Ronnie Schulman lied or that Rob Schulman looked

24  at more than the first page because they have no evidentiary

25  basis for making that argument and it is unduly prejudicial to

*Proceedings*                                                      914

1    my client.  I make that motion now.

2              THE COURT:  Is somebody going to find me the page?

3              MR. PITLUCK:  I'm sorry, Judge.  I'm looking for it.

4              (Pause.)

5              MR. PITLUCK:  I could be mistaken, Judge.  I

6    apologize.  I'm looking right now.  And if it's not in

7    evidence, then obviously we're not going to argue it.

8              THE COURT:  I looked quickly, but I'm tired of

9    looking at small print.

10             MS. NESTOR:  We understand, Your Honor.

11             MR. PITLUCK:  Judge, I don't see it in the Court's

12   ruling.  So it's possible that it's not in.  If it's not in,

13   then we're not going to argue.

14             MR. MEAD:  Thank you.

15             THE COURT:  Okay.  Relax.  Get some coffee.

16             We need to do a little more work on the charge.  As

17   soon as we've got it in one piece, we'll bring it out to you.

18             Thank you.

19             Thank you, Mr. Dubinsky.

20             MR. DUBINSKY:  Thank you, Your Honor.

21             (Recess taken.)

22             (Continued on following page.)

23

24

25

```
                          Proceedings                        915
```

1           (In open court.)

2           (Defendant not present.)

3           THE COURT:  Okay.  This is the charging

4    conference.  So who wants to be heard first?

5           MR. PITLUCK:  Judge, maybe it makes sense to go

6    through the Court's charge and just see if there are places

7    where we --

8           THE COURT:  Okay.  Do you want me to hear from you

9    first?

10          MR. PITLUCK:  I think the only general charge that

11   we would ask for is included in ours -- on our request based

12   on the specific request basing the verdict on sympathy,

13   which is not --

14          THE COURT:  I thought I had that at the end.

15          MR. SACK:  I think you do.

16          THE COURT:  I'm sure I do because it's in my

17   usual.

18          MR. PITLUCK:  The only thing I saw, judge, was

19   improper considerations, but I apologize if it's there,

20   judge.  I did not see it.

21          MS. NESTOR:  I didn't either.

22          MR. PITLUCK:  I looked at improper considerations,

23   to see if maybe it had been baked in there, and I didn't

24   find it.

25          THE COURT:  What page?

Proceedings                          916

1          THE LAW CLERK:  The reasonable doubt section.

2          THE COURT:  What page?

3          THE LAW CLERK:  Five.

4          MR. PITLUCK:  The reasonable doubt.  We would just

5    ask for sympathy not be baked into, to have a standalone

6    instruction rather than include it in reasonable doubt.

7          THE COURT:  It is not sympathy.

8          THE LAW CLERK:  It's also under role of the court

9    and the jury.

10          THE COURT:  What page?

11          THE LAW CLERK:  Page 4, first full paragraph.

12          THE COURT:  Do you have a special -- do you have

13   it?

14          MS. NESTOR:  Yes, Your Honor, we have it.

15          MR. PITLUCK:  Judge, it's actually --

16          MR. SACK:  Your Honor, on page 4, I think that

17   reference to sympathy is enough, and then in improper

18   consideration it is talks about any personal feelings you

19   may have.  That's race, religion, et cetera, but I think

20   it's clear there is no decision based on sympathy and

21   personal feelings.

22          THE COURT:  Yours is Q.  What page is yours on,

23   your sympathy?

24          MS. NESTOR:  It's request number 20.

25          THE COURT:  It's page 44.

```
                        Proceedings                    917
```

```
 1            MR. PITLUCK:  Page 44, yeah.  I'm just trying to
 2   compare the two.
 3            THE COURT:  I think I cover sympathy.
 4            MR. PITLUCK:  I think you do, judge.  I'm sorry.
 5   I didn't see it in four.  That was kind of -- it snuck in
 6   there on me.  We are good.
 7            THE COURT:  What's next?
 8            MR. PITLUCK:  Just, judge, in the first element --
 9            THE COURT:  Page, please.
10            MR. PITLUCK:  I'm sorry.  On your charge it is
11   page 21.
12            MR. SACK:  So before we get there, I have one
13   comment on page 13, Your Honor.
14            THE COURT:  Do you want me to just hear from you
15   back and forth as we go through the pages?
16            MR. PITLUCK:  You can go through the pages.
17            THE COURT:  Okay.  Fine.  Page 13?
18            MR. SACK:  That's under co-conspirator statements.
19   So in the carryover from 12 to 13, the instruction says, if
20   you find the defendant was a member of the conspiracy,
21   et cetera.  We think there should be a reciprocal statement.
22   Likewise, if you find that defendant was not a member of the
23   conspiracy, these acts may not be considered.
24            It's stated in a one-way fashion that it is
25   favorable to government.  Given that the jury is called upon
```

Proceedings                                          918

1   to make that finding of the existence of the conspiracy, it

2   should be reciprocal.

3           THE COURT:  Are you suggesting that we put, after

4   the sentence that begins, this is so?

5           MR. SACK:  Yes.  Likewise, if you find that the

6   defendant was not a member of the conspiracy; and then the

7   language would be any act done or statements made by persons

8   you find not to have been members -- I have to figure out

9   what the exact phrasing is, but it's the concept.

10          THE COURT:  So the likewise concept?

11          MR. SACK:  The likewise concept.

12          THE COURT:  Do you want to be heard on the

13  likewise concept?

14          MS. NESTOR:  One moment, Your Honor.

15          THE COURT:  Page 13, top.

16          MR. PITLUCK:  Judge, we are fine.  It's in our

17  charge on page 29.  Obviously, if the court wants to propose

18  language.

19          THE COURT:  You know, Mr. Sack, give me some

20  language.  You don't have to do it right now.  You can do it

21  over the weekend.

22          MR. SACK:  Got it.

23          MS. NESTOR:  It's on page 29 of ours.

24          MR. SACK:  We will take a look at what the

25  government proposes, and we may agree on it.

1           THE COURT:  Okay.  What's next?

2           MR. PITLUCK:  Sorry, judge.  We were looking at

3    page 21 under the first element, scheme or artifice to

4    defraud.

