**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

         -- against –

**TIBOR KLEIN and**
**ROBERT SCHULMAN,**

               **Defendants.**

**CR-16-442 (JMA)**

**SENTENCING MEMORANDUM ON BEHALF OF ROBERT SCHULMAN**
**(REDACTED PUBLIC FILING)**

LONDON AND MEAD
1225 19th Street, NW, Suite 320
Washington, DC 20036
202-331-3334

PROSKAUER
Eleven Times Square
New York, NY 10036-8299
212-969-3530

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
212-856-9600

*Counsel for Defendant Robert Schulman*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

I.   ROB SCHULMAN'S PERSONAL BACKGROUND ................................ 5

    A.   Rob is a devoted husband and father, and a doting grandfather. ........................... 5

    B.   The Schulmans have provided love and support to others. ................................. 7

    C.   Rob provides critical support to his parents and sister. .......................................... 9

    D.   Rob loved his work, and was a generous and supportive mentor. ........................ 11

    E.   Rob is not greedy or materialistic. ........................................................................ 15

    F.   Rob has lost the profession he loved, and is trying to put his life back together through charitable work. .................................................................... 17

II.  THE SENTENCING GUIDELINES .......................................................... 20

    A.   The gain calculation and corresponding guidelines enhancement is incorrect ..... 20

    B.   The "Obstruction of Justice" enhancement is inapplicable ............................. 26

    C.   Downward departures from the guidelines are appropriate ............................ 31

        1.   Schulman's conduct qualifies as aberrant behavior. ................................ 31

        2.   Schulman's conduct was "outside the heartland" of insider trading cases. ..................................................................................... 32

III. CONSIDERATION OF THE 3553(a) FACTORS COUNSELS LENIENCY ............... 33

    A.   Extraordinary family circumstances ..................................................................... 33

    B.   Commitment to charitable works .......................................................................... 34

    C.   A sentence of probation with substantial community confinement is sufficient to satisfy the 18 U.S.C. 3553 sentencing factors. ..................................... 36

        1.   The nature and circumstances of the offense and the history and characteristics of the defendant ........................... 36

        2.   The need for just punishment, deterrence, societal protection, and rehabilitation ........................... 36

CONCLUSION ................................................................................................ 39

## INTRODUCTION

On Friday evening, August 13, 2010, Rob Schulman was 52 years old. He had successfully practiced as a patent attorney for over 27 years. He had received material, non-public information ("MNPI") about his clients' potential business transactions and patent prosecutions repeatedly throughout his career, without trading on it. As the numerous, consistent supporting letters from family, friends, and colleagues attest, Rob had lived an exemplary, generous life. He and his wife Ronnie had been married 27 years, and were almost finished putting all three of their children through college with no debt. The Schulmans opened their home to family, neighbors, and their childrens' friends, most notably mentoring a friend of their daughter, Emily, who had a tough home life. Rob provided essential help and support to his aging parents, and to his sister, Gerri, as she struggled with multiple sclerosis.

Letters from colleagues demonstrate that Rob loved patent law, and mentored young lawyers to an unusual degree. He helped save the career of a young lawyer who had become an alcoholic, encouraging him to seek treatment and supporting him upon his return to work when other colleagues were not willing to trust. He put young colleagues in front of clients and left several firms, not for money, but because he did not feel they were supportive of his practice and his team.

Numerous letters show that Rob was not materialistic. **Redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted  redacted redacted redacted redacted redacted**. Despite later achieving an annual income of over one million dollars, and a net worth over four million dollars, the Schulmans have lived in the same McLean, Virginia house for over 25 years. Rob didn't belong to a country club, vacation at fancy resorts or ski lodges, or buy a

second home. He spent his time raising kids, working, gardening, and occasionally going to baseball games. He had a reputation for honesty, generosity, and telling bad jokes.

It is not appropriate to calculate the loss amount under U.S.S.G. 2B1.4 to include the trading profits of Michael Shechtman, or of Tibor Klein's other clients. Klein's partnership with his friend Michael Shechtman to trade risky options in King stock without sharing the profits with Schulman was not "reasonably foreseeable" to Schulman under the principles for determining "relevant conduct." U.S.S.G. § 1B1.3(a)(1)(B). Nor was it foreseeable that Klein would purchase King stock for multiple retail clients. To the extent the government contends that Klein's trading for himself and other clients was foreseeable because Rob intended to make a gift of MNPI to Klein, a single act with such an altruistic motive makes this a very atypical case. Further, it defies logic that any such "gift" would extend to Klein's clients or a secret partnership to trade options with a broker friend. While smart people sometimes do stupid things, intending to extend generosity to dozens of unknown beneficiaries, with a corresponding increase in the risk of detection, defies credulity.

No enhancement for obstruction of justice is appropriate. Rob Schulman did not testify at trial. To this day, he does not remember mentioning Pfizer to Klein on August 13. If they were all trying to tell the truth, neither Rob's, Klein's, or Shechtman's memories of the specifics of a conversation in 2010 would be fully reliable—human memory isn't that good. Klein and Shechtman have both admitted to lying in the past, and they have motives to lie now. Even accepting their versions of events, Rob's failure to recall mentioning Pfizer would not be the same as a knowing lie. Rob is the only player in this drama who has testified consistently from the beginning.

A downward departure for "Aberrant Behavior" is clearly appropriate. There is no evidence of any communication between Schulman and his investment advisor, Tibor Klein, about the King/Pfizer meetings before August 13, 2010. That Friday evening, Rob Schulman had a few glasses of wine. He has admitted from the moment government investigations began that he said something inappropriate, recalling he said "it would be nice to be King for a day." There was no evidence that Schulman and Klein ever communicated about Klein's trading in King stock again, until eight months later, when contemporaneous emails show that Klein first denied that he had bought King stock for the Schulmans, then corrected himself shortly afterward. Immediately after Klein corrected himself and informed Schuman that he had purchased King stock, Schulman reported it to his firm.

If Rob said something with the intent that Klein trade, it was "a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. 5K2.20(b), "Aberrant Behavior."

Rob made a small, one-time gain compared to his personal finances and non-materialistic lifestyle. The two-month gap between the tip and the acquisition showed that Rob had limited knowledge of the King/Pfizer negotiations. Rob supposedly had an altruistic motive in making a "gift" to Klein. Rob has already suffered atypical punishment from losing a profession he loved and millions of dollars in income. These factors take Schulman's personal circumstances "outside the heartland" for offenders sentenced under the insider trading guideline. *See Koon v. United States*, 518 U. S. 81, 96 (1996) (approving downward departure where criminal conduct is outside of the "heartland" of cases covered by the guideline).

3

Considerations that would warrant departures from the advisory guidelines also support a variance from those guidelines under the statutory sentencing factors in 18 U.S.C. § 3553(a). Sentencing letters from Rob's family demonstrate that he is a critical caretaker for his aging parents and sister Gerri. A departure/variance based on the loss of caretaking or financial support may be warranted where "no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family." Application Note 5H1.6(1)(B).

Rob has been trying to put his life back together after the conviction. Because he can no longer work as an attorney, he is devoting substantial time offering his expertise in gardening to various charities. He has made substantial progress **Redacted Redacted Redacted Redacted Redacted Redacted**, but the ability to work and be with family are important **Redacted Redacted Redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted** *See also* Chapter Five, Part K, Subpart 2 (Other Grounds for Departure)." U.S.S.G. § 5H1.3.

A sentence of probation with conditions of substantial community service, combined with the loss of reputation, career, and income already suffered, would be sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2). Given Rob's age, life history, and the aberrant circumstances of this offense, there is no need to protect the public from future crimes by Rob. Allowing Rob to work and be supported by his family would provide

4

redacted redacted redacted redacted redacted redacted redacted redacted redacted
redacted redacted redacted redacted redacted redacted redacted

## I.   ROB SCHULMAN'S PERSONAL BACKGROUND

### A.   Rob is a devoted husband and father, and a doting grandfather.

Rob and Ronnie Schulman have been married 34 years. They successfully raised three
kids together. The Court heard Ronnie Schulman's testimony about deciding to try dating a nice
guy for a change. Rob has lived up that "nice guy "label his entire life. As Ronnie Schulman
explained in her letter to the Court:

> Rob had an essential kindness and good nature that drew me to him. . . . As a
> husband, Rob has been supportive and understanding. . . . We have endured the
> deaths of my parents, the serious illness of our daughter, the illnesses of his
> parents and sister – all unfortunate, but a part of everyone's life. But I believe that
> his support of me and our family has not been typical. We have approached life's
> challenges and sorrows together, as a team.[1]

Rob's son Matthew wrote:

> I was a sensitive kid who took things very hard. My dad stood by me and
> encouraged me through every difficult moment. I remember holding back tears
> during a youth league basketball game because of a teammates nasty comment.
> My dad approached me, got down on one knee, and told me not to let other
> people's nastiness define me. . . .  As the youngest in our family I often felt
> overwhelmed and frustrated by my relative lack of development compared to my
> older siblings. . . . My dad—also the youngest in his family—would always turn
> this around make it feel like a positive. "We all know the third kid is the best,"
> he'd say. . . . I need my dad. Our entire family needs my dad. We need him for his
> unconditional love. We need him to take care of our elderly grandparents and sick
> aunt. We need him to light up my nephew's world. We need him for his bad
> jokes, his hearty laugh, his affection, and his warmth.[2]

Rob's son Scott wrote:

> As a child, I had some struggles with a learning disability. I had very poor fine-
> motor skills and had a terrible time writing in school. I was generally a good
> student, but had enormous difficulty spelling and would get extremely frustrated
> when I had to write a paper. However, my dad always believed in me and never
> made me feel that there was anything wrong with me… For years, he took me to a

---

[1] Letter of Ronnie Schulman, Tab 1 in Sentencing Letters Submission.
[2] Letter of Matthew Schulman, Tab 2 in Sentencing Letters Submission.

physical therapist to help develop my fine motor skills every Sunday and over time, my writing improved to the point where I graduated from law school this spring, with my dad watching proudly. . . . My dad was always around and always in a good mood ready to spend time with me, despite mountains of work. I was in the Boy Scouts growing up, and my dad was right there with me on nearly every camping trip as one of the parent volunteers, giving up his weekends to be with me. When my troop was planning a trip to the Canadian boundary waters for a weeklong canoe trip, my father, no outdoorsman, began an intense workout regime for a year to make sure he was in shape for the journey . . . .  To this day, it is still all about the rest of my family and me, because that is the kind of person my dad is.[3]

Rob's daughter Emily wrote:

[When 18 month-old Colin sees his grandfather Rob] His eyes light up and a smile comes over his face. He could be hungry, tired, crying. It doesn't matter; he always smiles. It is my father's smile. . . . . I imagine telling my son what has happened to my father. I imagine Colin becoming accustomed to not seeing my dad two or three times a week like he does now. I imagine him losing the love and joy he feels when my father is around. . . . [My dad] worked a lot, but it did not feel that way.  We always came first.  He has seen every Disney movie—*Aladdin* is his favorite—and read every *Harry Potter.*  He cried when I was in the hospital with a paralyzed arm, and when he saw me in my wedding dress. He has helped me move more times than I can count. He was there. He is there. He is always there.[4]

Rob's son-in-law, Michael Ballanco, wrote:

The love and wonderment of life that Rob exudes for Colin is difficult to put into words. Judge, please know that Colin needs his grandfather in his life, just as Rob's family desperately needs their husband, father, brother and son. . . . I want to close by mentioning that I have, to put it mildly, lionized my own father for as long as I can remember.  I never would have even contemplated that it would be possible for someone else to step into my life and to love me and shape me like only a father can do for his son.  I was so colossally wrong in assuming as much. Rob is my father, and when I saw my son Colin smile for the first time, revealing that he had that same kind smile as Rob, it made me happier than words can describe.[5]

Laurie Ballanco, Emily's mother-in-law, wrote:

---

[3] Letter of Scott Schulman, Tab 3 in Sentencing Letters Submission.
[4] Letter of Emily Ballanco, Tab 4 in Sentencing Letters Submission.
[5] Letter of Michael Ballanco, Tab 11 in Sentencing Letters Submission.

The Schulmans have become our family. We practice different faiths but the core of our life is the same: Love of God, love of family is our common belief. We have spent many weekends together the past 6 years. Rob has always shown humility, kindness to my family. He is a fantastic dad, as evidenced by his three beautiful and loving children. He is a loyal and loving husband who has made his family his #1 priority while still maintain a demanding career. I love that about him! I am proud to call him friend.[6]

**B.**     **The Schulmans have provided love and support to others.**

Emily's childhood friend, **redacted**, wrote:

> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**

The Schulmans unlocked, open-door policy was great for friends who needed dinner or homework help, and only backfired on the Schulmans when there was a petty thief in neighborhood who entered their unlocked home, not once, but twice a painful coincidence that even the local news lady remarked upon when covering the story. But the cost of locking the door was much greater than enabling a few petty thieves, because the openness and generosity of the Schulman household was worth too much to too many to simply lock up.

When I reflect on Mr. Schulman and how I perceived him through the lens of a child, then adolescent, and now adult, the persistent pattern is that Mr. Schulman's gratitude and joy for the everyday stuff of life that is so easy to become accustomed to, or once achieved, view as a foregone conclusion--. . . [b]ut Mr. Schulman never acted entitled to any of it, none of it was owed or deserved, Mr. Schulman seemed simply thrilled at having a chance to participate. . . . . The case will have a certain toll too on the people like me who benefitted from the kindness of this family. They are simply the most wonderful group of people I have ever had occasion to know.[7]

Carolyn Friedner, long-time family friend and second wife of Ronnie's father, wrote:

> My husband Louis had Alzheimer's disease. . . . . Louis had a significant garden for many years as well but he was not able to do so toward the end. Rob made a

---

[6] Letter of Laurie Ballanco, Tab 12 in Sentencing Letters Submission.
[7] Letter of **redacted**, Tab 15 in Sentencing Letters Submission.

point of inviting us to Virginia in the springtime to have Louis work with him in the garden. One of Louis' last contributions to Rob's garden were tomato cages that he made himself. He was so proud of those cages! It was touching to see them in the garden together everyday. Louis' "help" of course slowed Rob down, but he happily shared his garden with Louis. That time in the garden, made Louis feel alive again! Rob still uses the cages and always points them out to me when I visit.[8]

Friend **Redacted** wrote:

[I] provide two specific examples of why I hold Rob in the highest regard. The first is Rob's steadfast supportive refusal to turn his back on me when R**edacted**
**Redacted**
**Redacted**
**Redacted**
. . . . A second specific example of the kind and honorable man Rob is centers around Rob's caring concern and compassion for me after I became permanently disabled with three degenerative conditions of the spine and severe frequent and intractable migraine attacks. Because Rob's sister had suffered with Multiple Sclerosis for thirty years, Rob understood what it was like for a professional to become disabled in their mid-forties. . . . He and Ronnie visited me and cared for me during and after the two significant operations that were performed on my spine
. . . .
    I have always considered Robert Schulman to conduct himself with the utmost integrity and honesty and I trust him completely with all the things that matter: my family, my faith, and my welfare. When he speaks to me of important matters, I listen closely because I know that he speaks the truth.[9]

Rob's **Redacted**, wrote:

**Redacted**
**Redacted**
**Redacted**[10]

A friend, Stephen Himelfarb, wrote:

We have volunteered to work on food and clothing drives together, assisting in the organization as well as management of other volunteers. Additionally, Rob has offered professional assistance and guidance to **redacted** that I mentor who **Redacted redacted redacted redacted redacted redacted redacted redacted**

---

[8] Letter of Carolyn Friedner, Tab 14 in Sentencing Letters Submission.
[9] Letter of Marilyn Tebor Shaw, Tab 16 in Sentencing Letters Submission.
[10] **Redacted**.

**redacted redacted redacted redacted redacted redacted** Rob has always been generous in offering and sharing his time with others.[11]

### C.      Rob provides critical support to his parents and sister.

Gerri Schulman, Rob's older sister, was present during the trial and would like to testify

at sentencing. She wrote:

> I've had multiple sclerosis for 30 years. I am slowly but inexorably getting worse. I am quadriplegic and use a wheelchair. I am single without children. I have depended on Robert as my disease worsened. Both Robert and his wife Ronnie have been there when I needed them. I mention Ronnie as a direct result of Robert's inability to work. Ronnie, who had retired, is now working full time and has more time constraints. After I fell and fractured my arm Robert visited several times to assist me. When I moved to a wheelchair accessible apartment Robert helped me pack up and then set up my new apartment. This July I fell and was unable to get up. Robert and Ronnie were visiting and helped me into my wheelchair. Although I live in Philadelphia and they live in Virginia I know they are a phone call away. It frightens me that Robert might not be free to help me.
>
> Another consideration for sentencing is the care Robert provides for our parents. They are in their late eighties and defiantly insist on staying in the suburban home they have lived in for 60 years. Over the past year our father has been hospitalized twice. Our mother falls frequently, and has fractured her shoulder, hip, pelvis and neck (each a separate event). She is unable to drive and has limited mobility. Our father drives locally but not long distance. They live mostly in NJ and in Florida in the winter. I can provide emotional support and help with medical decision making but am unable to physically assist them. Robert and I have a brother who is a neonatologist in Florida but is too busy to routinely help. The bulk of their care has been provided by Robert. This past winter when our mother was hospitalized Robert visited Florida multiple times, did the errands and provided companionship for our father. He also aided me when I flew to Florida to visit them. Both Robert and Ronnie assisted them when they moved between NJ and Florida. Robert drives our parents to family events. He is helping my father manage his real estate holdings which requires at least two visits to NJ each month. Our parents are going to need progressively more help and Robert is the best situated to provide it. Given their frailty, I am also concerned about their reaction if Robert is imprisoned.[12]

Realistically, a sentence of imprisonment may mean that Rob's parents will never see

him again. Rob's aunt, Gail Feingold, wrote:

---

[11] Letter of Stephen Himelfarb Tab 22 in Sentencing Letters Submission.
[12] Letter of Gerri Schulman, M.D., Tab 7 to Sentencing Letters Submission.