5           Judge, we have language that we took straight from

6    Sand.  That's on page 10 of our charge that makes it clear,

7    as Sand does, that you need not find the defendant actually

8    participated in any securities transaction if the defendant

9    was engaged in fraudulent conduct that was, quote, in

10   connection with a purchase or sale; and that in connection

11   is satisfied, there was a nexus or relation between the

12   allegedly fraudulent conduct and the sale or purchase of

13   securities.  I think that's particularly appropriate in this

14   case, and it's in Sand, section 5703.

15          THE COURT:  So the paragraph -- you suggest adding

16   in your paragraph that says you need not, after the --

17          MR. PITLUCK:  Yeah.  Actually, judge, the next two

18   paragraphs of our charge on page 10.

19          MR. LEITNER:  What part of Sand is it?

20          MR. PITLUCK:  5703.

21          MR. SACK:  We are just taking another look at the

22   language.

23          MR. LEITNER:  5703?

24          MR. PITLUCK:  I'm sorry, 57 --

25          MR. LEITNER:  23?

```
                          Proceedings                    920

1               MR. PITLUCK:  5721.

2               MR. MEAD:  Where are you proposing?

3               MR. PITLUCK:  After the first, in the first

4    element, scheme or artifice to defraud.

5               MR. SACK:  SO there is a paragraph that begins the

6    first element, David?

7               MR. PITLUCK:  Yes.

8               MR. SACK:  Where would you put it in?

9               MR. PITLUCK:  I would put it in after that.

10              MR. SACK:  And then before the specific device

11   scheme.

12              MS. NESTOR:  No.

13              MR. PITLUCK:  Actually, we can put it after the

14   specific device scheme and before --

15              MS. NESTOR:  An insider.

16              MR. PITLUCK:  No, no, no.  I'm sorry.  Before the

17   specific device, scheme, or artifice paragraph.  It's

18   separate and apart from insider trading.

19              MS. NESTOR:  Correct.

20              THE COURT:  Mr. Leitner, are you looking at that?

21              MR. SACK:  Yeah, we are just taking a look now.

22              MR. PITLUCK:  Judge, I'm happy to hand up a copy.

23   It's my only copy.

24              THE COURT:  I have yours.  It's on page 10, right?

25              MR. PITLUCK:  Yes, judge.
```

Proceedings                                    921

1          MR. MEAD:  So as I understand the government's

2     concern, I think what they are saying is the defendant

3     doesn't personally have had to participate in the purchasing

4     of the securities to -- and that part you are entitled to.

5          The part in Sand in the standard instruction

6     starts to get really confusing for that.  In other words,

7     there ought to be language that we can propose that gives

8     the government what it needs and is entitled to without all

9     this confusion.

10          THE COURT:  Well, I'm reading.  It's page 10.

11     It's the first two full paragraphs before insider trading,

12     right?

13          MR. PITLUCK:  That's right, judge.

14          THE COURT:  Are you objecting to it?  Because I

15     don't think it's confusing.

16          MR. SACK:  I think it's the last sentence that we

17     are most troubled by.  Let me just huddle for a moment.

18          THE COURT:  Okay.

19          MR. PITLUCK:  Sorry.  The last sentence of what

20     paragraph?

21          MR. SACK:  It says, fraudulent conduct may be in

22     connection with, et cetera, touched upon a securities

23     transaction.  I think we can live with the language before

24     that sentence.

25          THE COURT:  Yes, I don't think that sentence adds

Proceedings                               922

1   anything.

2          MR. SACK:  So it's going to add where it says the

3   allegedly fraudulent conduct in the sale or purchase of

4   securities, period.  I think we can live with that.

5          MR. PITLUCK:  Let me just read it without.

6          THE COURT:  Yes, leaving out that last sentence?

7          MR. SACK:  Correct.

8          THE COURT:  I agree.

9          (Pause.)

10          THE COURT:  Then you would agree to put the next

11   paragraph in?

12          MR. SACK:  Let me just -- I thought that was the

13   paragraph.

14          THE COURT:  It's the first two paragraphs of the

15   government's page 10.

16          MR. LEITNER:  Which is the next paragraph, one

17   says is applicable.

18          MR. PITLUCK:  Next paragraph on page 10 of ours,

19   it is no defense to an overall scheme.

20          MR. LEITNER:  Okay.

21          MR. SACK:  It seems to me I do have a problem

22   with -- it's just a very lengthy and complicated

23   instruction.  I would think it would be suffice to say, to

24   address the government's stated concern, the sentence that

25   says it is not necessary for you to find that the defendant

Proceedings                              923

1   was the actual seller or offerer of the securities.  I got

2   the sense that that was the concern, given the fact there is

3   an investment adviser here.

4           I don't think we would have a problem with adding

5   that sentence, but I think the overall -- the narration

6   about what is or is not a defense and all of that is

7   complicated and not clear.

8           MR. PITLUCK:  Judge, we obviously don't think it's

9   complicated.

10          We think it's important because in this instance

11  it's particularly applicable, and Sand sets it out for that

12  reason.  You don't have to actually engage in the securities

13  fraud.  It doesn't mean you have less involvement because

14  you didn't do so.

15          We submit that it's clear.  It's set forth in

16  Sand.  I suppose, judge, it touched upon --

17          THE COURT:  That sentence can come out.

18          MR. PITLUCK:  To say Sand listed it, I think it's

19  just trying to explain in the jury instructions what that

20  is.  If you want to take that out, we don't have any problem

21  with that; but we think the next paragraph is equally

22  important.

23          MR. SACK:  What is this language about it is

24  sufficient if the government establishes the defendant

25  caused the statement to be made or the fact to be omitted?

```
                    Proceedings                    924
```

1    What does that have to do with this case?

2            MR. PITLUCK:  Are you talking about the end of

3    that paragraph?

4            MR. SACK:  Right.  There is so much there in the

5    paragraph that seems unrelated to the facts of this case.

6            MR. PITLUCK:  Judge, we are fine if you cut from

7    by, by the same token.

8            THE COURT:  Omit from by?

9            MR. PITLUCK:  Yes.

10           THE COURT:  For the rest?

11           MR. PITLUCK:  Excise from by --

12           THE COURT:  I agree.

13           MR. PITLUCK:  -- to the end.

14           THE COURT:  I think that's your point, Mr. Sack.

15           MR. SACK:  I think so.  Obviously, I just want to

16   take a look at the final language, but I think that gets it.

17           THE COURT:  I think I agree.  Okay.  Next page.

18   So did you have anything other than that?

19           MR. SACK:  I think there is a general issue that

20   comes up, Mr. Leitner is going to address.  I think we have

21   a concern about the repeated use of the anticipated language

22   rather than the intended language.