Robert has two very frail parents aged 86 and 88, both needing support and assistance. His mother, my sister, fractured her neck requiring neurosurgery in December 2016. Robert travelled to Florida to be with her and also to care for his ailing father, who suffers from severe rheumatoid arthritis, spinal stenosis and now, disorientation due to his wife's illness. Robert cared for him, cooking, driving, cleaning and comforting him. Robert constantly supported his father at his mother's bedside in the ICU. As she began to recover, Robert escorted his mother to her doctor, to physical therapy and to neurosurgery appointments. He made several trips to Florida to help his parents, and later, he organized their financial affairs and helped them to return to NJ when their health allowed. At their home, he organized help, housecleaning and safety improvements. Unfortunately, Robert's parents are broken-hearted and despondent over Robert's situation. The family worries that their fragile health will be negatively impacted by a custodial sentence.[13]

Rob's father Herman wrote:

I am writing to you from our home in Lincroft, New Jersey, which has been our home for over 60 years. . . . Robert's *bris* was in this house. We would like to finish our days together in this home. With Robert's help that will be possible. Robert has always assured us that he would be there to make that possible. . . .

My daughter, Gerri has progressive, relapsing M.S. Robert and his wife have always assured us and our daughter that they would always have room in their home for her and that he would make any needed accommodations to his home to maintain her. Our daughter is unmarried and has no children. Robert's steadfast promise to his sister that she would never have to be institutionalized has given my wife and I great peace in knowing that our daughter would not be abandoned after our demise.[14]

Rob's mother Rhoda wrote:

What you may not be aware of is that you are also sentencing [Rob's] parents. Let me explain. Many years ago my husband and I made a pact that while we were both alive we would stay in our home (which we have been in for 60 years). No assisted living or nursing home for us! We'd stay relatively independent. Rob is making that possible for us. He is constantly on call for us. . . . Robert comes and does chores we never thought we would need help in doing, from the most simple, like cleaning our light bulbs, to those that enable our house to remain in good and safe repair. Whenever possible, he accompanies us to doctors appointments, traveling as far as Philadelphia, waiting the whole day, driving us back to New Jersey and then driving back to Virginia.[15]

---

[13] Letter of Gail Feingold, Tab 9 in Sentencing Letters Submission.
[14] Letter of Herman Schulman, Tab 5 in Sentencing Letters Submission.
[15] Letter of Rhoda Schulman, Tab 6 in Sentencing Letters Submission.

Rob's brother Bruce wrote:

> He is the one person my parents and my older sister have always depended on for
> support and help whatever the circumstance, whenever needed, and wherever
> needed. Our parents are elderly, closing in on 90 years of age, with chronic
> complex medical problems. Our only other sibling is our older sister who lives in
> Philadelphia but has progressive severe multiple sclerosis and is wheelchair
> dependent. I live in South Florida. My career as a newborn intensive care
> physician limits my ability to easily and readily help. Rob is the glue that keeps
> our family together and functioning.[16]

Rob's uncle Aaron Feingold wrote:

> On many occasions I have heard Robby state throughout the family that "Gerri
> will never have to worry she has a home with me always". "We will build an
> addition to our home and make sure that she will always have a place to live and
> her needs will be taken care of ". These comments and promises are very, very
> important in the well being and consciousness of his sister Gerri as well as the
> well being and peace of mind for his mother and father. . . . I have witnessed over
> and over again throughout the decades Robby's exceptional caring efforts towards
> his parents.[17]

Rob's son-in-law, Michael Ballanco, wrote:

> I have witnessed Rob's unfailing love and compassion for his elderly parents and
> his physically challenged sister. He cares for them with sincerity, tenderness, and
> quiet actions. I have seen Rob put aside professional and personal commitments
> in order to care for his extended family in times of difficulty. Rob puts the needs
> of those he loves before his own needs.[18]

**D.    Rob loved his work, and was a generous and supportive mentor.**

Early on, Rob saw the importance of working hard, but also enjoying work. Rob's father,

Herman, wrote:

> Growing up, Robert worked in our family pharmacy for many years. He
> developed a sense of values. Our pharmacy was located in a working class
> neighborhood and he saw what it meant for people to live from paycheck to
> paycheck. When we would discuss his career choices, we always spoke of
> choosing work that he would enjoy as opposed to making money the goal. It has
> always been apparent to me that Robert held to those beliefs and philosophy.[19]

---

[16] Letter of Bruce Schulman, Tab 8 in Sentencing Letters Submission.
[17] Letter of Aaron Feingold, Tab 10 in Sentencing Letters Submission.
[18] Letter of Michael Ballanco, Tab 11 in Sentencing Letters Submission.
[19] Letter of Herman Schulman, Tab 5 in Sentencing Letters Submission.

Rob was lucky to find work that he loved. Rob spent much of his energy and money trying to do the same for his children. His son Scott wrote:

> My father's priorities and kindness are exemplified by my education. Unlike many of my peers, all my parents cared about was finding a college that was a good fit for me. I never had any pressure to force a decision based on economics or expectations; this is because of my father. Despite being highly successful, he was only interested in using his success for the wellbeing and happiness of my siblings and me. [20]

Rob's son Matthew wrote:

> I decided I wanted to pursue film and writing in college—a nightmare scenario for most parents. From the beginning, my dad encouraged me to pursue it. He told me I should do what I love—and that money didn't matter as long as I could support my most basic needs. When college ended, my dad encouraged me to move to New York City. He supported me through an unpaid internship—which turned into a great job I hold to this day. My entire life here would not be possible without his love and wisdom.[21]

Letters from friends and colleagues show Rob's passion for patent law. Former colleague Jeff Vockrodt wrote:

> Rob's passion for his particular brand of law practice, not the money he made, was the motivating factor in his professional life. He was energized by, and took great pride in, being an authority in chemical, pharmaceutical and biotech patent law. Most mornings when I dropped by his office, he would have his reading glasses, a cup of coffee, and the latest decision of the Federal Circuit in hand, with handwritten notes all over it. Before I could bring anything up, he would want to show me how the latest decision was either severely at odds with prior precedent or related to another case we were working on. He could talk about this stuff at length, and his passion for the subject is memorialized by nearly a decade of past editions of his annual Chemical & Biotech Year in Review Publication—a 30-50 page annual production summarizing the key Federal Circuit and Supreme Court cases affecting his area of practice.[22]

Former colleague Alexander Spiegler wrote:

---

[20] Letter of Scott Schulman, Tab 3 in Sentencing Letters Submission.
[21] Letter of Matthew Schulman, Tab 2 in Sentencing Letters Submission.
[22] Letter of Jeff B. Vockrodt, Tab 29 in Sentencing Letters Submission.

Rob's personality, sense of humor, and love for his work are infectious. People want to be around and work with Rob. For example, many of his clients have been his clients for numerous years-some over 20 years. Myself and others have worked with him for over 10 years and moved firms with him. The loyalty, respect, and admiration from people who know Rob has been clear since news of his indictment. I have spoken with dozens of clients, work colleagues, friends, and people who only know Rob through my description—all of whom have shown overwhelming support for Rob. It is truly remarkable how deeply and positively Rob has impacted so many people and how strongly they have been praying and rooting for him.[23]

Former colleague Christopher Yaen wrote:

Rob is also deeply passionate about his work. . . . . Rob also never slowed down and was often the first in the office and the last to leave. It was truly inspiring to see someone who was so devoted to his job. I believe his dedication was largely due to his love of being a patent attorney and helping people with their problems. His passion for the job was evident from his enthusiastic discussions on the law.[24]

Rob was good at his job. He regularly published and spoke at bar events, and was routinely included in lists of top patent attorneys. Despite the embarrassing press in the wake of the SEC Complaint against Klein and Shechtman describing Rob as a "drunken tipster," the firm of Arent Fox recruited Rob and his team of associates in 2015. Yelee Y. Kim of Arent Fox wrote:

I knew of Rob before he joined my firm, as he had a stellar reputation in the patent law community. He was well-respected and known to be a skilled patent practitioner. I thought he would be an outstanding attorney and colleague and an asset to the firm, and I was not wrong. However, as I started working with Rob, I was very surprised by his down-to-earth personality and genuine character.

Prior to first meeting Rob, I expected our conversation to focus on his many accolades. However, instead of talking about himself, he spoke highly of his "team." It quickly became apparent to me that he wanted to take care of his team and was willing to make personal and financial sacrifices to insure that they would succeed. . . . .