23           We think that anticipated is used several times on

24   pages 22 and 25, whereas we think the right language is

25   essentially say intended where it says anticipated.

Proceedings                                925

1          MS. NESTOR:  Your Honor, you have a different --

2    the way this is written out is based on the 2016

3    instructions from United States versus Stewart; and I think

4    the point is there is a separate section that discusses

5    intent, and that's why the anticipated is there.

6          THE COURT:  Do you object to it saying objected

7    rather than anticipated?

8          MS. NESTOR:  I just don't think that's an element

9    of this particular --

10         MR. SACK:  I think it is the element.

11         THE COURT:  It is the element.

12         MR. SACK:  It's intended to defraud, and

13   anticipated will tend to dilute the element.

14         THE COURT:  We actually debated about intended or

15   anticipated, and I actually think intended is the

16   appropriate word.  Okay.  What's next?

17         MR. SACK:  We have another item on 23.  We

18   actually -- and we appreciate your inclusion of the third

19   full paragraph.

20         THE COURT:  As an initial matter?

21         MR. SACK:  As an initial matter, but we actually

22   would ask that you take it out because we don't think -- we

23   don't want to draw more attention to it in that way.  We ask

24   that it be taken out.  We appreciate it.

25         THE COURT:  It's out.  It's out.  I assume as we

Proceedings                                926

1  move along to page 23, and then we move on, Mr. Pitluck,

2  you, Ms. Nestor, we are not going to go back.

3           MR. PITLUCK:  That's certainly our hope.  We are

4  talking about the anticipated versus intended right now, and

5  we will try to make sure that doesn't happen.

6           MR. SACK:  There are some additional references on

7  25.  Our view is the same throughout.

8           Then we will have -- but we don't want to rush the

9  government, but we will want to talk about the benefit

10 language on page 25 when everybody is ready.

11          MS. NESTOR:  We would like to talk about the

12 merger language on page 24 first.

13          THE COURT:  Okay.  Tell me when you are ready go

14 to page 24.

15          MS. NESTOR:  We are on page 24.  Your Honor, we

16 would like to add certain language.  We think the last

17 sentence of the first full paragraph on page 24 is currently

18 misleading.

19          THE COURT:  The sentence that begins the fact?

20          MS. NESTOR:  Yes, correct, Your Honor.  I know

21 that the defense proposed that very language.  It's been

22 proposed from -- and I can pass up a copy of the case to

23 Your Honor.  It is unfortunately all marked up, but I'm

24 happy to pass it up.  It's United States versus Mayhew.

25          It's a Second Circuit case, and I think the

Proceedings                                927

1   language is, frankly, diluted from what the case actually

2   says the law is.  What this case says, moreover where

3   information regarding a merger originates from an insider,

4   the information, even if not detailed, takes on an added

5   charge just because it is inside information; and a major

6   factor in determining whether information was material is

7   the importance attached to it by those who knew it.

8          I mean that's very different from what the

9   sentence says now.  It gives no direction to the jury as to

10  how they should weigh these factors.  This specifically says

11  these factors are to be weighed.

12         THE COURT:  Read it again to me.

13         MS. NESTOR:  Do you want me to pass it up to you?

14         (Pause.)

15         MS. NESTOR:  We want to say it specifically like

16  it says it in the case.

17         THE COURT:  Starting with -- what's the sentence

18  begin with?

19         MR. SACK:  The fact that --

20         MS. NESTOR:  Your Honor --

21         THE COURT:  If you too can agree on the language,

22  go ahead.  Where is it in this?  There is a lot of marking.

23         MS. NESTOR:  I know, Your Honor.  I'm sorry.  This

24  is how I work, unfortunately.  I circled it.

25         THE COURT:  This would replace the fact?

```
                        Proceedings                      928
```

1          MS. NESTOR:  It will replace that sentence.

2          MR. LEITNER:  Are you proposing to take directly

3     the language from the Mayhew case?

4          THE COURT:  You have it right there?

5          MR. LEITNER:  I try to be prepared, Your Honor.

6          MR. SACK:  He only does it when he is arguing,

7     Your Honor, not when partners are arguing, Your Honor.

8          THE COURT:  Oh, moreover.  So that's -- and so you

9     would end with information, or you would go on to and a

10    major factor in determining whether information was material

11    is the importance attached to it by those who knew it?

12    Okay.

13         MS. NESTOR:  Exactly there.

14         THE COURT:  Mr. Leitner.

15         MR. LEITNER:  Hold on one second, Your Honor.

16         (Pause.)

17         MR. SACK:  We have no objection.

18         THE COURT:  I agree.  I actually think it's

19    better.  Okay.  Next.

20         MS. NESTOR:  Directed benefit, Your Honor.

21         THE COURT:  Where are we?

22         MR. SACK:  So page 25.  It will be the last three

23    paragraphs on page 25, the last two.  The next to last and

24    the one before that.  In order to establish, and then the

25    personal benefit does not paragraphs.

Proceedings                                        929

1          THE COURT:  Okay.  So who wants to be heard?

2          MR. LEITNER:  I would like to be heard.  So I

3     think we want intending instead of -- a similar change.

4          THE COURT:  I'm going to do that.

5          MR. LEITNER:  In addition to that, we think this

6     instruction leaves the jury at sea on the gift issue.  So

7     not all disclosures of material nonpublic information

8     violate the securities laws.  It has to be breach of a duty,

9     and one way of doing that, that means it has to lead to --

10    it has to be with an intent to do it to give a personal

11    benefit or to obtain a personal benefit.  One way of doing

12    that is giving a gift.

13         But not all disclosures of material nonpublic

14    information are gifts.  The jury needs to be instructed on

15    how to distinguish between gifts on the one hand and

16    non-gifts on the other.  And in Salmon the Supreme Court

17    gave very specific guidance on explaining why something is a

18    gift.  The reason that a transfer of material nonpublic

19    information is a gift is because it's the equivalent of the

20    tipper trading on the information and then giving the

21    proceeds to the tippee.

22         The gift is the equivalent of a cash gift.  That's

23    lifted verbatim from the Supreme Court's explanation of why

24    a gift satisfies the personal benefit test.  If that

25    explanation is good enough for the Supreme Court, I think

Proceedings                                             930

1   the jury needs to understand the explanation of when

2   something is a gift and when something is not.

3              THE COURT:  So what are you proposing?

4              MR. LEITNER:  The language that we are proposing

5   is from the defense proposed instructions.