When Rob joined the firm, it was clear to me that his words during the interview were true and heartfelt. However, his selfless character became the most apparent to me during his legal proceedings. Two associate attorneys from his team, Alex Spiegler and Chris Yaen, attended every day of Rob's trial. . . . This

---

[23] Letter of Alexander H. Spiegler, Tab 30 in Sentencing Letters Submission.
[24] Letter of Christopher H. Yaen, Tab 35 in Sentencing Letters Submission.

kind of loyalty and personal sacrifice is rare, and it can only be earned by an
individual who often puts others before himself.[25]

Ms. Kim got it right. Numerous letters attest to Rob's successful mentoring of young

lawyers. Perhaps most impressive, Rob helped save the career of a young lawyer who had

become an alcoholic:

> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**
> **Redacted**

**Redacted**[26]

Another mentee who attended Rob's trial, Alexander Spiegler, wrote:

> Rob is like no other law firm partner. Most partners limit an associate's contact
> with their clients.  Rob did the opposite. From day 1, Rob had me to work directly
> with his clients and always encouraged me to have strong relationships with them.
> Throughout the years, he took me on many client trips to Europe and had me
> actively participate in meetings and give speeches at conferences. Other partners
> were surprised with how much confidence Rob had in his associates and
> ownership he gave them. [27]

Former colleague Dwight Benner wrote:

\          As a young attorney, Rob was my mentor. He spent countless hours of his time
teaching me and helping me to develop as an attorney. These are hours he could
have spent billing partner level hourly rates, but he saw my professional

---

[25] Letter of Yelee Y. Kim, Tab 32 in Sentencing Letters Submission.
[26] Letter of **Redacted**
[27] Letter of Alexander H. Spiegler, Tab 30 in Sentencing Letters Submission.

development as more important. Instead of taking credit for himself, once associates earned his trust, he would routinely put them in charge of managing clients directly.[28]

Former colleague Jeff Vockrodt wrote:

> Rather than focus on his own personal gain, Rob often focused on the group of people he mentored at the firm. He always introduced his associates to the clients, taking us on trips all over the U.S. and Europe to visit them. I've never known or worked with a partner who has been more open to helping his associates grow than Rob. [29]

Rob's mentoring even included his future son-in-law. Emily's father-in-law, Michael F.

Ballanco, wrote:

> Over the next four years, leading up to our children's marriage in 2012, Rob developed a close mentoring relationship with my son, to help guide his decision to leave his career in technology development to pursue a career as an intellectual Property Rights attorney. Rob spent hours and hours with Mike articulating his deep respect for the law, its highest ethical calling and the importance of impartiality and objectivity.[30]

Ronnie Schulman wrote about the support Rob has received during this prosecution:

> I was asked if we lost any friends as a result of our legal situation. The opposite is true. Our friends and Rob's former colleagues have been there for us at every turn. Former co-workers and colleagues that Rob hadn't heard from in years have lined up to express their support. I know why. Rob has always had a philosophy that being generous and inclusive with colleagues and mentees is what serves the profession of patent law and interests of clients. He truly "paid it forward," by sharing his expertise and love of patent law with many colleagues over his 35-plus year career.[31]

**E.**   <u>**Rob is not greedy or materialistic.**</u>

Herman Schulman summarized his son's character briefly and accurately:

> Robert never cared for fancy cars, jewelry, or ski or beach homes, and the like. His pleasure has always been his family and his work as an attorney. His spare

---

[28] Letter of Dwight M. Benner II, Tab 33 in Sentencing Letters Submission.
[29] Letter of Jeff B. Vockrodt, Tab 29 in Sentencing Letters Submission.
[30] Letter of Michael F. Ballanco, Tab 13 in Sentencing Letters Submission.
[31] Letter of Ronnie Schulman, Tab 1 in Sentencing Letters Submission.

time was spent in his vegetable garden, growing food which he shared with the neighborhood.[32]

Former colleague **Redacted** described an incident that **Redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted redacted** But Rob did the right thing:

<blockquote>

**Redacted**
**Redacted**
**Redacted**
**Redacted**
**Redacted**
**Redacted**
**Redacted**
**Redacted**
**Redacted Redacted Redacted Redacted Redacted Redacted**       Rob's sense of right and wrong would not permit him to do that. I have great respect for his choice of integrity over money and moral compromise.[33]

</blockquote>

Neighbor Monica Richards wrote:

<blockquote>

They are modest about their accomplishments and modest in how they live and what they do. This was in stark contrast to many families that my children knew as early as elementary school and certainly through high school. The Schulman's lifestyle is far more modest than others in Rob's position. Over the last twenty-five years they really have made few noticeable changes in the way they live even though Rob has made many advancements in his career. When Rob's wife, Ronnie, got a new car it took me a while to recognize her driving in the neighborhood because I was so accustomed to seeing her in the same white mini van for years… All three of the Schulman children worked in high school and during summers home from college. They delivered pizza, sold fireworks, and scooped ice cream. Today they are delightful, hardworking adults who love and support their parents. It has always been about family for Rob and Ronnie.[34]

</blockquote>

Friend Jeff Gibbs wrote:

<blockquote>

During all these conversations, what is striking is the lack of any interest in discussing finances or money. Rob has never talked to me about wanting to buy

</blockquote>

---

[32] Letter of Herman Schulman, Tab 5 in Sentencing Letters Submission.
[33] Letter of **Redacted**, Tab 41 in Sentencing Letters Submission.
[34] Letter of Monica B. Richards, Tab 18 in Sentencing Letters Submission.

more things, or how to make more money, or investments, or the like. Rob does like to discuss spiritual matters; he does not talk about the materialistic.[35]

Friend Ray Goldstein wrote:

> Rob allowed me to stay at his home many times when I traveled back to the D.C. area for meetings when I was posted overseas. I have never seen excessive or conspicuous spending by Rob or any focus on income or wealth. His primary interests outside of work are professional baseball and vegetable gardens. I would trust him under any circumstances.[36]

Former colleague Alexander Spiegler wrote:

> Rob is not greedy nor motivated by money.  Rob loves being a patent attorney and was more interested in seeing the law firm get work than to take credit for bringing it in.  Indeed, he was always willing to help out a partner or other associate pitch clients or help on a project without expecting or asking to get credit for it.  In fact, while most partners demanded as much credit as they could (e.g., being "originating," "billing", and "responsible" attorney), Rob was happy to share credit and routinely did so.  For example, even though I was an associate, he routinely made me "responsible" attorney on almost all matters I worked on.[37]

Former work colleague Dwight Benner wrote:

> Rob is not a materialistic person, and is not driven by money. He and his wife, Ronnie, have lived in the same modest home for years. Built in 1983, it was the home and neighborhood here they raised their children and where Rob grows a vegetable garden. They have never been swept up in the need to show off with flashy real estate or material possessions as is typical of many DC law partners. In fact, I clearly remember asking him while driving to see one of our clients why he had never moved. His response was that he and Ronnie did not care much about big houses and possessions, because people are more important than things.[38]

## F.    Rob has lost the profession he loved, and is trying to put his life back together through charitable work.

Rob Schulman has been successful, happy, and a positive influence on those around him

for decades. But **redacted redacted redacted redacted redacted**, and losing his profession,

---

[35] Letter of Jeffrey N. Gibbs, Tab 20 in Sentencing Letters Submission.
[36] Letter of Ray Goldstein, Tab 17 in Sentencing Letters Submission.
[37] Letter of Alexander H. Spiegler, Tab 30 in Sentencing Letters Submission.
[38] Letter of Dwight M. Benner II, Tab 33 in Sentencing Letters Submission.

reputation, and regular contact with work colleagues and clients have "taken an unbelievable toll on Rob and his entire family."[39] Rob has confided his struggles to friends. Ray Goldstein wrote:

> Rob has permanently lost his personal identity as a respected and successful attorney. It will take him a long time to realize that he has always been much more than his chosen field of work. He is a kind and loving person who cares for his family and friends. **Redacted Redacted Redacted Redacted Redacted Redacted Redacted** During this challenging and uncertain period, he has filled his time by helping churches and others with gardening.
>
> It has been very difficult to observe first-hand the effect on Rob of the lengthy legal processes. He has gone through multiple rounds of world-wide internet shaming, first portraying him as a loose-lipped drunk, and then as a sober conspirator. These articles, which appear in volume merely by searching the Web under his name, will stain him forever. Notwithstanding the unfortunate downfall, he still has my complete trust and I will always be his friend.[40]

Friend Jeff Gibbs wrote:

> I also want to emphasize the devastating impact that this case has had on Rob. Rob has worked hard to build a stellar professional reputation and an international practice. The inability to help his clients has been painful for him. However, the emotional and psychic toll has been even greater personally, as Rob has lived for years with the uncertainties brought about by the opening of an investigation, the SEC proceedings, the criminal investigation, the indictment, and then the trial. I have talked with Rob at length about this, and it has had a devastating impact on him personally. It has also inflicted suffering on his wife, Ronnie, who recently returned to work as a result of the expenses that have been incurred. The effects extend further, reaching his children and his elderly parents, who rely upon Rob for support in many different ways. [41]

Rob's son-in-law Michael Ballanco wrote:

> I would do anything to stop the pain from these recent events that has absolutely destroyed Rob. He has lost a career which he worked so hard to build, and which gave him so much satisfaction, and it has devastated him. Besides being in his garden, watching baseball, or being with his family—especially our son Colin— there is nothing Rob ever wanted to more than to read a new patent law decision and summarize it for the patent law year in review he authored each year. . . . **Redacted Redacted Redacted**.[42]

---

[39] Letter of Laurie Ballanco, Tab 12 in Sentencing Letters Submission.
[40] Letter of Ray Goldstein, Tab 17 in Sentencing Letters Submission.
[41] Letter of Jeffrey N. Gibbs, Tab 20 in Sentencing Letters Submission.
[42] Letter of Michael Ballanco, Tab 11 in Sentencing Letters Submission.

**Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted [43] Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted** Ronnie

Schulman is proud of how her husband is battling through the aftermath of the case:

> But the changes Rob has made have been truly remarkable He could have given in to depression and self-pity. Instead he has gone back to what he used to do: making the world a better place. Before, it was through practicing his hard-earned and beloved craft of obtaining patent protection for drugs, medical devices and other types of bio-technology. Today, it is by practicing his other great love, growing vegetables for food. Rob works at six community vegetable gardens… He is literally out of the house gardening for at least 20 hours a week. He is highly skilled and has taken on a lot of responsibility growing, harvesting, and distributing vegetables. He has been accepted to the competitive Master Gardeners Program offered by Virginia State Agricultural Service that begins this fall. This intensive program has a rigorous application process and is offered at no cost to successful candidates. In return the graduates are requiring to give back to the community in the form of teaching and outreach. That is exactly what Rob is doing now.
>
>  Rob also regularly attends the Reston Bible Church's Sunday morning classes that explore the intersection of faith and science (a long-time interest) and attends multi-week Mussar class at Temple Rodef Shalom. Mussar is a discipline that links Jewish religious values with inter-personal and community relationships.
>
>  I am amazed and in awe of how Rob has turned his life around. He is busy every day—literally seven days a week—doing something to help others. . . . I hope and pray every day that I don't have to find out if he can survive another shock.[44]

Despite all he has lost, Rob is a successful volunteer. Hillary Quarles of the Capital Area

Food Bank wrote:

>  In six months, Rob has become part of the heart of our garden community. His good cheer and undying energy buoys others spirits and helps keep the volunteer group working hard and having fun. This summer when the heat index was 100 degrees F and the humidity was beyond bearable, Rob brought cold water bottles to the volunteers and told absurd jokes to distract the group. It was one of those days when the heat seeped into my brain and it was hard not to be grumpy and

---

[43] Letter of Ronnie Schulman, Tab 1 in Sentencing Letters Submission.
[44] Letter of Ronnie Schulman, Tab 1 in Sentencing Letters Submission.

frustrated, but Rob stepped in at the perfect time when I need a boost. I will always be grateful for his thoughtfulness and creative humor.

Finally, Rob is absolutely dependable. . . . I knew that I could trust Rob more than any paid employee. . . .

Rob contributes greatly to both the condition of the garden and the community of DAFB volunteers working in the garden. I have come to rely on his good humor, hard work and dependability. As you consider his sentence, please know that I support and trust Rob and I very much look forward to working with him in the garden in the coming years.[45]

## II.    THE SENTENCING GUIDELINES

In imposing sentence, the Court must first calculate the relevant Guidelines range, including any applicable departure under the Guidelines, and then consider the calculated Guidelines range along with all other 18 U.S.C. § 3553(a) factors in determining a just and reasonable sentence. *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).

The PSR concludes that the Guidelines offense level applicable to Rob Schulman is 22. (PSR ¶ 43.) The government takes the position that the Guidelines offense level should be 2 levels higher based on an enhancement for the obstruction of justice. Both the PSR's and the government's guidelines calculations are wrong in a number of respects.

### A.    The gain calculation and corresponding guidelines enhancement is incorrect.

The PSR states that Rob Schulman is accountable for a gain of $436,800, and thus applies a 12-level enhancement for "gain" pursuant to U.S.S.G. § 2B1.1(b)(G). (PSR ¶ 36.) The government agrees, arguing that all of Klein and Shechtman's conduct was foreseeable to Schulman. That position is factually and legally incorrect. There is no evidence that Klein's trading for other clients or Klein's partnership to trade options with Shechtman were foreseeable

---

[45] Letter of Hillary Quarles, Tab 40 in Sentencing Letters Submission.

20

or desired by Schulman, and should not be considered as relevant conduct as set forth in § 1B1.3(a)(1)(B).  As that guideline states, acts by another individual only count toward relevant conduct if they are (1) *within the scope* of the jointly undertaken criminal activity, (2) *in furtherance* of that criminal activity, and (3) *reasonably foreseeable* in connection with that criminal activity.

The undisputed evidence at trial showed that after Klein's visit to the Schulman home on August 13, Klein and Shechtman called each other and bought King stock and options, without calling Schulman; secretly split the profits from Shechtman's options trading without calling Schulman or sharing any profits with him; and attempted to cover up their calls and mutual trading without calling Schulman or involving him. Shechtman testified that nothing Klein told him during the course of their concerted trading activity and cover up led Shechtman to believe that the source of Klein's information about King was benefitting in any way. Shechtman was surprised to learn later that Klein had bought King stock for any of Klein's clients. MJOA, Dkt. 122 at 3-4, 34, 39-42.

As Schulman argued in his post-trial motions, "[b]ecause Shechtman had no knowledge as to whether Klein's source expected to personally benefit, Shechtman did not join a conspiracy with Schulman." MJOA, Dkt. 122 at 54-56; Schulman's Consolidated Reply on post-trial motions ("Reply"), Dkt. 131 at 21-24.  Moreover, the government did not prove that Rob Schulman intended or foresaw that Klein would enter into a secret partnership with Shechtman to trade King options and split the profits without involving Schulman in any way. Reply, Dkt. 131, at 24-28; s*ee* U.S.S.G. § 1B1.3(a)(1)(B); *cf. United States v. Royer*, 549 F.3d 886, 905 (2d Cir. 2008) (affirming guideline calculation based on monetary gain attributed to co-conspirator where the nature of the insider trading enterprise "was evident to [the defendant] from his earliest

involvement"). The government itself argued that, based on Schulman's "relationship of trust" with Klein, Schulman expected that Klein would not "say anything" about Schulman's disclosure of MNPI. Reply, Dkt. 131, at 27.

Similarly, if the government's theory was that Rob Schulman intended to make a gift of MNPI to Klein for Klein's benefit, why would Rob have wanted or expected Klein to trade for anyone else's benefit, or enter into multiple transactions in King stock that could further draw attention to the trading? Schulman did not intend or foresee that Klein would "directly undermine the scheme by increasing their chance of detection." *United States v. Geibel*, 369 F.3d 682, 691 (2d Cir. 2004). Even assuming that Schulman intended to benefit Klein, nothing in the record suggests *how* Schulman intended to benefit Klein—much less an inference that Schulman expected Klein to buy King stock for other clients. Klein's trading for other clients, and Shechtman's options trading, are not relevant conduct under 1B1.3(a)(1)(B), which applies here.

Tellingly, the government's response to Defendant's objections to the PSR cited Klein's guilty plea allocution in support of its argument for an obstruction of justice enhancement, but did not cite Klein's allocution in support of its foreseeability argument. Klein's allocution confirms that the government's position, that Schulman expected or foresaw that Klein would buy King stock for his clients and trade options with Shechtman, rests on speculation.

Here is what Klein said at his guilty plea:

> Mr. Schulman told me that he thought he had inside information because he had to give his files to someone at Hunton & Williams for a meeting with Pfizer. Mr. Schulman then stated, "You know, it would be nice to be King for a day." After I did not respond to his comment, Mr. Schulman then leaned forward toward me and emphatically repeated the statement about being King for a day. These gestures were immediately followed by Mr. Schulman stating, you know I can't trade it. Throughout the conversation regarding King and

Pfizer, Mrs. Schulman repeatedly warned her husband that his
comments were inappropriate and he should stop discussing
the matter. When he told me about the material nonpublic
information, I knew that Mr. Schulman was breaching his duty
of confidence to King. During the rest of the evening and
prior to my leaving to New York the next morning,
Mr. Schulman never admonished me not to trade on the
information that he told me during the dinner conversation.
In fact, during the ensuing months, Mr. Schulman never told
me not to trade on the information. *I interpreted the full context of the*
*conversation, and, in particular, the comment that you know*
*I can't trade it to mean that Mr. Schulman could not*
*directly trade the stock but that I could both for my*
*benefit and his.* As a result, I bought King for myself and
for a number of my investment advisor clients, including
Mr. Schulman, so that he too would benefit from the tip. I
also passed the information to a broker who was a long-time
friend of mine and eventually I shared in his trading
profits.