6              THE COURT:  What page?

7              MS. NESTOR:  Page 9, Your Honor.

8              THE COURT:  What page?

9              MS. NESTOR:  Nine.

10             MR. LEITNER:  Page 9 of the defense instructions.

11             MS. NESTOR:  I'm not sure what the quote is.

12             MR. LEITNER:  Hold on.  You see the third

13  paragraph, Your Honor?

14             THE COURT:  The paragraph that begins, the

15  personal benefit?

16             MR. LEITNER:  Yeah.  So we agree that a gift can

17  be included, but we think that has to be explained.

18             MS. NESTOR:  Your Honor, just so we are clear, the

19  paragraph you used is from our instructions, which were

20  taken directly from the instructions in Salmon.

21             MR. LEITNER:  There was a Supreme Court decision

22  after.

23             MR. SACK:  We think the real point is just saying

24  gift doesn't really help the jury understand what giving of

25  NMPI is a gift and what isn't a gift, because it's clear

1    that not every giving of NMPI is a gift.

2              THE COURT:  Why don't we just add a paragraph?

3              MR. SACK:  Yes.

4              MR. LEITNER:  We are happy to add the paragraph

5    that we have proposed here.

6              THE COURT:  Where?

7              MR. LEITNER:  Paragraph three, in that

8    circumstance the government must prove that Schulman -- I

9    would say, intended to provide Mr. Klein with the equivalent

10   of a cash gift.  That is, the government must prove that

11   Mr. Schulman made a gift of information that was the same

12   thing as trading by Mr. Schulman followed by a gift of the

13   cash proceeds to Mr. Klein.  That paragraph is directly

14   lifted from Salmon.

15             MS. NESTOR:  Your Honor, we think that is way too

16   limiting.  That is one way this can work.  Salmon is very

17   specific to its facts.

18             The court isn't saying that's the only way you can

19   have a gift.

20             MR. LEITNER:  Right.  It's explaining why

21   something constitutes a gift.  It's because the equivalent

22   of a cash gift, of giving cash from the proceeds of a

23   securities transaction.  That's why the NMPI constitutes a

24   gift.

25             MS. NESTOR:  I also think the paragraph is

Proceedings                                          932

1    extremely confusing, Your Honor.

2              THE COURT:  I think it's confusing.

3              MR. SACK:  We can refine the language, but I don't

4    think it's unfairly limiting in the following sense.  We are

5    not limiting the concept of personal benefit.  Personal

6    benefit, still, what the language stays that may have -- may

7    be financial or tangible in nature or it may be a gift.

8    That breadth stays.

9              All we are trying to do is give some practical

10   meaning to what kinds of gifts of information.

11             THE COURT:  Isn't that covered by it can also

12   include, for example, the benefit of being able to -- blah,

13   blah, blah?

14             MR. SACK:  No.  That's more of a non-gift nature.

15   The gift is a particular -- there is some sort of pecuniary

16   gain, such as networking, reputation, future financial

17   benefits on the one hand.  Gift is a parallel tract, is a

18   separate but parallel extract.

19             THE COURT:  Right, but it says or making a gift.

20             MR. SACK:  Right.  All we are trying to say is but

21   what is a gift in this context?  When is giving material

22   information a gift that constitutes a personal benefit?  We

23   like to say it is a gift that constitutes personal benefit

24   when in effect it is the equivalent of buying -- of doing

25   the securities transactions and making a gift of the cash.

Proceedings                                     933

1    That's in essence what we would be saying.

2              THE COURT:  That is a confusing sentence.

3              MS. NESTOR:  Your Honor, I do feel that isn't --

4    again, that case was limited to its facts.  I think that

5    imposing Salmon -- and I know I'm saying it wrong -- on this

6    case, Salmon on this case, is inappropriate.

7              MR. LEITNER:  Your Honor, Salmon addressed the

8    gift theory in the context of how the gift theory applies

9    between relatives.  It's explaining why a gift constitutes a

10   breach of duty required for the crime.

11             The jury has to have some guidance as to why not

12   every exchange of information is a gift.  The way the

13   instruction reads right now, they could think any time

14   someone gives NMPI it could be a gift to someone.  They need

15   some guidance to distinguish gifts from non-gifts.

16             THE COURT:  I will hear you.  I just don't like

17   the sentence that you proposed.

18             MR. LEITNER:  There are two ways of saying it.

19   One is that it's the equivalent, it's in effect the same

20   thing as the tippee trading himself and then giving the

21   proceeds to the tippee.  The other --

22             THE COURT:  Tipper.

23             MR. LEITNER:  Tipper -- no, tippee.

24             MR. SACK:  Tipper trades.

25             MR. LEITNER:  The tipper trades and gives the

Proceedings                                    934

1    proceeds to the tippee.

2              THE COURT:  Confusing.

3              MR. LEITNER:  The other should say that NMPI is

4    the equivalent of a cash gift based on trading.  That's a

5    simpler way of saying it, based on the trading that the

6    tippee will do.

7              MS. NESTOR:  Again, I just don't think that makes

8    any sense.

9              THE COURT:  The second one makes more sense.

10             MR. SACK:  I think -- actually, I think it's

11   especially important.  In Salmon it was less important

12   because of the relationship, the familial relationship.

13             THE COURT:  Work on the second sentence.

14             MR. SACK:  We will.

15             MR. LEITNER:  The version --

16             MR. SACK:  We will.

17             THE COURT:  The second one.  The first one is

18   confusing.

19             MR. LEITNER:  The cash equivalent.

20             MR. SACK:  Not the equivalent one, the one with

21   just the cash gift.

22             MR. LEITNER:  We will work on that proposed

23   language.

24             THE COURT:  Yes.

25             MR. LEITNER:  The other issue we have with the

Proceedings                                       935

1    personal benefit instruction is we think the jury should

2    understand that they cannot infer that a gift was given

3    merely from the fact that Mr. Klein and Mr. Schulman are

4    friends.  That's directly lifted from Newman.

5            Now, Salmon came after Newman, but Newman had two

6    holdings.  One, that friendship is not enough; two, the

7    tipper has to get pecuniary or some other gain.  Salmon

8    governed with the second holding.  The tipper no longer has

9    to receive something in return.

10           Salmon said absolutely nothing about the

11   circumstances in which a gift of information between

12   friends -- excuse me, when a gift can be inferred from

13   friendship; and, of course, Salmon didn't have to say

14   anything about that because Salmon dealt with two family

15   members, not friends.