. . .

THE COURT: And he was trading options for your
benefit as well or buying options for your benefit?
THE DEFENDANT: After the fact that was
determined, Your Honor.
THE COURT: Now, let's go back to the dinner.
What exactly did Mr. Schulman say to you that was material
nonpublic information?
THE DEFENDANT: He said that he believed that he
had inside information because he had to give his files over
to someone at his law firm at Hunton & Williams for a
meeting with Pfizer. And then he continued to make that
King-for-a-day statement which I didn't -- I didn't get it
at first and kind of -- he said it again and kind of looked
at me like come on. And, you know, I figured it out from
there.
THE COURT: And did you say that at that dinner he
told you that King was the subject of an acquisition,
potential acquisition?
THE DEFENDANT: He didn't specifically say that
it -- come out and say King was the subject of an
acquisition. He specifically stated that he had to give his
files over. He didn't say what files. He just said he had
to give his files over to someone at Hunton & Williams for a
meeting with Pfizer. And the reference to King came in that

23

statement that it would be good to be King for a day.
THE COURT: And at some point he told you he
couldn't trade it?
THE DEFENDANT: Yes.
THE COURT: What did he say?
THE DEFENDANT: Exactly that, you know I can't
trade.
THE COURT: And what did Mrs. Schulman say during
this dinner?
THE DEFENDANT: She repeatedly told him to stop
talking about it.
THE COURT: What did she say?
THE DEFENDANT: It's not appropriate. Rob, stop it.
THE COURT: And how many times did he make the
statement that it would be good to be King for a day?
THE DEFENDANT: Twice.[46]

Klein's allocution confirms the complete absence of proof on the issue of how Schulman

expected Klein to trade or otherwise benefit from the disclosure of MNPI.  It took a feat of self-

serving "interpretation," relying on "the full context of the conversation," for Klein to read

Schulman's statement that "I can't trade on it" as a green light to trade on MNPI.  Since the "full

context of the conversation" included Ronnie Schulman "repeatedly warn[ing] her husband that

his comments were inappropriate and he should stop discussing the matter," Rob's statement is

far more reasonably "interpreted" as a directive *not* to trade on MNPI.[47]  Either way, no possible

"interpretation" of Schulman's statements to Klein supports a non-speculative inference that

Schulman expected Klein to trade for the benefit of third parties. To find otherwise would

impermissibly shift the burden of proof, requiring Schulman to prove that he expected Klein's

trading to be limited in scope. But the government—not Schulman—bears the burden of proving

---

[46] Transcript of Klein plea proceedings, July 25, 2017, at 16-19 (emphasis added).
[47] Rob and Ronnie Schulman were joint clients of Klein, with obvious common interests. Ronnie spent more time with Klein and was more involved in the couple's finances. Tr. 736-44. If she was repeatedly telling her husband to stop talking about King, there can be no doubt that Klein understood that Ronnie Schulman did not want Klein trading on potential MNPI. Tellingly, Klein did not mention Ronnie Schulman's intent at all during his allocution.

the scope of an insider trading conspiracy. *See Geibel*, 369 F.3d at 692 ("government failed to establish the single conspiracy").

Moreover, Klein's "interpretation" that Rob meant that "he could not directly trade the stock but that I could both for my benefit and his" makes little sense. If Schulman believed that he should not buy King stock in his own accounts, why would that statement imply that Klein should buy King stock in Schulman's account? The result is precisely the same—a trade clearly linked to an account in Rob Schulman's name--government inquiry to follow. And if Klein interpreted the statement to mean that Klein should trade for Klein's own benefit, why would that suggest that Rob Schulman would want Klein to make multiple trades in King for the benefit of others, increasing the risk of government inquiries? At most, Klein's allocution suggests that the only foreseeable trading would have been in Klein's personal account for Klein's own benefit.  Any other inference would be speculation.[48]

---

[48] In addition to underscoring the thinness of the government's proof, Klein's allocution is simply not credible.  *First*, Klein now admits he lied under oath to the SEC. Meanwhile, Rob Schulman's version of the conversation has not changed, and his memory remains the most consistent with the subsequent facts. *Second*, Klein said that Ronnie Schulman was present during the conversation, and repeatedly told Rob to stop talking about King. Yet Ronnie's testimony directly contradicted Klein's version of events. She recalled no such conversation. *Third*, although Klein said that Rob "had to give his files over to someone at Hunton & Williams for a meeting with Pfizer," the government introduced no evidence that the firm requested Schulman's files. If Schulman had been asked to gather and organize files for a due diligence meeting with Pfizer, he likely would have billed for it. Yet he never billed a single minute to "Project Pain," the billing designation for Hunton & Williams' response to King's preliminary due diligence requests. Tr. 105-06; MJOA, Dkt. 122, at 11-15. *Fourth,* Klein's supposed "interpretation" relied heavily on Rob's failure to tell him *not to trade* the next day, or in the months that followed. But Rob's silence cannot be twisted into a direction *to trade*. Klein knew that Rob had something stupid, and that Ronnie had told her husband repeatedly to stop talking. Klein woke up in the Schulmans' home the next morning. Klein knew that Ronnie would never have wanted him to trade. He knew that Rob Schulman made a million dollars a year, and that a small profit from trading in King stock would have meant little or nothing to the Schulmans. He suspected that something was going on with King, without knowing the details. But that morning, and in the months that followed, Klein never asked Rob anything about King, even after Shechtman's first set of options expired worthless in September. Klein didn't ask because

Therefore, the only gain attributable to Rob Schulman is the $15,500 he personally gained from the King stock. Under § 2B1.4(b)(1), the base offense level is increased by 4 levels per § 2B1.1(b)(1)(B).[49] (*See* PSR ¶ 36.) The adjusted offense level (PSR ¶ 40) and total offense level (PSR ¶ 43) is 14.[50]

Even adding Klein's profits of $8,000 to Schulman's gain does not reach the next threshold of $40,000 under § 2B1.1(b)(1)(D). If the Court relies on Klein's allocution for foreseeability, the relevant threshold would still result in a total offense level of 14.

**B.     The "Obstruction of Justice" enhancement is inapplicable.**

The PSR did not apply a 2-level enhancement for obstruction of justice under U.S.S.G. 3C1.1. The government objected, arguing that Rob's statements to the SEC and the prosecution qualified for the enhancement. The government is wrong as a matter of law. As the guideline states, an enhancement for obstruction of justice is appropriate if (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense. § 3C1.1.

"The willfulness requirement means that the enhancement 'is appropriate only upon a finding that the defendant had the specific intent to obstruct justice, i.e., that the defendant

---

he knew what Rob's answer would have been—"of course I don't want you to trade in King stock, and I don't know anything more than there was a preliminary meeting between King and Pfizer attorneys to discuss King's prior patent litigation."

[49] Under § 2B1.1(b)(1), add two levels for gain exceeding $6,500; add four levels for gain exceeding $15,000; and add six levels for gain exceeding $40,000.

[50] By definition, all loss thresholds are arbitrary. That the $15,500 in profits increases the offense level by four levels, while $500 less in trading profits would increase the offense level by two levels less, should be considered in the heartland and variance analyses. That $500 difference is roughly 3% of the total profits in Rob's retirement account.

consciously acted with the purpose of obstructing justice.'" *United States v. Zagari*, 111 F.3d 307, 328 (2d Cir.1997) (quoting *United States v. Defeo*, 36 F.3d 272, 276 (2d Cir.1994)). Thus the guideline requires the court to find that the defendant, with the specific purpose of obstructing justice, made a statement that (1) was false; (2) he knew was false; (3) was material to the proceeding in which it was made; and (4) was material to the offense for which he was been convicted. *United States v. Rajaratnam*, 09-Cr.-1184 (RJH), 2012 WL 362031, at *18 (S.D.N.Y. Jan. 31, 2012).

The enhancement is improper where defendant's conduct does not significantly impede the investigation. *See United States v. Khimchiachvili*, 372 F.3d 75, 82 (2d Cir. 2004) (vacating sentence based on finding that obstruction enhancement was not warranted and explaining that "it is not enough to simply say that the false statements were material because they had an effect on some discrete action taken by a magistrate judge; that effect or its intention must be to somehow impede the search for justice.")

Here is Rob's relevant SEC testimony:

> Q "QUESTION: Did you tell anyone about any knowledge you had regarding a potential merger or acquisition of King Pharma?"
> A "ANSWER: No. I never told anybody. The best I can think of that I did, and I've been trying to think about this, is there was one evening when Mr. Klein was at my house where I did mention, and I kind of make a joke with him, 'boy, it would be nice to be king for a day.' And I made some joke with him about that. And at that point I would have never told him anything about their meeting, there's a potential merger, it would have been much more in the nature of 'hey, wouldn't it be great to be king for a day, ha, ha, ha,' kind of like telling him, like acting like I am a big shot and I know this thing. But that's the extent of what I would have communicated to him.[51]

---

[51] Tr. 174-5.