16           Right now, in this circuit, Newman's directive

17   that you cannot infer a gift just because two people are

18   friends is binding, absent Supreme Court precedence directly

19   overruling it or making it so clear that it's going to be

20   overruled that you can disregard it.

21           The Supreme Court's decision was self-described as

22   very narrow.  It had nothing do with friendship.  Right now

23   that sentence from Newman is on the books in this circuit,

24   and we think it should be given to the jury for that reason.

25           MR. SACK:  So what's the one sentence that we

Proceedings                                          936

1    would write?

2            MR. LEITNER:  Let's skip to the practical import,

3    Your Honor.

4            MS. NESTOR:  We disagree, Your Honor.

5            THE COURT:  Let me just hear his sentence, and I

6    will hear you.

7            MR. LEITNER:  It's the last paragraph, it's the --

8    one second.

9            THE COURT:  What page?

10           (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                    937

1          MR. LEITNER:  To the extent the Government contends

2    the personal benefit received by Mr. Schulman consists of a

3    gift of non-material public information to Mr. Klein, the

4    personal benefit cannot be inferred from the mere fact of a

5    friendship between Mr. Schulman and Mr. Klein, particularly if

6    their friendship was of a casual or social nature.

7          MS. NESTOR:  Your Honor, that eliminates any type of

8    friendship.  That makes absolutely no sense.

9          Again, I've read this over seven times, Your Honor.

10   I don't understand the argument.

11         MR. LEITNER:  Well, Your Honor, it makes a lot of

12   sense.  It means you need other context besides the fact that

13   two people are friends.

14         MS. NESTOR:  Of course, you need an actual gift.

15   What other context are you talking about?

16         MR. LEITNER:  Ms. Nestor, then any time people are

17   friends and information is given, does that mean that it's a

18   gift?

19         MR. PITLUCK:  So you contend that Salman's holding

20   only applies to that?

21         MR. LEITNER:  My contending is that Salman doesn't

22   get rid of the Second Circuit's holding that the friendship

23   needs to be somewhat robust to support the gift theory.  Mere

24   friendship is not enough.  Something more needs to be there.

25         MS. NESTOR:  What does mere friendship mean?  That

*Proceedings*                                                    938

1    is confusing.  Mere friendship is enough.

2              That's no what Newman says here.

3              MR. LEITNER:  Newman says --

4              MS. NESTOR:  First of all, Newman is inapplicable

5    here, Your Honor.  It's a downstream tippee case where the

6    tippees had no relationship at all to the person who was

7    giving the tip.

8              MR. LEITNER:  Your Honor, that's the Government's

9    typical pivot when Newman is brought up, it involves

10   downstream tippees.

11             THE COURT:  But it does involve downstream tippees.

12             MR. LEITNER:  Yes.  But, Your Honor, the case

13   specifically addresses the personal benefit element and what

14   it means.  That's the heart of Newman.  Personal benefit

15   requires X, and then Newman goes on to describe what the X is.

16             The fact that downstream tippers were involved is

17   neither here nor there.  Its holding on what you need for a

18   personal benefit remains the law in this circuit to the extent

19   it wasn't overturned by Salman, and its friendship language

20   was not overturned by Salman.

21             MS. NESTOR:  It's actually really confusing what was

22   overturned by Salman because the paragraph, Your Honor, that

23   paragraph is all one paragraph, actually.

24             I've looked at this seven different times.  I don't

25   believe that -- I don't understand the argument, to begin

*Proceedings*                                                        939

1   with.  I'm sure I'm not as smart as Mr. Leitner, but I don't

2   think that -- what does it mean to say "mere friendship"?  I

3   mean, what kind of friendship would be enough?  Are we

4   instructing the jury on what they need to find in terms of

5   friendship?  Do they have to exchange rings?  I mean, I don't

6   understand.

7           MR. SACK:  Let me try.  I think what we're really

8   arguing --

9           THE COURT:  Wait.  Let me ask you something, Ms.

10  Nestor.

11          The last sentence here that says:  The Government

12  must prove beyond a reasonable doubt that the friendship

13  between Mr. Schulman and Mr. Klein was such that when Mr.

14  Schulman provided material, non-public information to Mr.

15  Klein he was doing the equivalent of trading and then making a

16  gift of the proceeds to Mr. Klein.

17          Do you agree that that states the law?

18          MS. NESTOR:  You're reading from the instruction on

19  page 9?

20          THE COURT:  Yes, page 9, the last sentence.

21          MS. NESTOR:  I mean, Your Honor, again, I think it's

22  too limiting because I don't think that's necessarily what

23  Salman is saying.  It's saying to the facts in that case.  I

24  don't disagree that this is what the case held, but I just

25  don't believe that it's necessary to instruct this jury on

*Proceedings*                                                    940

1    that because I don't think that's the only way you can give a

2    gift.  It's not necessarily exchange for money.  You can give

3    a gift of reputational benefit, for instance.

4            I just think it's confusing.  It confuses me and I'm

5    not a juror.  I mean, it's just confusing.

6            MR. LEITNER:  Your Honor, reputational benefit is in

7    the instruction.

8            The question is when a gift of NPI is actionable?

9    That's the question.  What constitutes a gift?  We have an

10   explanation given from the Supreme Court and it's in this

11   sentence right here.  Otherwise the jury is at sea with

12   respect to determining which transfers of NPI are gifts and

13   which aren't.

14           THE COURT:  They're not going to be -- I think

15   you're making more of it than there is in this case.  I think

16   the facts in this case are pretty simple, and I don't want to

17   confuse the jury.

18           Is there some way you can come up with some kind of

19   agreement on a different sentence?  I don't like this

20   sentence.

21           MR. LEITNER:  Which one?

22           THE COURT:  Your sentence:  The Government must

23   prove beyond -- I don't want to read it again.  The last

24   sentence on page 9.

25           MS. NESTOR:  She's talking about this sentence

*Proceedings*                                                    941

1   (indicating).

2           MR. LEITNER:  Your Honor's problem is with the first

3   part of the sentence or the second part of the sentence?

4           THE COURT:  The whole sentence.

5           MR. LEITNER:  We certainly can get back to you on

6   language about the cash gift that we had talked about earlier,

7   but we also want to address the friendship part as well.

8   Because the directive from Newman is that the jury should not

9   be allowed to say a given was given just because they're

10  friends.  That's the law in the circuit.

11          THE COURT:  That's not what I'm instructing.

12          MR. LEITNER:  But does Your Honor disagree that

13  that's the law from Newman?