Here is the agent's testimony about Rob's statements to the EDNY in his voluntary interview:

> Q Now, did the defendant indicate whether or not he
> discussed King Pharmaceuticals the weekend of August 13, 2010
> when he met with Klein?
> A He did mention that he mentioned the word "King" during
> that meeting, yes.
> Q Can you tell us what exactly he said?
> A The defendant said that at some point in the evening, he
> and his wife and Mr. Klein were sitting at his kitchen table
> when he uttered the phrase, "Hey, I would like to be king for
> a day."
> Q Did the defendant provide you with any context for this
> statement?
> A No. We asked him what conversation preceded that, but he
> could not recall.
> Q Did he say what -- he couldn't recall a conversation or
> context for the statement?
> A No. There was nothing else that he was able to add,
> whether it was before, what led up to that comment.[52]

Rob has always admitted that he said something he shouldn't have. The issue is whether Rob intended that Klein trade on whatever he said. To this day, Rob does not recall mentioning Pfizer to Klein on August 13, 2010. A failure of recollection is not a knowing lie. His testimony to the SEC was a combination of what he recalled, and what he thought he "would have said," or "never would have said."  Testimony about what he "would have save said," or "never would have said," even if inaccurate, does not qualify as an intentional lie. A defendant "may give inaccurate testimony due to confusion, mistake, or faulty memory" or the defendant's testimony "may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent." *United States v. Dunnigan*, 507 U.S. 87, 96 (1993). The

---

[52] Tr. 173.

undisputed evidence at trial did not support an inference that Rob said more than "it would be nice to be King for a day."[53]

In its submission to probation, the government argued that Tibor Klein's plea allocution supported an enhancement for obstruction of justice. Klein's allocution is a mixed bag for the government. In rebuttal summation, government counsel repeatedly argued that Michael Shechtman's testimony "confirm[ed] exactly what [Schulman] said that night, that Pfizer is going to acquire King."[54] That argument never made any sense; all Rob knew was that Pfizer and King attorneys were meeting to discuss a prior patent litigation. No one knew that Pfizer would acquire King on August 13—Pfizer didn't announce the deal until October 12, two months later. MJOA, Dkt. 122, at 11-24.

At his guilty plea, Klein denied the government's theory:

> THE COURT: And did you say that at that dinner he
> told you that King was the subject of an acquisition,
> potential acquisition?
> THE DEFENDANT: He didn't specifically say that
> it -- come out and say King was the subject of an
> acquisition. He specifically stated that he had to give his
> files over. He didn't say what files. He just said he had
> to give his files over to someone at Hunton & Williams for a
> meeting with Pfizer. And the reference to King came in that
> statement that it would be good to be King for a day.[55]

So if Klein is to be believed, Schulman did not say "exactly" what the government told the jury he said. Klein's allocution was consistent with Rob's testimony that he would not have mentioned an acquisition. Rob was testifying in 2012 about a conversation that happened in 2010. None of this adds up to a knowing lie.

---

[53] MJOA, Dkt. 122, at 8-25; Reply, Dkt. 131, at 35-45.
[54] MJOA, Dkt. 122 at 2, citing Transcript at 1142.
[55] Transcript of Klein plea proceedings, July 25, 2017, at 18.

Significantly, at the very first sign that Klein's trading in King had been discovered by the authorities, Rob's conduct was anything but obstructive. One of the truths that the government prevented the jury from hearing and seeing was Rob Schulman's emails to his firm in response to the April 2011 FINRA inquiry about trading in King stock.  The government moved in limine to prevent the defense from introducing two emails Rob Schulman wrote in April. Dkt. 60. FINRA sent Hunton & Williams a list of individuals and entities that had traded in King before the Pfizer acquisition. Tibor Klein was on the list. A Hunton employee sent out a group email asking attorneys who had worked on King whether they recognized any of the names on the list. On April 8, at 3:38 p.m., Rob replied by email that Klein was his financial advisor. Rob wrote: "As he manages my portfolio without my input, I called to inquire whether I ever had a position in the stock and he confirmed that I did not." Dkt. 60 at 2. Less than 30 minutes later, Rob wrote another email to the same Hunton employee, saying: "Correction. My broker informed me that I did have 27k position in this. I did not know about this." Dkt. 60 at 3.

The government argued that these exculpatory emails were irrelevant to Rob's intent, and were inadmissible hearsay even if Rob were to take the stand. Dkt. 60 at 4-5. Without Klein as a witness, the defense had no way to get those emails into evidence, and the jury never saw them. But those emails demonstrate that Schulman was not trying to cover up his conduct with a fabricated story.  They make little sense if Schulman intended to obstruct justice.[56]

The PSR is correct. No enhancement for obstruction of justice applies on these facts.

---

[56] The emails also significantly undermine Klein's version of events in his allocution. If Klein "interpreted" Rob's statements as a criminal agreement, and recalled the event clearly, why did he tell Rob in the first phone call that he had not bought King stock for the Schulmans?

**C.**   **Downward departures from the guidelines are appropriate.**

      **1.**   **Schulman's conduct qualifies as aberrant behavior.**

Section 5K2.20 permits the Court to depart downward "if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." § 5K2.20(b); *see* App. Note 3 (court may consider defendant's employment record, record of prior good works and motivation for committing the offense). At trial, the government's theory was that Rob Schulman made a brief, one-time disclosure of confidential information at dinner in his home on a Friday night. There was no evidence that Rob planned the conversation. Indeed, the principal purpose of Klein's visit was to discuss issues arising from the death or Ronnie's father. There was no evidence that Klein talked to Rob about King again until the FINRA inquiry in April 2011, eight months later. Klein's trading in King was "of limited duration"—he bought King stock in August, and sold it by October

At the time of the offense, Rob Schulman was 52, had no criminal record, and had never before acted on any of the material non-public information he had learned during his successful career as a patent attorney. Rob was not materialistic or greedy; **Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted**   *See* section I.E. above. This unplanned, limited duration event, if done with criminal intent, "represents a marked deviation by the defendant from an otherwise law-abiding life," warranting a downward departure for aberrant behavior. *See United States v. Patterson*, 281 F. Supp. 2d 626 (E.D.N.Y. 2003) (approving aberrant conduct departure where

the criminal act was spontaneous and involved no planning in defendant's otherwise law-abiding life).

**2.     Schulman's conduct was "outside
the heartland" of insider trading cases.**

A downward departure is warranted because Rob's alleged conduct was "outside the heartland" of insider trading cases. U.S.S.G. § 5K2.0; *see Koon v. United States*, 518 U.S. 81, 96 (1996) (approving downward departure where criminal conduct is outside of the "heartland" of cases covered by the guideline). Rob's personal circumstances compared to his gain from the offense were disproportionate and atypical. Klein's purchases of King stock resulted in a profit of only $15,500 in Schulman's retirement account. Schulman made more than $15,000 a week from practicing a profession he loved.

Schulman's limited knowledge of the Pfizer/King negotiations, and the two-month gap between Rob's "tip" and the Pfizer acquisition of King, were also atypical. Schulman knew only that King and Pfizer attorneys had met to discuss prior patent litigation on August 4. He told Klein "it would be nice to be King for a day" on August 13. Pfizer did not announce its acquisition of King until October 12, 2010. The government did not introduce any evidence that notice of a meeting in early August, followed by two months of inactivity, would have moved King's stock price in any material way. Shechtman lost money when his options expired in mid-September. Indeed, even Shechtman's second options purchase made it just under the wire. If the acquisition of King had occurred one week later, Shechtman would have lost money.

King's stock had traded at the acquisition price before. Insider trading is mostly a victimless crime; given these facts, unusually so here.

Because of his profession, sterling reputation, and income, Rob Schulman has already suffered atypical punishment. The sentencing letters show Rob's passion for patent law. His

32

inability to practice, the loss of contact with colleagues and clients, and the loss of reputation have been devastating to Rob. **Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted** He has spent hundreds of thousands of dollars trying to defend his innocence, and he has lost his substantial income as an attorney since late 2016. If Klein's trading in Rob's retirement account had resulted in profits of $15,000, instead of $15,500, Rob's guidelines would be two levels lower.

The government's theory that Rob intended to make a gift to Klein provides an independent basis for the Court to depart downward. *See United States v. Blarek*, 7 F. Supp. 2d 192, 211 (E.D.N.Y. 1998) (concluding defendant's case was "outside of the heartland" of racketeering and money laundering conspiracy cases because defendant did not act out of "pure personal greed or avarice.")

To the extent any motive can be imputed to Rob's conduct, it was misplaced trust in Klein and ego. (*See* PSR ¶ 32.) Rob's state of mind distinguishes the case from the "heartland" cases covered by the Guidelines. Rob's small, one-time gain compared to his personal finances and non-materialistic lifestyle, his limited knowledge of the negotiations, the long gap between the tip and the acquisition, his supposed altruistic motive in making a "gift" to Klein, and the atypical punishment Rob has already suffered warrant an "outside the heartland" downward departure.