14          MR. SACK:  I think the judge is saying that there's

15  enough here to contextualize.

16          THE COURT:  Well, right now I'm satisfied with what

17  I did.  If you want to submit something, you may.

18          MR. LEITNER:  And you think it should be along the

19  lines of the cash gift?

20          THE COURT:  It should be a lot clearer than this.

21          MR. LEITNER:  Okay.

22          MR. SACK:  We'll work on it, Your Honor.

23          THE COURT:  What's next after page 25?

24          Do you have something on 25?

25          MS. NESTOR:  I don't even know anymore.

*Proceedings*                                                    942

```
1              No, Your Honor.

2              MR. PITLUCK:  We've come to agreement that we don't

3      need the aiding and abetting.

4              MR. SACK:  I have something on 26 though.

5              MR. PITLUCK:  Come on.  You took the wind out of my

6      sails though.

7              MR. SACK:  That was really terrible.  We have an

8      agreement, Your Honor.  Let's state the agreement.

9              MR. LEITNER:  Announce it.

10             THE COURT:  I thought, okay, they're going to come

11     up, and take this as a compliment, Mr. Mead, a Mr. Mead type

12     argument on aiding and abetting because -- take it as a

13     compliment, like something really ingenious and clever that I

14     haven't thought of.

15             MR. PITLUCK:  Rest assured, Your Honor, we have that

16     explanation.  I just, I don't want to go into it.

17             MR. LEITNER:  He said he'd give it to me over a

18     beer.

19             MR. PITLUCK:  We don't think it's appropriate.

20             THE COURT:  Yes, thank you.

21             MR. SACK:  If you don't mind going back to page 26.

22             THE COURT:  Yes, I'm on page 26.

23             MR. SACK:  So, in the final paragraph on page 26,

24     here's my concern.

25             It's clearly trying to sort of summarize some
```

1    fairly --

2              THE COURT:  It's a wrap-up.

3              MR. SACK:  It's a wrap-up.  But here's the problem

4    with the wrap-up.  It's the second sentence.

5              Your Honor is giving a further explanation:  That

6    is, the Government must prove beyond a reasonable doubt that

7    the defendant provided MNPI decline while - I believe it

8    should say - intending that Klein would purchase securities.

9              But that's only the intent.  It doesn't summarize

10   the willfulness and it doesn't summarize the benefit.

11             So if it is a wrap-up, it shouldn't be a somewhat

12   truncated wrap-up.  So what we would ask --

13             THE COURT:  But then the next page, that's why it's

14   not truncated because we have the whole next page, or the

15   knowingly and willfully is for you to determine, blah, blah,

16   blah.

17             MR. SACK:  But the first sentence says:  The

18   Government's not required to show, et cetera, so long as it

19   proves the defendant acted knowingly, willfully and with

20   intent to defraud.  But then the "that is" sentence only talks

21   about intent to defraud, and I think that's somewhat unclear

22   to the jury.

23             THE COURT:  Maybe I should just omit that whole

24   paragraph.

25             MR. SACK:  Or you could keep the sentence.

 1              THE COURT:  Which sentence?

 2              MR. SACK:  "The Government is not required to show."

 3     We can live with that.

 4              THE COURT:  And then take out the last sentence?

 5              MR. SACK:  Take out the last sentence.  And then I'd

 6     have one edit in the first sentence now, is to insert after

 7     the word "proved" "beyond a reasonable doubt."

 8              THE COURT:  I'm fine with that.

 9              MR. PITLUCK:  I'm not following.

10              THE COURT:  Are you on page 26?

11              MR. PITLUCK:  Yes.

12              THE COURT:  At the bottom.

13              MR. PITLUCK:  Yeah.

14              THE COURT:  The last paragraph begins:  The

15     Government is not required.

16              It would read:  Not required to show that the

17     defendant also knew that he was violating some particular

18     federal statute as long as it proves beyond a reasonable doubt

19     that the defendant acted knowingly, willfully and with intent

20     to defraud.

21              And then take out the last sentence because the

22     defense view is that it doesn't explain enough.  It's just

23     kind of one-half.

24              MR. SACK:  Could we just confer for one moment?

25              THE COURT:  You changed your mind?

*Proceedings*                                                945

1          MR. PITLUCK:  Judge, I'd like to let the record

2   reflect we got rid of aiding and abetting.

3          MS. NESTOR:  We also asked Mr. Mead if he was going

4   to come up with a new argument on the complaint on Monday and

5   to let us know in advance.

6          THE COURT:  So, aiding and abetting took up like a

7   page-and-a-half.  So now you have a page-and-a-half credit,

8   so.

9          MS. NESTOR:  Where's our credit?

10         MR. SACK:  We just took out a sentence, Your Honor.

11  We're getting there.  We're fine with what we just said.

12         THE COURT:  What's next?  Can we move to page 27?

13         MR. SACK:  I really think the next issue's in

14  conspiracy, Your Honor.

15         THE COURT:  Do you have anything before that?

16         MR. PITLUCK:  No, Judge.

17         MS. NESTOR:  No.

18         THE COURT:  Okay.  What page?

19         MR. SACK:  34.

20         THE COURT:  Okay.

21         MR. SACK:  So, in a nutshell, Your Honor, we think

22  it's really important because the conspiracy talks about

23  knowingly and willfully joining and participating in the

24  conspiracy, obviously.  But then does not talk about what that

25  means in this context.

*Proceedings* 946

1          So what we would think really is very important to

2    be done is to make an express reference back to the mental

3    state requirements of the substantive offense, not a

4    reiteration of all of the charge, but where it talks about,

5    for example, and there's two places, but I'll just take one

6    example.  The top of page 34, the first full very brief

7    sentence:  Thus a defendant enters a conspiracy knowingly and

8    willfully, et cetera, with knowledge of and intent to further

9    the unlawful object.

10          An express reference there that the object, and I

11   don't have the exact wording, but we'll propose it

12   momentarily, is a reference back to the knowing, willful and

13   intentional misconduct in the first -- in Count Two, what

14   you've already charged the jury.

15          And then there's one other place.

16          THE COURT:  Why is that necessary where I say:  And

17   the intent to further its unlawful object?  Why do I have to

18   hit them over the head with what the object is again?

19          MR. LEITNER:  Because, Your Honor, all you say is

20   "securities fraud."  I think it makes sense to say what was

21   the fraud.  It's the scheme of the essential elements that you

22   already instructed and that's actually --

23          THE COURT:  Wait.

24          MR. PITLUCK:  Judge, I don't think we're -- I'm

25   looking at the same paragraph the Court is where you say "with

*Proceedings*                                                      947

1   the intent to further its unlawful object" on page 34.