## III.   CONSIDERATION OF THE 3553(A) FACTORS COUNSELS LENIENCY

### A.   Extraordinary family circumstances

By statutory mandate, in determining the particular sentence to be imposed, the Court shall consider any pertinent policy statement issued by the Sentencing Commission. 18 U.S.C. § 3553(a). The application notes to the relevant Guidelines policy statement provide that a departure based on the loss of caretaking or financial support may be warranted where "no

effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family." Application Note 5H1.6(1)(B). The Second Circuit has clarified that the departure is not on behalf of the defendant himself, but on behalf of the family. *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992).

Rob's critical roles as a caretaker for his parents and sister warrant a downward departure. Rob's frail parents, 88 and 86, rely on Rob to allow them to stay in the home where they have lived for more than sixty years. Any substantial sentence realistically might mean that one or both of them would never see their son again. Multiple sclerosis is progressively disabling Rob's childless sister, Gerri. The entire Schulman family counts on Rob to take care of her. *See* section I.C. above.

The Schulmans represent the special situation of a "close-knit family whose stability depends on [Rob's] continued presence." *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (affirming the sentencing court's finding that "incarceration in accordance with the Guidelines might well result in the destruction of an otherwise strong family unit."); *see United States v. Deutsch*, 104 F. App'x 202, 204 (2d Cir. 2004) (finding downward departure was justified where none of defendant's relatives was capable of caring for his family for any extended period of time).

### B. <u>Commitment to charitable works</u>

Charitable works are a recognized ground for variance under 18 U.S.C. § 3553(a). *See United States v. Canova*, 412 F.3d 331, 359 (2d Cir. 2005). Rob Schulman has demonstrated a lifelong commitment to community service, charitable work, and improving the lives of others. Even under the mandatory guidelines system, a court was authorized to grant a downward departure on the basis of good works if the factor is "'present to an exceptional degree or in some

34

other way makes the case different from the ordinary case where the factor is present.'" *Id.* at 358 (quoting *Koon v. United States*, 518 U.S. 81, 96 (1996)); *see also United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming downward departure based on charitable fundraising work); *United States v. Greene*, 249 F. Supp. 2d 262, 264 (S.D.N.Y. 2003) (downward departure for extraordinary charitable works and community need not be based on large dollar philanthropy, because commitment of defendant's time was "a much more valuable commodity"). The sentence that Mr. Schulman receives should reflect not only his offense but also his good deeds.

Letters from family, friends, and work colleagues show that Rob has consistently provided love and support to others: he helped **Redacted** his daughter's friend; **Redacted Redacted Redacted**; provided loyal support and care to a **Redacted Redacted Redacted** mentored young lawyers, including aiding the recovery of an alcoholic young associate; worked at local charity events and helped a **Redacted**    . *See* sections I.B. and D. above. Since the jury's verdict, Rob has devoted himself to charitable works, using his love for gardening, to help others. *See* section I.F. above.

Rob derived no financial or reputational benefit from these charitable works. *See United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) (emphasizing importance of good deed "not performed to gain status or enhance image"), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). He has lived a generous, exemplary life. A variance is appropriate.

**C.     A sentence of probation with substantial community
         confinement is sufficient to satisfy the 18 U.S.C. 3553 sentencing factors.**

**1.     The nature and circumstances of the offense
         and the history and characteristics of the defendant**

Under 18 U.S.C. § 3553(a)(1), the Court should consider "the nature and circumstances of the offense and the history and characteristics of the defendant." For the reasons stated above, both the nature and circumstance of the offense, and the history and characteristics of the defendant, are atypical. The offense was unplanned, of limited duration, and resulted in an unknown gain of $15,500 in the retirement account of a successful lawyer who made more money than that every week.

The defendant was 52 years old, who had repeatedly received MNPI in his long and successful legal career without trading on it. He was a loving husband and father who provided care and support to others. He mentored young lawyers; **Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted**; performed random acts of kindness. He is a critical caregiver to aging partners and a progressively disabled sister.

The nature of the offense, and the nature of the alleged offender, merit mercy.

**2.     The need for just punishment,
         deterrence, societal protection, and rehabilitation**

As set forth in 18 U.S.C. § 3553(a)(2), the Court should consider the need for the sentence imposed to: (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; and (B) afford adequate deterrence to criminal conduct.[57]

---

[57] The other two purposes of § 3553(a)(2) are not of concern here.  Rob has no criminal history and is not a threat to society.  He is educated, self-sufficient, does not abuse alcohol or illicit substances, and is well established with a stable family that he has always supported; he is not in need of training or rehabilitation services provided by the Bureau of Prisons to inmates.

The impact of the federal prosecution on Rob Schulman can hardly be exaggerated. The conduct underlying this case occurred between May 2009 and December 2010. Rob's involvement began and ended on August 13, 2010, when he made an ill-advised joke to Klein. Rob did not learn that Klein had traded in his account until April 2011, when the FINRA inquiry began. To say that the ensuing prosecution and trial has cast a shadow over Rob's life and that of his family would be a monumental understatement. A respected attorney and a pillar of strength for his family now, at the age of 59, finds himself **Redacted Redacted Redacted Redacted Redacted Redacted**. (PSR ¶ 60.) **Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted Redacted** He tries to keep busy by performing charity and spending time with his family, but it is difficult to find comfort and joy in his life. (PSR ¶¶ 60-61.)

In addition to his awareness that the government apparently will be seeking a prison term, Rob faces a myriad of collateral punishments. These include financial sanctions, loss of reputation and standing in the community, loss of his license to practice law, and the recognition that his mistakes and failings have created trauma and hardship for his wife, children, siblings, and parents. In her letter to the court, Rob's wife shares how difficult it has been "watching the anguish of our children throughout the past year" and witnessing the toll the case has had on them.[58]

Rob Schulman is not criminogenic by nature. To the contrary, he has, as the many letters submitted on his behalf clearly indicate, always demonstrated the highest degree of responsibility for his family and concern for his colleagues, friends, and community. The risk of him ever reoffending is essentially non-existent. Putting aside that Rob's behavior was an aberration from

---

[58] Letter of Ronnie Schulman, Tab 1 in Sentencing Letters Submission.

his otherwise law-abiding life, as a practical matter his age makes him an unlikely candidate to commit future crimes. *See United States v. Hodges*, No. 07 Cr. 706, 2009 WL 36231, at *8 (E.D.N.Y. Feb. 12, 2009) (sentencing 43-year old defendant to non-Guideline sentence and noting that "post-Booker, courts have observed that recidivism is markedly lower for older defendants"); *United States v. Lucania*, 379 F. Supp. 2d 288, 298 (E.D.N.Y. 2005) (fashioning a non-guideline sentence because the Guidelines "do not take into account the inverse relationship between age and recidivism."); *United States v. Eberhard*, No. 03 CR. 562-01 (RWS), 2005 WL 1384038, at *10 (S.D.N.Y. June 9, 2005) (finding 41-year old convicted of fraud offenses unlikely candidate for future criminal conduct based on age and lack of prior criminal conviction).

With respect to general deterrence, the wave of publicity that followed Rob's arrest and conviction put the world on notice to the serious consequences for lawyers and others who have MNPI and believe they can get away with disclosing the information to close friends or personal confidants, particularly in informal conversations.  After his arrest, Rob was branded the "tipsy lawyer" who tipped his financial advisor in articles on Law360, Above the Law, and other legal news publications, and details of the indictment spread beyond the patent bar to the wider legal community.

In *United States v. Adelson*, Judge Rakoff noted that there was no reason to give the white-collar defendant a long prison sentence on the basis of general deterrence.  441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).  There is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."  441 F. Supp. 2d at 514.  In this case, even a non-custodial sentence will send

an unmistakable message to the white collar community that conduct like Rob's simply will not be tolerated.  *See* § 3553(a)(2)(B).

Rob's life will never be the same.  He will forever bear the burden and shame or this prosecution and conviction.  Given the manifold punishments that have already begun, and will continue into the future, ample retribution can be imparted without a custodial sentence.

## **CONCLUSION**

Robert Schulman asks for mercy. We ask that the Court impose a sentence of probation with requirements for documented public service totaling 1,000 hours.

Respectfully Submitted,

_____/s/_____
Christopher B Mead
London and Mead
1225 19th Street, NW, Suite 320
Washington, DC 20036
202-331-3334
Fax: 202-785-4280
cmead@londonandmead.com


_____/s/_____
Mark D. Harris
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
212-969-3530
Fax: 212-960-2900
mharris@proskauer.com


_____/s/_____
Jonathan S. Sack
Curtis B. Leitner
Morvillo Abramowitz Grand
Iason & Anello P.C.
565 Fifth Avenue
New York, NY 10017
212-856-9600
Fax: 212-856-9494
jsack@maglaw.com
cleitner@maglaw.com

*Counsel for Defendant Robert Schulman*

40