2            Is that the one you were referencing?

3            MR. SACK:  And there's one other place too.

4            MR. LEITNER:  Correct.

5            MR. SACK:  Where's the other place, Curtis?

6            MR. LEITNER:  The other place is page 34, second

7   paragraph.

8            MR. SACK:  The second paragraph?

9            MR. LEITNER:  No, no, the first paragraph.

10           There are two relations back, Your Honor, one with

11  respect to the agreement and one with respect to the mental

12  state, of joining the conspiracy.

13           We want a relation back with respect to both and

14  that's where --

15           THE COURT:  Where on page 33?

16           MR. SACK:  The first paragraph.

17           MS. NESTOR:  The second element of conspiracy?

18           THE COURT:  But we say here:  To achieve an unlawful

19  object, in this case, securities fraud.

20           MR. SACK:  Yeah, but it's helpful but what does that

21  mean in this context.  It seems to me important to say:  The

22  object that I've just described to you just now," which is

23  precisely what Judge Rakoff did in the Gupta case.

24           THE COURT:  Just tell me what you would want me to

25  say --

*Proceedings*                                                           948

1          MR. PITLUCK:  Judge, how about --

2          THE COURT:  One second.

3          MR. PITLUCK:  I'm sorry.  Go ahead.

4          THE COURT:  Let me just point them to where I want

5    them to go, and then I can hear their suggestion.

6          Where it says:  An unlawful object, in this case,

7    securities fraud, you would like me to take out "securities

8    fraud" and insert something else?

9          MR. LEITNER:  Two sentences.

10         MR. PITLUCK:  Judge, if I may be --

11         THE COURT:  Let me hear you.

12         MR. PITLUCK:  We wrote, I think it's very clear and

13   I just used this:  That I already explained this to you in my

14   instructions regarding securities fraud as set forth in Count

15   Two.

16         So you say:  In this case, securities fraud as set

17   forth in Count Two, or as I discussed in Count Two, or as I

18   told you about in Count Two.

19         MR. LEITNER:  We want to lift the exact language

20   from Rakoff's instructions, from Judge Rakoff's instructions,

21   which is:  The object of the conspiracy consists of a scheme

22   to engage in insider trading in King securities.

23   Specifically, it is to undertake that any scheme -- a scheme

24   that meets the essential elements of the insider trading as I

25   have already explained to you and.

1          THE COURT:  I usually think he does like the right

2     thing, but I'm not going to do that.  It has to be shorter.  I

3     don't think that's all necessary.

4          "In this case, securities fraud, which I've

5     explained before in the instruction."

6          MR. LEITNER:  Well, maybe a reference to the

7     elements that you have outlined before.

8          THE COURT:  Give me language.  Tell me exactly what

9     you want me to say and I'll consider it.

10          MR. SACK:  Can we do that over the weekend?

11          THE COURT:  You can, but I may not, which I'll tell

12     you, of course, Monday morning if I don't think that it's

13     necessary.

14          If you want to propose language, it needs to be

15     tight.

16          MR. SACK:  Tight.

17          THE COURT:  Because I'm not convinced that it's

18     necessary.

19          Okay.  Now we're on 33.  I know you have the same --

20          MR. SACK:  So we have the one other place, and we'll

21     get you some tight language.

22          MR. LEITNER:  Tight language for that as well, Your

23     Honor.

24          MR. PITLUCK:  Judge, we'll respond on Monday.  We're

25     not going to brief this over the weekend, if that's okay.

*Proceedings*                                                  950

1              MS. NESTOR:  I may not respond on Monday.

2              I'm just kidding.

3              THE COURT:  Yeah, we'll just see what they have.  I

4     mean, I'm dubious, but I'm always happy to hear you.

5              MS. NESTOR:  That's it.

6              MR. LEITNER:  Hold on one second.

7              (Pause.)

8              MR. SACK:  I'm sorry, I actually do.

9              THE COURT:  Okay.  What page?

10             MR. SACK:  It's a very small thing.

11             THE COURT:  Well, it will be a small thing until Mr.

12    Leitner discusses it.

13             MR. LEITNER:  I thought Mr. Mead was the longwinded

14    one.

15             MS. NESTOR:  Mr. Mead has been -- I have to give him

16    some credit here.  He's been sitting here nice and quiet the

17    entire time.

18             MR. LEITNER:  You said you were waiting to hear from

19    me for a couple of days.

20             MR. SACK:  So, it's page 24 carrying over to 25.

21    The sentence is:  A tip from an insider that is more reliable

22    and specific than unconfirmed facts or public rumors.

23             It says:  Is non-public information.  I think it

24    should be:  May be non-public information despite the

25    existence of such.

*Proceedings*                                                    951

 1          THE COURT:  Yes, I agree.  That's a good one.
 2   That's a thank you.
 3          All right.  What's next?
 4          MS. NESTOR:  I think we're done.
 5          THE COURT:  Okay.  We're working on a verdict sheet?
 6          MS. NESTOR:  We have.  We will file one.
 7          Okay, good.
 8          MR. PITLUCK:  Unless --
 9          THE COURT:  No, I'd like one from you.
10          MR. PITLUCK:  Okay.
11          THE COURT:  Okay.  So tell me, in terms of timing, I
12   was hoping we'd have summations on Monday, and I was hoping to
13   charge on Monday, but it depends on how long.  We have a chart
14   or something from you, a summary witness, and Dubinsky.
15          MR. MEAD:  And we'll probably call two case agents
16   for very specific prior inconsistent statements by Shechtman.
17   Depending, I mean, literally I'm thinking the direct would be
18   five minutes or each of them, though I obviously ask for
19   permission to question as adverse witnesses.
20          THE COURT:  Right.  But Dubinsky, how long?
21          MR. MEAD:  Well, you just heard it.
22          THE COURT:  Well, it's not going to be that long.
23          MR. MEAD:  Yeah, pretty much.  I mean, I ran
24   through.
25          THE COURT:  Please do not make me hear his

1  qualifications to that extent again.  I mean, you can collapse

2  that.

3          MS. NESTOR:  His family life is also kind of

4  irrelevant.

5          THE COURT:  What was his family?

6          MS. NESTOR:  I don't know what --

7          MR. PITLUCK:  I had kids and I came back.

8          MR. MEAD:  I can skip what his parents did for a

9  living.

10          MS. NESTOR:  I was hoping we weren't going to go

11  into what he did in preschool.

12          MR. PITLUCK:  Judge, there's the specific risk, as

13  we said, about the, like, the certified fraud examiner portion

14  of the qualifications.  That's not relevant here.

15          So, I don't want to object.  I don't want to have to

16  go to sidebar, but, you know, what we heard, I timed it, it

17  was 25 minutes of qualification, and I get that that's

18  appropriate in a Daubert hearing to give the Court the full

19  understanding.

20          THE COURT:  Well, wait.  I mean, you could truncate

21  it a lot and just you stipulate he's an expert in whatever.

22          MR. SACK:  That's not entirely fair when we're

23  putting on an expert to establish his credibility.

24          THE COURT:  Well, he's a financial -- all the things

25  that he is that are relevant to the issues he's going to

*Proceedings*                                                           953

1   testify about.

2          MR. SACK:  And that he's testified on the

3   government's behalf where he's been an expert on the

4   government's behalf?

5          THE COURT:  Yeah, fine.  But it went a long time.  I

6   don't see how we'd finish before lunch.

7          MR. PITLUCK:  I also don't see how any specific

8   instances of cases of unrelated topics and subject matters.

9   You know, certainly if he has testified on the government's

10  behalf, that's fine.

11         THE COURT:  Yeah.

12         MR. PITLUCK:  But in the Madoff case, just as an

13  attempt to -- they're unrelated, and what he's testifying to

14  is very -- has been specifically delineated by the Court

15  related to investment advisory and we think that's

16  appropriate.

17         MR. MEAD:  Judge, I have to tell you there's no way

18  in the world that I want my expert not to testify that he was

19  hired by FINRA twice to talk about brokerage behavior and he

20  was hired in the Madoff case.

21         We have a very different view --

22         THE COURT:  I don't mind you saying he was hired by

23  FINRA, but I don't think I need to hear that he was hired for

24  the Madoff case.  He was hired by FINRA, fine.

25         MR. MEAD:  Your Honor.

*Proceedings*                                                        954

1          THE COURT:  But what he's going to testify about has

2    to do with what literature was out there in the field around

3    the time that it's relevant to this case.

4          So, it just went on for a really long time.

5          MR. MEAD:  I'll try to shorten it, Your Honor, I

6    really will.  But here's the problem.

7          You know, you don't win trials just by putting on a

8    scintilla of evidence that helps you.  You put on, when a

9    man's life is at stake, everything you've got.  And I don't

10   care if I --

11         THE COURT:  Well, that's why I'm here.

12         MR. MEAD:  No, but that's not fair.  This is the

13   only thing I got on an expert, and I need to be able to tell

14   the jury that this man has been trusted by the United States

15   Government.  He's testified in cases they've heard about.  It

16   makes him more credible.  It makes his testimony more helpful

17   to an innocent man.

18         And I will try to keep it short.  I understand your

19   point, but we -- I -- if I had ten witnesses to call that

20   were, you know, that corroborate in some central fact that was

21   critical to the defense, I'd call them all with no apologies.

22         THE COURT:  Okay.  How long are you going to be with

23   him?

24         MR. MEAD:  So, I mean, the direct in terms of

25   substance, I mean, obviously you're telling me not to go into

*Proceedings*                                                  955

1    the financial report reading stuff, so that will cut.

2          But, you know, literally I think what you heard on

3    substance in terms of the slide is exactly what I'm going to

4    do with him in front of the jury.  So it takes about an hour,

5    I think, on substance.

6          MR. PITLUCK:  Judge, there's obviously going to be

7    significant cross.

8          MS. NESTOR:  Your Honor, I think we got here at 1

9    and we were done with him by 4.

10         MR. SACK:  Well, we started about 1:30.

11         MS. NESTOR:  But nonetheless, that's --

12         THE COURT:  How do you feel --

13         MR. PITLUCK:  And Judge, there may be -- we may have

14   issues with the impeachment and the inconsistent statements.

15         THE COURT:  How do you all feel about, how do you

16   feel about summations Monday and charge Tuesday morning then?

17   I don't know if you have a -- how you feel about breaking that

18   up.

19         MS. NESTOR:  Your Honor, I can start summations on

20   Monday afternoon.  My concern is we won't start 'til 3

21   o'clock, and defense counsel I know is not going to be less

22   than three hours.

23         THE COURT:  I don't know that.

24         How long do you think you're going to be?

25         MR. MEAD:  Probably 45 minutes to an hour.

*Proceedings*                                                     956

1              MS. NESTOR:  That's great.  That's all right then.

2              MR. MEAD:  I mean, you heard --

3              MR. PITLUCK:  You got that?

4              MR. MEAD:  Obviously I don't want to commit whatever

5     else.  I may go a little longer, but there's a limit to what

6     juries can tolerate.  I try not to step over that.

7              THE COURT:  Well, I have a little bit in the bank in

8     terms of goodwill with this jury.  So maybe if we have to go

9     Tuesday, we'll go to Tuesday.

10             I prefer to do summations and charge in the same

11    day.

12             MR. PITLUCK:  Judge, it's not a really lengthy

13    charge.  I mean, it's --

14             THE COURT:  No, I know.

15             MR. PITLUCK:  I think there's also, as the Court is

16    I'm sure aware, there's the snow issue on Tuesday.

17             THE COURT:  On Tuesday?

18             MR. PITLUCK:  They're calling for five to eight

19    inches on Tuesday, which is a new, fun joy.

20             THE COURT:  Another good reason we're not in Islip.

21             MR. SACK:  Amen.

22             MR. MEAD:  I think we can get it done Monday.

23             THE COURT:  We'll do our best.

24             MR. MEAD:  I really think we can.

25             THE COURT:  Thank you.

*Proceedings*                                                      957

1              MR. PITLUCK:  Thank you, Judge.

2              (Time noted:  6:52 p.m.)

3              (Whereupon, the proceedings were adjourned to

4    March 13, 2015, at 9:30 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

958

1                                 INDEX

2

3    BRUCE DUBINSKY                                819

4

5        DIRECT EXAMINATION                        819

6        BY MR. MEAD

7        DIRECT EXAMINATION (continued)            862

8        BY MR. MEAD

9        CROSS-EXAMINATION                         889

10       BY MR. PITLUCK

11

12       VOIR DIRE                                 856

13       BY MR. PITLUCK

14

15

16

17

18

19

20

21

22

23

24

25